KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Adam C. Rogoff
P. Bradley O'Neill
Gregory A. Horowitz
Natan M. Hamerman
David E. Blabey Jr.

*Attorneys for Defendants*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| BH SUTTON MEZZ LLC, *et al.*, | Case No. 16-10455 (SHL) |
| Debtors. | (Jointly Administered) |
| BH SUTTON MEZZ LLC, a Delaware Limited Liability Company, SUTTON 58 OWNER LLC, a Delaware Limited Liability Company, and SUTTON 58 OWNER LLC, a New York Limited Liability Company, | Adv. No. 16-01187 (SHL) |
| Plaintiffs, | |
| -against- | |
| SUTTON 58 ASSOCIATES LLC, GAMMA LENDING S58 LP, GAMMA LENDING S58 II LP, GAMMA FUNDING LP, GAMMA FUNDING MANAGEMENT LP, GAMMA FUNDING, LLC and GAMMA REAL ESTATE LLC, | |
| Defendants. | |

## **DEFENDANTS' PRE-TRIAL BRIEF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ...................................................................................................................................4

CHOICE OF LAW ...................................................................................................................4

ARGUMENT ...........................................................................................................................5

I.    Debtors Cannot Escape Their Contractual Obligations To Defendants by Blaming
Their Counsel or Claiming Not To Have Reviewed Documents They Signed .................5

II.   Defendants Are Entitled To Judgment On the Breach of Contract Claims (Claims
1-5, 20)........................................................................................................................6

    A.    Defendants Did Not Breach the Gamma 1 Loan Documents, Gamma 2
Loan Documents, or Kalikow Lender Term Sheet (Claims 1-3)............................6

        (i)    The Defendants Did Not Breach the Gamma 1 Loan Documents –
Nor Are There Any Allegations That They Did ........................................6

        (ii)   The Defendants Did Not Breach the Gamma 2 Loan Documents
Because Their Actions Were Consistent With Rights Thereunder.............7

            (a)    The Defendants Properly Retained Various Reserve Funds        8

            (b)    The Defendants Properly Processed Draw Requests        10

            (c)    The Defendants Did Not "Fabricate" Defaults        11

        (iii)  The Defendants Did Not Breach the Kalikow Lender Term Sheet
Because It Was a Non-Binding Agreement ...............................................12

    B.    The Debtors Are Not Entitled To a Declaration Regarding the "Fabricated
Default" (Claim 4) ..............................................................................................12

    C.    The Claim for Breach of the Implied Covenant of Good Faith and Fair
Dealing Is Duplicative of the Breach of Contract Claims (Claim 5)....................13

    D.    The Unjust Enrichment Claim Is Duplicative of the Breach of Contract
Claims (Claim 20)...............................................................................................14

III.  The Defendants Are Entitled To Judgment On the Tortious Interference Claims
(Claims 6 & 7) ...........................................................................................................14

    A.    The Claim for Tortious Interference With Contract Fails (Claim 6) .....................14

        (i)    The Defendants Did Not Procure a Breach of Contract By JLL ..............15

        (ii)   The Defendants Did Not Procure a Breach of Contract By Foster +
Partners ..................................................................................................16

        (iii)  The Defendants Did Not Procure a Breach of Contract By Any Of
the Debtors' Other Contract Counterparties ............................................16

    B.    The Claim for Tortious Interference With Economic Opportunity Fails
(Claim 7) ............................................................................................................17

i

|  |  | (i) | The Defendants Did Not, and Could Not, Tortiously Interfere With Business Relations Embodied In Existing Contracts | 18 |

|  |  | (ii) | The Defendants Did Not Tortiously Interfere With the Debtors' Relationships With Potential Alternative Sources of Financing | 18 |

IV. The Defendants Are Entitled To Judgment On the Unconscionability Claims (Claims 9 & 10) ........................................................................................ 20

    A. The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Unconscionable (Claim 9) ........................................................................ 21

        (i) The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Procedurally Unconscionable ............................................ 21

        (ii) The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Substantively Unconscionable ............................................ 24

    B. The Apartment Option Contract Is Not Unconscionable (Claim 10) .................... 25

V. The Defendants Are Entitled To Judgment On the Criminal Usury Claim (Claim 11) ............................................................................................................ 26

    A. The Building Loan Is Part of the Overall $147 Million Gamma 2 Financing ............................................................................................ 27

    B. There Is No Private Cause of Action for Criminal Usury ..................... 29

    C. The Usury "Savings Clause" Precludes a Finding of Criminal Intent .................. 31

VI. The Defendants Are Entitled To Judgment On the Equitable Subordination or Equitable Disallowance Claim (Claim 17) ........................................................ 31

    A. Equitable Subordination Is an "Extraordinary Remedy" That Is Rarely Applied To Non-Insiders ................................................................... 32

    B. The Defendants Are Not Insiders of the Debtors ................................... 33

    C. The Alleged Inequitable Conduct Falls Far Short of Supporting a Claim for Equitable Subordination ................................................................. 35

        (i) Attorney Kalikow's Alleged Conflicts Cannot Be Used as a Basis for Subordinating Defendants' Claims .................................... 35

        (ii) The Herrick Waiver Letter Provides No Basis for Subordination ............ 36

        (iii) The Defendants' Alleged "Loan-to-Own" Strategy Provides No Basis for Subordination ...................................................... 37

    D. That Part of Claim Seventeen Seeking Equitable *Disallowance* Should Be Dismissed Because the Bankruptcy Code Recognizes No Such Claim ................ 38

VII. The Defendants Are Entitled To Judgment On the Debtors' "Objection to Claim" (Claim 18) ............................................................................................. 39

VIII. The Defendants Are Entitled To Judgment On the Lender Liability, Breach of Fiduciary Duty, and Breach of Duty of Loyalty Claims (Claims 21-23) .................... 40

    A. The Defendants Did Not Exercise Control Over the Debtors Sufficient to Transform Their Role From Traditional Lender to Fiduciary ................................ 41

B.      To the Extent Courts Recognize a Claim for "Lender Liability," the Claim
        Must Be Dismissed for the Same Reasons As the Fiduciary Duty Claim ............42

IX.   The Defendants Are Entitled To Judgment On the Fraudulent Transfer Claims
      (Claim 24) ............................................................................................................43

      A.      The Debtors Cannot Meet Their Burden of Proof On the Constructive
              Fraudulent Transfer Claim .........................................................................44

              (i)     The Debtors Cannot Prove They Received Less Than Reasonably
                      Equivalent Value..............................................................................44

              (ii)    The Debtors Cannot Prove They Were Insolvent ...................................45

      B.      The Debtors' Intentional Fraud Claim Does Not Allege the Requisite
              Fraud On the Part of the Debtor-Transferor ...........................................46

X.    The Defendants Are Entitled To Judgment On the Preferential Transfer Claim
      (Claim 25) ............................................................................................................47

XI.   The Defendants Are Entitled To Judgment On the Improper UCC Sale Claim
      (Claim 26) ............................................................................................................48

XII.  The Debtors' Recovery Is Limited to Direct, Not Consequential, Damages.....................50

      A.      The Debtors Have Waived Consequential Damages ...............................................50

      B.      The Debtors' Claims for Lost Profits, Lost Investment Opportunity,
              Damage to Reputation, and Attorneys' Fees Must Be Disallowed .......................51

XIII. The Withdrawn Claims Should Be Dismissed With Prejudice ...........................................53

CONCLUSION.................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*437 Madison Ave. Assocs. v. A.T. Kearney, Inc.*,
488 N.Y.S. 2d 950 (N.Y. App. Div. 1985) ...........................................................................51

*455 CPW Assocs. v. Greater N.Y. Savs. Bank (In re 455 CPW Assocs.)*,
225 F.3d 645 (2d Cir. 2000)..................................................................................33, 35

*In re 80 Nassau Assocs.*,
169 B.R. 832 (Bankr. S.D.N.Y. 1994)....................................................................33

*A.N.R. Inv. Co. v. HSBC Private Bank*,
135 A.D.3d 632 (N.Y. App. Div. 2016) ..................................................................14

*Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*,
-- F. App'x --, 2016 WL 3315847 (2d Cir. Jun. 15, 2016) ....................................46

*In re Aeropostale, Inc.*,
555 B.R. 369 (Bankr. S.D.N.Y. Aug. 26, 2016) .......................................... *passim*

*Airbus DS Optronics GmbH v. Nivisys LLC*,
No. 14-2399, 2016 WL 2342060 (D. Ariz. May 2, 2016) ......................................43

*Airlie Opportunity Fund, L.P. v. Scion Commc'n Partners LLC*,
No. 09-26679 (N.Y. Sup. Ct. Jan. 24, 2011) ..........................................................31

*Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Cap. LLC)*,
531 B.R. 25 (Bankr. S.D.N.Y. 2015)......................................................................21

*Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*,
70 A.D.3d 423 (N.Y. App. Div. 2010) ...................................................................13

*In re AMR Corp.*,
490 B.R. 158 (Bankr. S.D.N.Y. 2013)....................................................................33

*Arthur Young & Co. v. Fleischman*,
85 A.D.2d 571 (N.Y. App. Div. 1981) ...................................................................13

*Arvildsen v. Prystay*,
574 N.Y.S.2d 535 (N.Y. App. Div. 1991) ..............................................................26

*Asturiana De Zinc Mktg., Inc. v. LaSalle Rolling Mills, Inc.*,
20 F. Supp. 2d 670 (S.D.N.Y. 1998).......................................................................53

*Aylaian v. Town of Huntington*,
459 F. App'x 25 (2d Cir. 2012) ...............................................................................5

*Bank of Am., N.A. v. Corporex Realty & Inv. Corp.,*
    -- F. App'x --, 2016 WL 4376434 (6th Cir. Aug. 17, 2016)............................................37, 54

*Beattie v. Brown & Wood,*
    243 A.D. 2d 395 (N.Y. App. Div. 1997) ..............................................................................5

*Benjamin v. Diamond (In re Mobile Steel Corp.),*
    563 F.2d 692 (5th Cir. 1977) ............................................................................................32

*Binghamton Masonic Temple, Inc. v. City of Binghamton,*
    602 N.Y.S. 2d 310 (N.Y. Sup. Ct. 1993) ........................................................................51

*Bonanni v. Straight Arrow Publishers, Inc.,*
    133 A.D.2d 585 (N.Y. App. Div. 1987) ...........................................................................17

*Brownie's Army & Navy Store, Inc. v. Burke,*
    72 A.D. 2d 171 (N.Y. App. Div. 1980) ............................................................................53

*Bus. Networks of N.Y., Inc. v. Complete Network Solutions Inc.,*
    265 A.D.2d 194 (N.Y. App. Div. 1999) ...........................................................................20

*Carvel Corp. v. Noonan,*
    3 N.Y.3d 182 (N.Y. 2004) .........................................................................................18, 19

*Carvel Corp. v. Noonan,*
    350 F.3d 6 (2d Cir. 2003) ...............................................................................17, 19, 20

*Cary Oil Co. v. MG Ref. & Mktg., Inc.,*
    90 F. Supp. 2d 401 (S.D.N.Y. 2000)................................................................................42

*Cede & Co v. Technicolor, Inc.,*
    542 A.2d 1182 (Del. 1988) ...............................................................................................54

*Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.,*
    494 N.Y.S.2d 602 (N.Y. Sup. Ct. 1985) ..........................................................................51

*Clark-Fitzpatrick, Inc. v. Long Island R.R.,*
    70 N.Y.2d 382 (N.Y. 1987) ..............................................................................................14

*Coppola v. Bear Stearns & Co.,*
    499 F.3d 144 (2d Cir. 2007)..............................................................................................43

*Corsello v. Verizon New York, Inc.,*
    18 N.Y.3d 777 (N.Y. 2012) ..............................................................................................14

*Cosoff v. Rodman (In re W.T. Grant Co.),*
    699 F.2d 599 (2d Cir. 1983)........................................................................................34, 41

*Cruz v. FXDirectDealer, LLC,*
    720 F.3d 115 (2d Cir. 2013)..............................................................................................13

*Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*,
No. 01-6209, 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002)............................................34, 45

*Dimino v. Fisher (In re Dimino)*,
429 B.R. 408 (Bankr. E.D.N.Y. 2010)...........................................................................44

*DiVittorio v. Equidyne Extractive Indus., Inc.*,
822 F.2d 1242 (2d Cir. 1987)......................................................................................47

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
755 F.2d 239 (2d Cir. 1985)........................................................................................54

*Evra Corp. v. Swiss Bank Corp.*,
673 F.2d 951 (7th Cir. 1982) ..................................................................................51, 53

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.*,
131 A.3d 842 (Del. Ch. 2016)......................................................................................54

*Five Star Development Resorts Communities, LLC v. iStar RC Paradise Valley,
LLC.*,
No. 09-2085, 2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012) ...............................................38, 51

*Funding Grp., Inc. v. Water Chef, Inc.*,
852 N.Y.S.2d 736 (N.Y. Sup. Ct. 2008) .......................................................................30

*Gillman v. Chase Manhattan Bank, N.A.*,
135 A.D. 2d 488 (N.Y. App. Div. 1987) .......................................................................23

*Gillman v. Chase Manhattan Bank, N.A.*,
73 N.Y. 2d 1 (N.Y. 1988) ..................................................................................5, 21, 23

*Gray v. Toyota Motor Sales, U.S.A., Inc.*,
806 F. Supp. 2d 619 (E.D.N.Y. 2011) ..........................................................................14

*Henneberry v. Sumitomo Corp. of Am.*,
532 F. Supp. 2d 523 (S.D.N.Y. 2007)...........................................................................17

*Hillair Capital Invs., L.P. v. Integrated Freight Corp.*,
963 F.Supp. 2d 336 (S.D.N.Y. 2013).......................................................................29, 31

*I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*,
856 F. Supp. 168 (S.D.N.Y. 1994)...............................................................................52

*ICD Holdings S.A. v. Frankel*,
976 F. Supp. 234 (S.D.N.Y. 1997)...............................................................................13

*Interpharm, Inc. v. Well Fargo Bank, N.A.*,
No. 08-Civ-11365, 2010 WL 1257300 (S.D.N.Y. Mar. 31, 2010)....................................23, 54

*Jack L. Inselman & Co. v. FNB Fin. Co.*,
   41 N.Y.2d 1078 (N.Y. 1977) ...........................................................................................15

*Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp. (In re Join-In Int'l*
   *(U.S.A.) Ltd.)*,
   56 B.R. 555 (Bankr. S.D.N.Y. 1986) ...........................................................................45

*JPMCC CIBC Bronx Apts., LLC v. Fordham Fulton LLC*,
   84 A.D.3d 613 (N.Y. App. Div. 2011) ...................................................................37, 54

*Koenig v. Slazer Enters.*,
   910 N.Y.S.2d 405 (N.Y. Sup. Ct. 2010) .......................................................................30

*Koret, Inc. v. Christian Dior, S.A.*,
   161 A.D. 2d 156 (N.Y. App. Div. 1990) ...............................................................10, 18

*Lama Holding v. Smith Barney*,
   88 N.Y.2d 413 (N.Y. 1996) .....................................................................................14, 15

*In re Lehman Bros. Holdings, Inc.*,
   541 B.R. 551 (S.D.N.Y. 2015) ......................................................................................43

*Lehman v. Roseanne Inv. Corp.*,
   106 A.D.2d 617 (N.Y. App. Div. 1984) ........................................................................31

*In re LightSquared, Inc.*,
   504 B.R. 321 (Bankr. S.D.N.Y. 2013) ...........................................................................39

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
   511 B.R. 253 (Bankr. S.D.N.Y. 2014) ..............................................................32, 37, 39

*Link v. Wabash R.R.*,
   370 U.S. 626 (1962) .......................................................................................................35

*Lippe v. Bairnco Corp.*,
   230 B.R. 906 (S.D.N.Y. 1999) ......................................................................................46

*Main Evaluations, Inc. v. State of N.Y.*,
   296 A.D.2d 852 (N.Y. App. Div. 2002) ........................................................................13

*Marshall v. Hyundai Motor Am.*,
   51 F. Supp. 3d 451 (S.D.N.Y. 2014) .............................................................................13

*Martens v. Smith Barney, Inc.*,
   No. 96-3779, 2002 WL 867666 (S.D.N.Y. May 3, 2002) .......................................5, 22

*McGill v. Parker*,
   179 A.D.2d 98 (N.Y. App. Div. 1992) ..........................................................................20

*In re Merhi*,
    518 B.R. 705 (Bankr. E.D.N.Y. 2014)............................................................29, 30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Oliver*,
    No. 15-4971, 2016 WL 344980 (S.D.N.Y. Jan. 27, 2016) ......................................22

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    84 N.Y. 2d 430 (N.Y. 1994) ..............................................................................50

*Mfrs. Hanover Trust Co. v. Yanakas*,
    7 F.3d 310 (2d Cir. 1993) .................................................................................41

*In re Mid-Island Hosp., Inc.*,
    276 F.3d 123 (2d Cir. 2002)..............................................................................41

*Murdock v. Plymouth Enters., Inc. (In re Curtina)*,
    23 B.R. 969 (Bankr. S.D.N.Y. 1982) ...................................................................44

*My Play City, Inc. v. Conduit Ltd.*,
    589 F. App'x 559 (2d Cir. 2014) .......................................................................50

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Xerox Corp.*,
    25 A.D.3d 309 (N.Y. App. Div. 2006) ...........................................................13, 14

*Nat'l Westminster Bank USA v. Century Healthcare Corp.*,
    885 F. Supp. 601 (S.D.N.Y. 1995)......................................................................43

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*,
    87 N.Y.2d 614 (N.Y. 1996) .........................................................................15, 17

*Ng v. HSBC Mortgage Corp.*,
    No. 07-5434, 2011 WL 3511296 (E.D.N.Y. Aug. 10, 2011) .................................25

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*,
    361 B.R. 369 (Bankr. S.D.N.Y. 2007) .............................................................35, 47

*NML Cap. v. Republic of Arg.*,
    621 F.3d 230 (2d Cir. 2010)...................................................................21, 24, 25

*Norlin Corp. v. Rooney, Pace Inc.*,
    744 F.2d 255 (2d Cir. 1984)..............................................................................41

*O'Toole v. Karnani (In re Trinsum Grp. Inc.)*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) .................................................................46

*Off. Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, LLC)*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) .................................................................44

*Orlander v. Staples, Inc.*,
    802 F.3d 289 (2d Cir. 2015)................................................................................6

*Pamilla v. Hosp. for Special Surgery*,
  223 A.D.2d 508 (N.Y. App. Div. 1996) ..............................................................19

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*,
  500 B.R. 371 (Bankr. S.D.N.Y. 2013) ................................................................44

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ................................................................39

*Pinky Originals, Inc. v. Bank of India*,
  No. 94-3568, 1996 WL 603969 (S.D.N.Y. Oct. 21, 1996) ..................................42

*Preifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*,
  No. 13-1320, 2013 WL 3828509 (Bankr. S.D.N.Y. Jul. 23, 2013) ......................45

*Process Am., Inc. v. Cynergy Holdings, LLC*,
  -- F.3d --, 2016 WL 5795744 (2d Cir. Oct. 5, 2016) ..........................................23

*Prof. Merch. Advance Cap., LLC v. C Care Servs. LLC*,
  No. 13-6562, 2015 WL 4392081 (S.D.N.Y. July 15, 2015) ................................30

*Roswell Capital Partners LLC v. Alternative Constr. Techs.*,
  638 F. Supp. 2d 360 (S.D.N.Y. 2009) ................................................................42

*In re Sabine Oil & Gas Corp.*,
  547 B.R. 503 (Bankr. S.D.N.Y. 2016) ................................................................32

*Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*,
  874 F.2d 88 (2d Cir. 1989) ..................................................................................54

*Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.*,
  No. 93-0388, 1995 WL 679256 (S.D.N.Y. Nov. 15, 1995) ................................52

*Schick v. Schmutz (In re Venture Mortgage Fund, L.P.)*,
  282 F.3d 185 (2d Cir. 2002) ......................................................................24, 27, 30

*Schonfeld v. Hilliard*,
  218 F.3d 164 (2d Cir. 2000) ................................................................................52

*Schwartz v. Leonard*,
  526 N.Y.S.2d 506 (N.Y. App. Div. 1988) ..........................................................53

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
  403 F.3d 43 (2d Cir. 2005) ..................................................................................47

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) ................................................................47

*Stoerchle v. Stoerchle*,
  101 A.D.2d 831 (N.Y. App. Div. 1984) ..............................................................54

*Taylor v. Gordon Flesch Co.*,
   793 F.2d 858 (7th Cir. 1986) ...........................................................................5, 22

*Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.*,
   833 F. Supp. 344 (S.D.N.Y. 1993)...........................................................................23

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
   894 F.2d 516 (2d Cir. 1990)...................................................................................51

*Travelers Ins. Co. v. 633 Third Assocs.*,
   14 F.3d 114 (2d Cir. 1994).....................................................................................53

*U.S. Bank, N.A. v. 23rd St. Dev. LLC*,
   25 Misc. 3d 1214 (N.Y. Sup. 2009)...................................................................37, 54

*Vargas Realty Enters., Inc. v. CFA W. 111 St., LLC*,
   440 B.R. 224 (S.D.N.Y. 2010)......................................................................37, 45, 54

*In re Velo Holdings, Inc.*,
   471 B.R. 201 (Bankr. S.D.N.Y. 2012) ....................................................................33

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) ......................................................................................54

*Wells Fargo Trade Cap. Servs., Inc. v. Sinetos*,
   No. 652317/2010, 2012 WL 6694407 (N.Y. Sup. Ct. Dec. 19, 2012) ...................22

*Welsbach Elec. Corp. v. MasTec N. Am. Inc.*,
   7 N.Y. 3d 624 (N.Y. 2006) ......................................................................................4

*Westside Fed. Savs. & Loan Ass'n of New York City v. Fitzgerald*,
   136 A.D. 2d 699 (N.Y. App. Div. 1988) ...............................................................54

*Windings, Inc. v. Secretary of the State of N.Y.*,
   189 Misc. 2d 417 (N.Y. Sup. Ct. 2001) ...............................................................54

*In re Winer*,
   39 B.R. 504 (Bankr. S.D.N.Y. 1984) ...................................................................5, 22

**Statutes**

11 U.S.C. § 101(31)(B)...........................................................................................33

11 U.S.C. § 510(c) .............................................................................31, 32, 38, 39

11 U.S.C. § 548.......................................................................................................43

11 U.S.C. § 548(a)(1)(A) .......................................................................................46

11 U.S.C. § 548(a)(1)(B) .......................................................................................44

11 U.S.C. § 548(a)(1)(B)(ii) ................................................................................................45, 46

Del. Code Ann. tit. 6, § 18-209(d) ...............................................................................................54

N.Y. Gen. Oblig. Law § 5-501.....................................................................................................29

N.Y. Gen. Oblig. Law § 5-501(6)(a) ...........................................................................................30

N.Y. Gen. Oblig. Law § 5-501(6)(b) .................................................................................24, 26, 29

N.Y. Gen. Oblig. Law § 5-511................................................................................................29, 30

N.Y. Ltd. Liab. Co. Law § 1003(b) ..............................................................................................54

N.Y. Penal Law § 190.40..................................................................................27, 29, 30, 31

N.Y. Penal Law § 190.42.............................................................................................................27

N.Y. U.C.C. Law § 9-612(a).........................................................................................................49

Fed. R. Civ. P. 9(b) ......................................................................................................................47

Defendants Sutton 58 Associates LLC, Gamma Lending S58 LP, Gamma Lending S58 II LP, Gamma Funding LP, Gamma Funding Management LP, Gamma Funding LLC, and Gamma Real Estate LLC (collectively, "<u>Defendants</u>") hereby submit this joint pre-trial brief in connection with the November 1 trial on the adversary complaint (the "<u>Complaint</u>") filed by BH Sutton Mezz LLC ("<u>Sutton Mezz</u>"), Sutton 58 Owner LLC (DE) ("<u>Sutton DE</u>") and Sutton 58 Owner LLC (NY) ("<u>Sutton NY</u>" and together with Sutton Mezz and Sutton DE, the "<u>Debtors</u>").[1]

## PRELIMINARY STATEMENT

1.      Touting a "fraudulent merger" theory of liability and alleging "malevolent intent," Compl. at 7, the Debtors filed their 26-count Complaint on July 13 seeking over $100 million in damages from the Defendants, their pre-petition secured lenders.  A short three months later, the playing field has shifted dramatically.  Two days ago, on the eve of trial, the Debtors withdrew their four merger-related claims, along with claims for "waste and diminution in value" and duress, and a contractual unconscionability claim.  If the aim was to appear more reasonable, it has failed.  Not only have the Debtors wasted enormous resources in pursuit of frivolous and now-abandoned claims, but the counts that remain to be litigated are equally lacking in merit.

2.      At bottom, this is the story of a sophisticated real estate developer with "stars in his eyes" – a man who negotiated flexible bridge financing for a real estate project (the so-called "Gamma 1 Financing"); was presented with numerous opportunities to turn his short term leveraged investment into a substantial profit in a quick sale; declined those sale opportunities in favor of additional debt in the hopes of an even greater return (the "Gamma 2 Financing"); repeatedly, and with gross negligence, signed binding agreements without even reading them; mismanaged the Project, squandered his opportunities, and defaulted on his debt; and now seeks to place blame for his missteps on his former attorney (who is not even a Defendant) and his

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Complaint.

arm's length lenders that provided over $147 million in financing to the Debtors when few others would. It is a cautionary tale, perhaps, but it provides no legal or factual basis for liability.

3.    As set forth further herein, and as will be shown at trial, each of the Debtors' claims fails for multiple reasons:

- Breach of Contract (Claims 1-5, 20). The Debtors' central allegation of breach – that Defendants refused to release funds from reserve accounts when requested – is refuted by ample evidence that the express conditions to release of funds were never satisfied. These conditions included the acquisition of certain neighboring real estate (the "426 Property") and the procurement of demolition permits – events that the Debtors acknowledge did not occur. The Debtors' other claim of breach – that Defendants mismanaged the disbursement of reserve funds in response to draw requests – has no factual support and seeks to hold the Defendants to disbursement procedures that are nowhere stated in the governing agreements.

- Tortious Interference (Claims 6 & 7). The tortious interference with contract claim fails because such a claim must establish that a contract *counterparty* breached its contract with the plaintiff as a result of defendant's conduct. Here, while the Debtors may have breached certain contracts with their vendors, no vendor breached its contract with the Debtors. The tortious interference with business relations claim fails because, even if the Defendants could be shown to have interfered with any relationship, they did not act "solely out of malice" or in a "criminal or independently tortious" manner, as required by the case law; instead, they acted in accordance with their contractual rights and in their own economic self-interest.

- Contractual Unconscionability (Claims 9 & 10). The unconscionability claims fail because the Debtors are sophisticated commercial actors and (as expert testimony will show) the terms of the various agreements are reasonable in the circumstances of the case, including the extraordinarily high degree of leverage. Moreover, the claims are premised, in substantial part, on the alleged misconduct of the Debtors' former attorney, and the law is clear that the misconduct of a party's attorney provides no basis for rescinding or avoiding a contract with a third party. There is no evidence of a conspiracy between the Debtors' former attorney and the Defendants.

- Criminal Usury (Claim 11). The usury claim fails because the criminal usury laws do not apply to loans over $2.5 million, and the $1.4 million Building Loan that the Debtors challenge as usurious is but one component of a $147 million financing package. In addition, there is no private cause of action for criminal usury, and the criminal usury laws require a showing of criminal intent, which is absent here.

- Equitable Subordination/Disallowance (Claim 17). The Debtors cannot meet their substantial burden with respect to the extraordinary relief of equitable subordination because: the Defendants are not insiders of the Debtors; they have neither breached a contract nor committed a tort; and the primary misconduct alleged is that of the

2

Debtors' former attorney, which cannot be attributed to Defendants.  The "equitable disallowance" claim fails because it has no statutory basis in the Bankruptcy Code.

- Objection to Claim (Claim 18).  The Debtors' objection to claim is in large part a restatement of the other claims alleged in the Complaint and should be denied for all the reasons set forth elsewhere herein.  To the extent the objection to claim complains of the inclusion of specific amounts therein, the Defendants' calculation of the claim is correct for reasons discussed below.

- Lender Liability/Breach of Duty Claims (Claims 21-23).  Because a debtor-creditor relationship is not typically a fiduciary relationship, the Debtors' claims for "lender liability," breach of fiduciary duty, and breach of the duty of loyalty depend on the establishment of control (beyond mere bargaining leverage) and/or the existence of a relationship of confidence and trust.  However, (i) as with their "insider" claims, the Debtors cannot show that Defendants exercised influence beyond that normally exerted by a lender to a financially challenged borrower, and (ii) the Debtors signed written agreements (not challenged here) in which they expressly *disclaimed* the existence of a special, confidential, or fiduciary relationship.

- Fraudulent Transfer Claims (Claim 24).  The Debtors' constructive fraud claim fails because the December 2015 pre-negotiation letter they challenge was supported by value (the opportunity to negotiate a consensual restructuring) and the Debtors were not insolvent (holding property they value at up to $1 billion).  The intentional fraud claim fails because the Debtors (as transferors) have acknowledged they did not intend to defraud their creditors, which is a prerequisite for an intentional fraud claim.

- Preferential Transfer Claim (Claim 25).  The Debtors' preferential transfer claim (which challenges a pre-petition $16.4 million setoff of reserve funds) fails because the Defendants are secured creditors and received no more from this transfer than they would have received in bankruptcy.

- Improper U.C.C. Sale Claim (Claim 26).  Before bankruptcy the Debtors sought a preliminary injunction to halt the Defendants' foreclosure sale, arguing the sale was commercially unreasonable.  The state court denied the requested relief, finding no likelihood of success on the merits.  The Debtors make the same arguments now, and they fail for the same reasons.  In addition, the claim is now moot (because the sale did not go forward) and the Debtors' contract waives any right to damages.

4.   For these and other reasons set forth below, the Defendants are entitled to judgment dismissing each of the Debtors' claims with prejudice (including the withdrawn claims).  Moreover, should the Court determine that any of the Debtors' claims have merit, the

Debtors are limited to direct damages, having waived, by contract, their right to recover special, exemplary, punitive, or consequential damages.[2]

## FACTS

5.      The relevant factual background is set forth in the declarations of Defendants' fact witnesses: Jonathan Kalikow and N. Richard Kalikow (principals of the Defendants); Richard "Richie" Kalikow (of Herrick Feinstein, former counsel to the Debtors); and Van Nguyen (an investor in the Gamma 2 Financing). In addition, contemporaneously with this pre-trial brief, Defendants are submitting the expert declaration of David Eyzenberg. Additional evidence will be adduced at trial.[3]

## CHOICE OF LAW

6.      New York courts will enforce a choice-of-law provision "so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Welsbach Elec. Corp. v. MasTec N. Am. Inc.*, 7 N.Y. 3d 624, 629 (N.Y. 2006). Here, each of the relevant agreements is governed by New York law. *See, e.g.*, Acquisition Loan Agreement, dated as of June 19, 2015, between Sutton 58 Owner, LLC and Sutton 58 Associates LLC (the "Acquisition Loan Agreement") § 8.4; Building Loan Agreement, dated as of June 19, 2015, between Sutton 58 Owner, LLC and Sutton 58 Associates LLC (the "Building Loan Agreement") ¶ 8.4; Mezzanine Loan Agreement, dated as of June 19, 2015, between BH Sutton Mezz LLC and Sutton 58 Associates LLC (the "New Mezz Loan Agreement") ¶ 8.4. Because, among other things, the real estate project that is the subject of this litigation is located in New York, the Court should honor the parties' choice of law and apply New York law to the Debtors' claims.

---

[2] On October 27, the Defendants filed a motion *in limine* seeking to preclude the testimony of the Debtors' proposed expert witness, Ronald C. Minkoff. The arguments set forth in that motion are incorporated herein by reference.

[3] References to "[witness] Declaration" are to the written direct testimony submitted by Defendants herewith.

4

<u>ARGUMENT</u>

I.   **Debtors Cannot Escape Their Contractual Obligations To Defendants by Blaming
     Their Counsel or Claiming Not To Have Reviewed Documents They Signed**

7.    The main theory of the Debtors' case, in brief, is that (i) they were represented by

conflicted counsel, and (ii) they never reviewed key transaction documents before signing them.

But while the Debtors' primary witnesses have repeatedly invoked these excuses at deposition,

neither one provides a valid basis for escaping their contractual obligations to the Defendants.

8.    First, far from excusing performance, it is well-settled that a sophisticated party's

failure to read a document before executing it constitutes *gross negligence*. *Gillman v. Chase*

*Manhattan Bank, N.A.*, 73 N.Y. 2d 1, 11 (N.Y. 1988) (holding that "failure of a signer to read an

instrument . . . amounts to gross negligence"). Thus, the "common law . . . is unequivocal that,

absent fraud or misrepresentation, the uninformed signer of an agreement is bound." *Aylaian v.*

*Town of Huntington*, 459 F. App'x 25, 27 (2d Cir. 2012); *see also, e.g.*, *Beattie v. Brown &*

*Wood*, 243 A.D. 2d 395, 395 (N.Y. App. Div. 1997) ("Since plaintiff was competent to execute

the settlement agreement, and no fraud is alleged, he is responsible for his signature and is bound

to read and know what he signed.").

9.    Second, it is equally well established that a party to a contract may not escape its

obligations thereunder by claiming its counsel was conflicted. *See, e.g.*, *In re Winer*, 39 B.R.

504, 507-08 (Bankr. S.D.N.Y. 1984) (holding that "one who signs a document is bound by its

contents" and rejecting argument that alleged conflict voided contract); *Martens v. Smith Barney,*

*Inc.*, No. 96-3779, 2002 WL 867666, at \*4 n.4 (S.D.N.Y. May 3, 2002) (holding dissatisfaction

with lawyer's performance provided no basis for rescission of agreement). The proper recourse

in those circumstances is not rescission of the contract but a claim for legal malpractice. *Taylor*

*v. Gordon Flesch Co.*, 793 F.2d 858, 864 (7th Cir. 1986) ("To the extent that [plaintiff's]

5

decision may have been based upon the incompetency of his counsel, his remedy lies in an action for legal malpractice, not in an action seeking to renege on a settlement agreement.").

10.     As discussed further in the context of individual claims, below, proper application of these principles in this case requires the dismissal of many of the Debtors' claims.

## II.     Defendants Are Entitled To Judgment On the Breach of Contract Claims (Claims 1-5, 20)

11.     To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff, (iii) failure of defendant to perform, and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (citation omitted).  Here, the evidence will show that the Defendants did not fail to perform under the Acquisition Loan Agreement, Building Loan Agreement, or any other contract.  In addition, as discussed in Part XII, below, the damages the Debtors allege are greatly overstated and are primarily consequential (not direct) damages, which were expressly waived.

### A.     Defendants Did Not Breach the Gamma 1 Loan Documents, Gamma 2 Loan Documents, or Kalikow Lender Term Sheet (Claims 1-3)

12.     The Debtors' First Claim for relief asserts that the Defendants breached the Gamma 1 and Gamma 2 Loan Documents and the Kalikow Lender Term Sheet by (i) "failing to fund the Unfunded Commitment," (ii) "tortiously interfering with the Draw Req Process," and (iii) "alleging defaults which defaults had not occurred."  *See* Compl. ¶ 697.  The Debtors' Second and Third Claims – which are essentially duplicative of the First Claim – further assert that the Defendants breached the Acquisition Loan Agreement and the Building Loan Agreement, respectively, by failing to release certain reserve funds.  Each of these claims fails.

#### (i)     The Defendants Did Not Breach the Gamma 1 Loan Documents – Nor Are There Any Allegations That They Did

13.     The Complaint itself contains no allegations that the so-called "Gamma 1 Loan Documents" were breached.  This term, which is not defined, appears to refer to the various

6

contracts entered into among the parties in connection with the initial financing provided by Gamma Lending in January 2015. *See, e.g*., Compl. ¶¶ 132, 135, 177. However, each of the three breaches alleged in the First Claim, if proved, would relate only to the Defendants' performance under the Gamma 2 Financing, which was not even advanced until some months later, in June 2015. It is only in connection with this latter financing that Defendants are alleged to have refused to distribute the "Unfunded Commitment," *see* Compl. ¶ 624, interfered with the "Draw Req Process," *see id*. ¶ 531, and "fabricated" defaults, *see id*. pp. 72 & 81. Accordingly, in the absence of any allegations (let alone evidence) of breach, that portion of the First Claim relating to the Gamma 1 Loan Documents should be dismissed.

14.     Moreover, even if Debtors had alleged that the Gamma 1 Loan Documents were breached, the Debtors have waived any claim relating to such alleged breach. On April 1, 2015, the Debtors executed a so-called "pre-negotiation agreement" (the "April Pre-Negotiation Letter") that contained a broad waiver of claims against the Defendants. Among other things, the Debtors agreed not to raise "any defenses, offsets, cross-claims or counterclaims in connection with any actions, suits or proceedings now or hereafter instituted by the Lender with respect to the Loan." April Pre-Negotiation Letter ¶ 6. While the Debtors have alleged that a later pre-negotiation letter was a fraudulent transfer (*see* below at Part IX), they have not challenged the validity of the April Pre-Negotiation Letter.

### (ii)     The Defendants Did Not Breach the Gamma 2 Loan Documents Because Their Actions Were Consistent With Rights Thereunder

15.     There is also no evidence the Defendants breached the Gamma 2 Loan Documents, including the Acquisition Loan Agreement and the Building Loan Agreement.[4]

---

[4] The term "Gamma 2 Loan Documents" is not defined in the Complaint. It appears to refer to the contracts entered into in connection with the June 2015 "Gamma 2 Financing." *See, e.g*., Compl. ¶ 489.

7

(a)      **The Defendants Properly Retained Various Reserve Funds**

16.      The Debtors first allege that the Defendants improperly failed to fund the "Unfunded Commitment" by disbursing funds held in various reserve accounts. *See* Compl. ¶¶ 697, 707, 714. However, the Defendants' actions were consistent with their rights and obligations under the governing loan documents.

17.      The Acquisition Loan Agreement called for the establishment and funding of an "Interest Reserve," a "Contract Property Purchase Reserve," and an "Expense Reserve." Acquisition Loan Agreement § 2.1. A related Cash Collateral Agreement (the "Acquisition Cash Collateral Agreement") governed disbursements from these reserve accounts. *See* Acquisition Cash Collateral Agreement, Art. IV. Similarly, the Building Loan Agreement called for the establishment and funding of an "Interest Reserve," a "Demolition Reserve," and an "Architectural Fee Reserve." Building Loan Agreement § 2.1. A related Cash Collateral Agreement (the "Building Cash Collateral Agreement") addressed disbursements from these reserve accounts. *See* Building Cash Collateral Agreement, Art. IV.

18.      The Debtors allege that the Defendants improperly failed to make disbursements from certain of these reserve accounts. *See* Compl. ¶¶ 707, 714; *see also id.* ¶¶ 573-610. Notwithstanding these allegations, however, the evidence will show that the Defendants fully funded all reserve obligations as required by the applicable documents and that the Debtors wrongfully demanded payments they were not entitled to receive. Specifically:

- The Defendants' obligation to disburse amounts from the Contract Property Purchase Reserve was not triggered. The Debtors assert that Defendants improperly failed to release funds from the Contract Property Purchase Reserve, which had been created for purposes of acquiring the real property located at 426 East 58th Street (the "426 Property"). Compl. ¶ 592. However, this reserve was available only to make payments in respect of acquisition of fee title to the 426 Property – and then only after satisfaction of the conditions set forth in section 4.28 of the Acquisition Loan Agreement. *See* Acquisition Cash Collateral Agreement § 4.02. These conditions included evidence that the property would be conveyed free of tenants, delivery of a pro forma title policy, and delivery of spreader agreements relating to existing

8

mortgages.  *See* Acquisition Loan Agreement § 4.28.  Not only have the Debtors admitted that they never purchased the 426 Property, the evidence shows that the other conditions in section 4.28 of the Acquisition Loan Agreement were never satisfied.  The Debtors had no right to request, and the Defendants thus had no obligation to release, the Contract Property Purchase Reserve.[5]

- The Defendants' obligation to release the "development fee" was not triggered.  The Debtors also assert that Defendants improperly failed to release a $3.9 million "development fee" from the Contract Property Purchase Reserve.  Compl. ¶¶ 574, 633.[6]  Again, the Debtors' request was inappropriate, as section 4.02(a) of the Acquisition Cash Collateral Agreement provides that any such development fee was to be paid only "upon [Sutton Owner's] acquisition of fee title to the [426 Property]" – an event that the Debtors admit never occurred.  *See* Plaintiffs' Objections and Responses to Defendants' Requests for Admission, Response to RFA No. 1 (admitting that "neither Sutton Owner Party ever acquired fee simple title to 426 East 58th Street").

- The Defendants fulfilled their contractual obligation to disburse funds from the Expense Reserve.  The Debtors also assert that Defendants improperly failed to release a portion of the Expense Reserve.  Compl. ¶ 591.  However, this allegation again ignores that the Debtors did not have an unfettered right to seek payment from the reserve accounts and that any release was subject to conditions that were never satisfied.  As the Debtors acknowledge, *see* Compl. ¶ 576, a portion of the Expense Reserve was to be held back until after the acquisition of the 426 Property.  *See* Acquisition Cash Collateral Agreement 4.03(a)(i).  The Defendants funded $1,392,933 million, which was the amount available absent the acquisition of the 426 Property.  Consistent with the contract limitations, the Defendants did not fund further amounts that were conditions upon the acquisition of the 426 Property.

- The Defendants disbursed amounts from the Demolition Reserve and Architectural Fee Reserve in compliance with the agreements.  Finally, the Debtors assert Defendants breached the Building Loan Agreement by failing to release funds from the Demolition Reserve and Architectural Fee Reserve.  Compl. ¶ 597.  However, section 4.02 of the Building Cash Collateral Agreement specifies that funds from these reserves are available only "after satisfaction of all conditions to disbursement set forth in Article 9 of the [Building Loan Agreement]."  These conditions include receipt of "any and all authorizations required by any Governmental Authority for the Project or otherwise necessary to perform the work necessary to achieve Project Completion (including, without limitation, all Project Permits)."  *See* Building Loan Agreement § 9.3(b)(i).  As the Debtors acknowledge, and the evidence will show, the Debtors failed to satisfy the necessary preconditions to requesting a draw, such as

---

[5] The Debtors argue they had a more financially advantageous plan to acquire an easement over the 426 Property and construct a cantilevered tower.  *See* Compl. ¶¶ 578-589.  The parties' agreements, however, address only the purchase of the 426 Property and not alternative arrangements, such as an easement right.  As such, the Debtors had no right to request release from the reserve.

[6] The Debtors describe this as an "equity return" and calculate it at $3.9 million.  The Acquisition Cash Collateral Agreement provides for a fee only of "up to $3,319,500," however.  Acquisition Cash Collateral Agreement § 4.02.

16-01187-shl    Doc 28    Filed 10/28/16    Entered 10/28/16 22:07:58    Main Document
Pg 22 of 111

obtaining all requisite "Project Permits." *See* Compl. ¶¶ 598 and 602. Accordingly, Defendants had no obligation to release these reserve funds.[7]

19.     In sum, the Defendants fully complied with their obligations to release funds from the various reserve accounts established under the Gamma 2 Loan Documents in accordance with the terms and conditions for release of such monies.

### (b)     The Defendants Properly Processed Draw Requests

20.     The Debtors next allege that the Defendants "tortiously interfered" with the "Draw Req Process" – i.e., the "requisition process whereby the Debtors would request a draw from their reserve accounts for work, labor and services." Compl. ¶¶ 531, 697. However, as a matter of law, a defendant cannot tortiously interfere with a contract to which it is a party. *See Koret, Inc. v. Christian Dior, S.A.*, 161 A.D. 2d 156, 157 (N.Y. App. Div. 1990) ("It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract.").

21.     Moreover, the Defendants' conduct was fully consistent with their rights and obligations under the agreements. The Debtors' central allegation is that "the Defendants controlled the flow of finances and disbursed money directly to vendors and claimants in violation of the Gamma 2 Financing Documents and the Draw Req Process." Compl. ¶ 534. These allegations, even if proven, do not support a breach of contract claim. The Acquisition Cash Collateral Agreement specifically granted Defendants the right to review and approve invoices and also to make disbursements from the Expense Reserve. *See* Acquisition Cash Collateral Agreement § 4.03 ("Lender shall have the right to . . . withdraw sums from the Expense Reserve for payment of such project expenses from and after Lender's reasonable

---

[7] The Debtors seem to assert that the intricacies of the New York City Department of Buildings' procedures placed them in a "Catch-22" situation in which they were required to obtain certain preliminary permits for "initial preparatory work" before being eligible to obtain the requisite demolition permits. *See* Compl. ¶¶ 598, 602. However, the Debtors then state that they were actually successful in obtaining the initial permits. *See id.* ¶ 599. No justification is provided for their failure to then timely obtain the demolition permits that they acknowledge were required to trigger funding of the Demolition Reserve and Architectural Fee Reserve.

approval of invoices therefor."). Similarly, the Building Cash Collateral Agreement (at section 4.02) calls for Defendants to disburse sums from reserves in accordance with Article 9 of the Building Loan Agreement, and Article 9 of the Building Loan Agreement, in turn, gives the Defendants "absolute discretion" to determine the "existence or nonexistence of any fact or facts the existence or nonexistence of which is a condition hereof." *See* Building Loan Agreement § 9.5(f).[8]

22.      The Debtors also allege that Defendants' management of the Draw Req Process was "disorganized" and "irresponsible," leading to confusion and delay. *See* Compl. ¶¶ 551, 559, 562, 563. There is no evidence of confusion, however, and to characterize the Defendants as the sole managers of the Draw Req Process is a distortion of the facts. In reality, the Debtors and the Defendants appear to have worked in conjunction to review and approve invoices and issue checks and wires. In any event, the loan documents call for no specific methodology for handling the Draw Req Process, and the Debtors conspicuously point to no specific provision of the loan documents violated by Defendants' actions.

### (c)      The Defendants Did Not "Fabricate" Defaults

23.      The Debtors allege, in conclusory terms, that the Defendants breached the Gamma 2 Loan Documents by "alleging defaults which defaults had not occurred, or were precipitated by Defendants [sic] own conduct and default." Compl. ¶ 697; *see also id.* at pp. 72, 81. No specific "alleged" or "fabricated" defaults are identified, however, and the term "Alleged Default" (used in several of the Claims for Relief) is never even defined in the Complaint. Moreover, as set forth above, the Defendants were justified under the plain terms of the loan documents in denying requests to make various disbursements from the reserve accounts in light

---

[8] The Debtors' proposed expert witness, Gary M. Tenzer, acknowledged at deposition that he has seen situations comparable to the Gamma 2 Financing in which lenders have approval rights, if not control, over the check disbursement process.

of the Debtors' failure to satisfy the preconditions to any such releases. Whether or not a default had occurred or been formally noticed, the conditions to funding from the reserve accounts were not satisfied.[9] Finally, it is clear that the Debtors' *did* default. Among other things: section 9.8(d) of the Building Loan Agreement required Borrower to obtain all "Project Permits" within 60 days of entry into the agreement (which was dated June 19, 2015) – and Debtors admit they did not timely obtain such permits. *See* Compl. ¶¶ 598, 602.

### (iii)    The Defendants Did Not Breach the Kalikow Lender Term Sheet Because It Was a Non-Binding Agreement

24.    The Debtors also allege that the Defendants breached the Kalikow Lender Term Sheet. Compl. ¶ 697. The assertion is perplexing given that it is undisputed that the Defendants did enter into the Gamma 1 Financing contemplated by the term sheet. Moreover, the term sheet specifically states (with exceptions not relevant here) that it "shall be non-binding upon Borrower and Lender." *See* Kalikow Lender Term Sheet at p. 1. Accordingly, Defendants could not have breached, and did not breach, this alleged contract. Finally, the Original Loan Agreement expressly provided that it contained "the entire agreement of the parties" and superseded "all prior agreements, understandings and negotiations among or between" the parties. *See* Original Loan Agreement § 8.12.

### B.    The Debtors Are Not Entitled To a Declaration Regarding the "Fabricated Default" (Claim 4)

25.    In their Fourth Claim for Relief, the Debtors seek a declaration that "Sutton Owner DE and Sutton Mezz DE were not in default at the time Defendants created the Alleged Default and failed to fund the Unfunded Commitment, and that issuance of such default

---

[9] The Debtors assert that "Defendants breached the Gamma 2 Financing Documents by, among other things, failing to fund before any written notice of default to the borrower." Compl. ¶ 607. But there was no requirement that Defendants deliver a notice of default before declining to fund a draw request. Instead, as described above, the terms of the two Cash Collateral Agreements imposed explicit conditions to disbursements; if those conditions were not satisfied, then no draw was permitted or required under the documents.

constituted a breach of the Gamma 2 Loan Documents by Defendants." Compl. ¶ 727. The Complaint does not define the capitalized term "Alleged Default." However, it appears the Fourth Claim relates to the same alleged breaches asserted in the First through Third Claims: the failure to release funds from various reserve accounts. As set forth above, these alleged breaches are without merit. Moreover, because the claim for declaratory relief is duplicative of the underlying claims for breach of contract, it must be dismissed on those grounds as well. *See Arthur Young & Co. v. Fleischman*, 85 A.D.2d 571 (N.Y. App. Div. 1981) ("[N]o declaratory judgment is appropriate when an adequate remedy is already provided by another well-known form of action, such as actions for injunction or breach of contract, both alleged in this complaint."); *Main Evaluations, Inc. v. State of N.Y.*, 296 A.D.2d 852, 853 (N.Y. App. Div. 2002) (same); *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 472 (S.D.N.Y. 2014) (same).

### C.   The Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Duplicative of the Breach of Contract Claims (Claim 5)

26.   The Debtors' Fifth Claim asserts a violation of the implied covenant of good faith and fair dealing in connection with the Gamma 1 Loan Documents, Gamma 2 Loan Documents, and Kalikow Lender Term Sheet. However, it is well settled that "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) (same); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (N.Y. App. Div. 2010) (same). Thus, because the Fifth Claim relies on the same facts as the First through Third Claims, it must be dismissed.[10]

---

[10] That the First through Third Claims are also subject to dismissal does not save the Fifth Claim, because the implied covenant of good faith and fair dealing does not "create independent contractual rights." *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Xerox Corp.*, 25 A.D.3d 309, 310 (N.Y. App. Div. 2006). Thus, a redundant implied covenant of good faith and fair dealing claim must be dismissed even when the related breach of contract

### D.    The Unjust Enrichment Claim Is Duplicative of the Breach of Contract Claims (Claim 20)

27.    The Twentieth Claim, for unjust enrichment, is premised on the same breaches of contract that are the subject of the First, Second, and Third Claims in the Complaint. *See, e.g.*, Compl. ¶¶ 890-91.    However, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388 (N.Y. 1987).    Thus, the Twentieth Claim should be dismissed as duplicative of those breach of contract claims. *See Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (N.Y. 2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").

## III.    The Defendants Are Entitled To Judgment On the Tortious Interference Claims (Claims 6 & 7)

28.    The Debtors' Sixth and Seventh Claims assert claims for tortious interference with contract and tortious interference with business relations, respectively.    Each of these claims fails.    Among other things, the Complaint's allegations – and the evidence introduced in support thereof – reflect a fundamental misunderstanding of the legal standards governing such claims.

### A.    The Claim for Tortious Interference With Contract Fails (Claim 6)

29.    To state a claim for tortious interference with contract, a plaintiff must allege: "[i] the existence of a valid contract between the plaintiff and a third party, [ii] defendant's knowledge of that contract, [iii] defendant's intentional procurement of the ***third-party's*** breach of the contract without justification, [iv] actual breach of the contract, and [v] damages resulting therefrom." *Lama Holding v. Smith Barney*, 88 N.Y.2d 413, 424 (N.Y. 1996) (emphasis added). A defendant's mere "deliberate interference with plaintiff's contractual rights that causes

---

claims are dismissed as well.  *See id.*; *see also, e.g.*, *A.N.R. Inv. Co. v. HSBC Private Bank*, 135 A.D.3d 632, 634 (N.Y. App. Div. 2016); *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 806 F. Supp. 2d 619, 624 (E.D.N.Y. 2011).

14

damage" is not actionable.  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614,

620-21 (N.Y. 1996).  Instead, to have a cause of action for tortious interference with contract, "it

is axiomatic that there must be a *breach* of that contract by the *other party*."  *Jack L. Inselman &*

*Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080 (N.Y. 1977) (emphasis added).

30.    Here, reading the Complaint charitably, the Debtors have asserted that Defendants

interfered with three categories of alleged contracts: (i) a contract with Jones Lang LaSalle

Americas, Inc. ("JLL"); (ii) a contract with Foster + Partners; and (iii) certain contracts the

Debtors refer to generically as the "Debtors' Contracts."  However, as to none of those contracts

have the Debtors properly alleged – nor will they prove – that the Defendants intentionally

procured the *third-party's* (as opposed to the *Debtors'*) breach of contract, as required by the

third and fourth prongs of the *Lama Holding* test.[11]

### (i)    The Defendants Did Not Procure a Breach of Contract By JLL

31.    Far from alleging that JLL breached its contract with the Debtors, the Complaint

appears to allege just the opposite:  that the *Debtors* breached their contract with JLL by failing

to make payments.  *See* Compl. ¶ 292 ("As a result of JLL not being paid, JLL stopped

performing services for the Debtors").[12]  As noted above, a breach by the third-party, not the

plaintiff, is required to state a claim for tortious interference.

32.    The Debtors attempt to show that their breach of contract was the Defendants'

fault.  This is irrelevant for the reasons just discussed.  But it is also factually incorrect.  The

evidence will show that Defendants had no obligation to pay JLL, having expressly disclaimed

responsibility for brokerage fees, and the Debtors took the position that they did not want to pay

---

[11] The Complaint itself largely fails to identify any specific contract that is alleged to have been breached – by, for instance, referencing the contract's title, its parties, its date of execution, its material terms, or the terms that are alleged to have been breached.  To the extent the Debtors fail to present any evidence at trial as to these matters, Claim Six will be subject to dismissal on these grounds as well.

[12] Contrary to the allegations in the Complaint, the evidence will show that JLL continued to perform even after payment ceased, and stopped performing only when the Debtors terminated the JLL contract.

JLL because JLL, the Debtors' broker, had not actually played any role in locating the financing for the Gamma 1 and Gamma 2 loans.  Finally, even if the Defendants had been responsible for paying JLL from the reserves and had failed to do so, that allegation would only support a breach of contract claim against the Defendants, not a tortious interference claim.

### (ii)    The Defendants Did Not Procure a Breach of Contract By Foster + Partners

33.    Any claim for tortious interference with the Debtors' contract with Foster + Partners fails for similar reasons.  The facts alleged in the Complaint could establish (at most) only that the Debtors did not pay Foster + Partners, not that Foster + Partners breached its contract with the Debtors.  *See* Compl. ¶¶ 616-18 ("In late 2015, Foster + Partners advised Beninati that, as a result of non-payment, the debtors would no longer be allowed access to Foster + Partners exhibition room").  The evidence will show that Foster + Partners continued to perform its contract even after non-payment by the Debtors, by continuing to allow access to the exhibition room.  Moreover, while the Complaint, again, tries to blame the Debtors' failure to pay Foster + Partners on the Defendants' failure to release certain funds from reserves, this at most restates the Debtors' breach of contract claim.  It cannot establish that Defendants procured a breach by Foster + Partners.

### (iii)    The Defendants Did Not Procure a Breach of Contract By Any Of the Debtors' Other Contract Counterparties

34.    In paragraph 736 of the Complaint, the Debtors allege that they "entered into numerous contractual agreements with their vendors, including, but not limited to, architects, engineers and other professionals (the 'Debtors' Contracts')."  Compl. ¶ 736.  However, none of these "Debtors' Contracts" are identified in the Complaint.  Having failed to identify any specific contracts or contract counterparties – let alone any actual breach of contract by any counterparty – the Debtors have not plead any of the elements necessary for a tortious interference with

16

contract claim, and the count should be dismissed.  *See, e.g.*, *Bonanni v. Straight Arrow Publishers, Inc.*, 133 A.D.2d 585, 587 (N.Y. App. Div. 1987) ("Failure to plead in nonconclusory language facts establishing all the elements of a wrongful and intentional interference in the contractual relationship requires dismissal of the action.").  Moreover, the evidence will show that the Defendants did not procure a breach of contract by any other party. Indeed, Mr. Beninati admitted at deposition that he did not know whether any of the Debtors' architects, engineers, or other professionals breached their contracts with the Debtors.

> **B.    The Claim for Tortious Interference With Economic Opportunity Fails (Claim 7)**

35.    To state a claim for tortious interference with business relations or economic opportunity, a plaintiff must allege that: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) ("*Carvel I*").  "[T]he requirements of this tort are more demanding than those imposed on a party asserting tortious interference with the performance of an existing contract," and require the pleading of "more culpable conduct."  *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 547-48 (S.D.N.Y. 2007); *see also NBT Bancorp*, 87 N.Y.2d at 621 (same).

36.    Here, while the Complaint's allegations are sparse, the Debtors appear to assert that the Defendants tortiously interfered with the Debtors' economic opportunities by: (i) interfering with existing contracts between the Debtors and third parties; (ii) interfering with existing contracts between the Debtors and the Defendants; and (iii) interfering with the Debtors' relationships with several potential sources of financing.  However, the first and second of these assertions fail to state a claim as a legal matter, and the evidence adduced in support of the third comes nowhere close to satisfying the stringent requirements necessary to establish the tort.  To

the contrary, the evidence will show that Defendants did not tortiously interfere with any business or economic opportunity of the Debtors.

### (i)    The Defendants Did Not, and Could Not, Tortiously Interfere With Business Relations Embodied In Existing Contracts

37.    Many of the allegations in the Seventh Claim relate to alleged interference with existing contracts of the Debtors.  *See* Compl. ¶¶ 752, 753, 759, 760.  These allegations are irrelevant to a claim of tortious interference with business relations, which focuses not on interference with a contract but on interference with an existing or potential business relationship.  *See, e.g.*, *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189 (N.Y. 2004) ("*Carvel II*") ("We have recognized that inducing breach of a binding agreement and interfering with a nonbinding 'economic relation' can both be torts, but that the elements of the two torts are not the same.").  Similarly, allegations that Defendants interfered with the "loan documents" governing the relationship between Defendants and Debtors (*see* Compl. ¶ 756) are irrelevant because a defendant cannot interfere with a contract to which it is a party.  *See Koret*, 161 A.D.2d at 157 ("It is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract.").

### (ii)    The Defendants Did Not Tortiously Interfere With the Debtors' Relationships With Potential Alternative Sources of Financing

38.    The Complaint suggests, in conclusory terms, that Defendants and/or Attorney Kalikow may have interfered with the Debtors' prospective relationships with several alternative sources of financing.  *See* Compl. ¶ 758.  Discovery suggests the Debtors' claims relate primarily to their alleged relationships with three potential sources of financing:  Inbursa, Power China, and Fortress.  However, despite their Complaint's parroting of the elements of a potential cause of action, the Debtors have not, and cannot, satisfy the third prong of the tortious interference

18

test:  that "the defendant acted solely out of malice, or used dishonest, unfair, or improper means." *Carvel I*, 350 F.3d at 17.

39.    First, the Complaint itself directly contradicts any contention that Defendants acted "solely" out of malice, as it is replete with statements that Defendants acted in their own economic self-interest.  *See, e.g.*, Compl. ¶ 564 (Defendants' actions were "aimed at wresting control over the Project from the Debtors"); *see also id.* ¶¶ 565, 756, 757.  These allegations are fatal to Debtors' claim.  *See, e.g.*, *Carvel II*, 3 N.Y.3d at 190 (no claim stated where defendant's "motive in interfering with the franchisees' relationships with their customers was normal economic self-interest"); *Pamilla v. Hosp. for Special Surgery*, 223 A.D.2d 508, 509 (N.Y. App. Div. 1996) (plaintiff failed to state a claim where "there are allegations that [defendants] were at least partially motivated by their own self-interest").  The evidence will confirm that Defendants, like any arm's length lender, acted not with malice, but in economic self-interest.

40.    Second, to satisfy the third prong of the *Carvel* test, a plaintiff must show that (i) the defendant's conduct was "criminal or independently tortious," *Carvel II*, 3 N.Y.3d at 190, and (ii) such improper conduct was directed at the *third party*, not at the plaintiff, *id.* at 192.  Here, the Debtors cannot show that Defendants engaged in criminal conduct or committed any independently tortious acts with respect to the Debtors' business relations.  Based on deposition testimony, it appears the Debtors' main complaint is that Defendants did not agree to waive a condition in the Gamma 1 Financing documents that would have allowed the subordination of Defendants' loan under certain specified circumstances.  *See* Original Loan Agreement § 4.16.  However, the mere enforcement of a contractual right is not a criminal or tortious act.  Moreover,

any improper conduct alleged here – to the extent it could possibly be construed as criminal or tortious – was directed at the *Debtors*, not at any third parties lenders.[13]

41.    Finally, based on the sparse allegations in the Complaint, and evidence adduced to date, it appears the Debtors may also be unable to satisfy the first, second, and fourth prongs of the *Carvel* test (the existence of a business relationship, interference therewith, and resulting injury).    The Complaint's allegations as to interference by the *Defendants* are completely conclusory, *see* Compl. ¶¶ 753, 758, 762, with most of the relevant allegations instead relating to the conduct of *Attorney Kalikow*, *see id.* ¶¶ 55, 74, 97, 119.    If the Debtors are unable to elaborate on their claims against Defendants at trial, they must be dismissed for this reason alone.    *See, e.g.*, *Bus. Networks of N.Y., Inc. v. Complete Network Solutions Inc.*, 265 A.D.2d 194, 195 (N.Y. App. Div. 1999) (dismissing claim for "failure to allege any specific prospective relationship with which defendants interfered"); *McGill v. Parker*, 179 A.D.2d 98, 105 (N.Y. App. Div. 1992) (dismissing claim for failure to contain "any sufficiently particular allegation of interference with a specific contract or business relationship").

## IV.    The Defendants Are Entitled To Judgment On the Unconscionability Claims (Claims 9 &10)

42.    The Debtors Ninth and Tenth Claims assert that the Acquisition Loan, Building Loan, New Mezz Loan, and Apartment Option Contract are unconscionable.[14]    For a variety of reasons – including the commercial setting of the transactions and the sophistication of the parties – each of these claims must be dismissed.

---

[13] There is no allegation, for instance, that Defendants made wrongful threats to Power China, Inbursa, or Fortress to induce them not to lend to the Debtors.

[14] There is no allegation in the Complaint that the contracts entered into in connection with the January 2015 Gamma 1 Financing were unconscionable.    Indeed, the Debtors' proposed expert witness, Mr. Tenzer, acknowledged at deposition that he did not believe the Gamma 1 Financing was unconscionable.    Moreover, any such claim was waived by the April Pre-Negotiation Letter, which, as noted above, the Debtors do not challenge.

A.      **The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Unconscionable (Claim 9)**

43.     "The doctrine of unconscionability seeks to prevent sophisticated parties with grossly unequal bargaining power from taking advantage of less sophisticated parties." *NML Cap. v. Republic of Arg.*, 621 F.3d 230, 237 (2d Cir. 2010) (citation omitted).   An unconscionable contract is one that is "so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y. 2d 1, 10 (N.Y. 1988) (citation omitted).   For contracts entered into by two businesses in a commercial setting, "there is a presumption of conscionability." *Ally Fin. Inc. v. Wells Fargo Bank, N.A. (In re Residential Cap. LLC)*, 531 B.R. 25, 49 (Bankr. S.D.N.Y. 2015).   Indeed, the Second Circuit has noted that it is aware of *no* authority "finding an agreement involving parties of like sophistication unenforceable on substantive unconscionability grounds." *NML Cap.*, 621 F.3d at 238.

44.     To prove a contract is unconscionable, a party generally must show "that the contract was both procedurally and substantively unconscionable." *Gillman*, 73 N.Y. at 10.   The procedural prong of this inquiry requires "an examination of the contract formation process and the alleged lack of meaningful choice," while the substantive prong "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Id.* at 10-12.   The Debtors can satisfy neither prong of the unconscionability test here.

(i)      **The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Procedurally Unconscionable**

45.     The Debtors' allegations as to the procedural unconscionability of the Gamma 2 Financing Documents focus primarily on the alleged conflicts of their counsel, *see* Compl.

¶¶ 777, 778, and, secondarily, on the lack of meaningful choice in executing the documents, *see id.* ¶¶ 471, 501. These allegations do not satisfy the standard for procedural unconscionability.

46.     First, while the Debtors' Complaint reads like a malpractice action against their former attorney – containing at least 264 references to "Attorney Kalikow" – the Debtors' lawyer is not an agent of the Defendants, nor is he even a named defendant in this suit. No evidence will support the Debtors' allegation that the Defendants conspired with the Debtors' lawyer. Absent such evidence, the Debtors' extensive allegations as to Attorney Kalikow provide no basis for avoiding the Debtors' contractual obligations to third parties. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Oliver*, No. 15-4971, 2016 WL 344980, at *3 n.1 (S.D.N.Y. Jan. 27, 2016) (rejecting argument agreement was unconscionable, and noting: "most of [defendant's] complaints appear to be directed as his own counsel's conduct, which is not a basis for voiding an otherwise valid agreement"); *Martens v. Smith Barney, Inc.*, No. 96-3779, 2002 WL 867666, at *4 n.4 (S.D.N.Y. May 3, 2002) ("[U]nder fundamental principles of contract law, the fact that [plaintiff] may be unhappy with her lawyers' performance does not provide a basis for rescission of the agreement she independently negotiated with [defendant]."); *In re Winer*, 39 B.R. 504, 507 (Bankr. S.D.N.Y. 1984) (holding that "one who signs a document is bound by its contents" and rejecting argument that alleged conflict voided contract); *Wells Fargo Trade Cap. Servs., Inc. v. Sinetos*, No. 652317/2010, 2012 WL 6694407, at *4 (N.Y. Sup. Ct. Dec. 19, 2012) (where plaintiff acknowledged signing guaranty, his "claim that his former lawyer sent out the signed document without his permission does not affect the validity of the Guaranty"); *Taylor v. Gordon Flesch Co.*, 793 F.2d 858, 864 (7th Cir. 1986) ("To the extent that [plaintiff's] decision may have been based upon the incompetency of his counsel, his remedy lies in an action for legal malpractice, not in an action seeking to renege on a settlement agreement.").

22

47.    Second, the Debtors cannot show that they had no meaningful choice in agreeing

to the terms of the Gamma 2 Financing.  This prong of the unconscionability analysis focuses on

"the size and commercial setting of the transaction, whether deceptive or high-pressured tactics

were employed, the use of fine print in the contract, the experience and education of the party

claiming unconscionability, and whether there was disparity in bargaining power."  *Gillman*, 73

N.Y. 2d at 11 (citations omitted).  Here, the transaction was large, the setting was commercial,

and the Debtors' principals were sophisticated and experienced real estate developers – all facts

militating strongly against a finding of unconscionability.  *See, e.g.*, *Gillman v. Chase Manhattan

Bank, N.A.*, 135 A.D. 2d 488, 491 (N.Y. App. Div. 1987) ("[T]he doctrine of unconscionability

has little applicability in the commercial setting because it is presumed that businessmen deal at

arm's length with relative equality of bargaining power."), *aff'd* 73 N.Y. 2d 1 (N.Y. 1988).[15]

48.    While the Debtors say they faced looming deadlines necessitating closing of the

Gamma 2 Financing, they had other options available to them, including finding other sources of

financing, selling the Project (at what the evidence suggests would have been a significant profit

to the Debtors' controlling principals), abandoning the Project, or seeking bankruptcy

protection.[16]  The Debtors may have viewed these alternatives as unpalatable, but their decision

to reject them and instead enter into the Gamma 2 Financing was one that was freely made.  As

the Debtors' proposed expert, Mr. Tenzer, testified at deposition, it appears that Mr. Beninati

---

[15] That Mr. Beninati may have been a relative newcomer to the *Manhattan* real estate development scene is no reason to find he lacked sophistication in commercial transactions.  *See Process Am., Inc. v. Cynergy Holdings, LLC*, -- F.3d --, 2016 WL 5795744, at *9 n.6 (2d Cir. Oct. 5, 2016) ("Business entities negotiating in a commercial setting do not warrant any special solicitude as 'unsophisticated' parties simply because they are new to a particular industry and choose to forego representation by counsel.").

[16] In the context of claims of economic duress (which bear certain similarities to the procedural aspect of unconscionability), courts have recognized that a party's ability to seek bankruptcy protection is a factor that militates against a finding of duress.  *See Interpharm, Inc. v. Well Fargo Bank, N.A.*, No. 08-Civ-11365, 2010 WL 1257300, at *11 (S.D.N.Y. Mar. 31, 2010) (existence of bankruptcy alternative defeated duress claim); *Teachers Ins. & Annuity Ass'n of Am. v. Wometco Enters., Inc.*, 833 F. Supp. 344, 349 n.7 (S.D.N.Y. 1993) ("[D]efendants' economic duress argument also fails to meet the fourth prong of the [duress] test since [defendant] could have filed for bankruptcy protection as an alternative to granting plaintiff's requests for further concessions.").

opted not to sell the Project but instead to proceed with the Gamma 2 Financing because he had

"stars in his eyes" – that is, he was "reluctant to part with the upside in the project."

### (ii)    The Acquisition Loan, Building Loan, and New Mezz Loan Are Not Substantively Unconscionable

49.    The Debtors' assertions as to the substantive unconscionability of the Gamma 2

Financing Documents focus on the interest rate, the repayment period, and the imposition of a

"second exit fee for the same principal."  *See* Compl. ¶ 781.  As an initial matter, the business

terms on which the Debtors premise their claims of substantive unconscionability are largely

unrelated to the alleged procedural deficiencies identified above.  The evidence will show that

the business terms were negotiated directly by the principals of the Debtors, not by their

attorney.  Thus, even if Attorney Kalikow was conflicted (the main "procedural" aspect of the

unconscionability claim), and even if his conflict was relevant to claims against the Defendants,

the Debtors alone are responsible for the negotiation of the business terms they now complain of.

50.    Perhaps more to the point, however, none of the business terms the Debtors object

to are sufficiently unreasonable for this Court to hold – for what would apparently be the first

time, *see NML Capital*, 621 F.3d at 238 – that an agreement such as this between highly

sophisticated and experienced parties is substantively unconscionable.

51.    First, as a matter of law, the interest rate cannot be a basis for invalidating the

loan.  New York law is clear:  loans in excess of $2.5 million are exempt from the scope of the

usury laws.  *See* N.Y. Gen. Oblig. Law § 5-501(6)(b); *see also Schick v. Schmutz (In re Venture*

*Mortgage Fund, L.P.)*, 282 F.3d 185, 189 (2d Cir. 2002) ("[N]o New York usury law prohibits,

voids, or regulates transactions over $2.5 million, a financial plane above which all players

apparently are deemed to be able to fend for themselves.").  As the Second Circuit has

recognized, this exemption reflects a legislative intent "to permit parties negotiating the terms

applicable to the borrowing and repayment of sums of $2.5 million or more to choose to

incorporate interest rates higher than 25%." *NML Cap.*, 621 F.3d at 238-39 (enforcing interest rate of roughly 101% per annum).   To hold that a loan with an interest rate in excess of 25%, while not usurious, is nevertheless unconscionable, would directly contradict the acknowledged legislative limitations of New York's usury laws.

52.     Second, the other terms of the loan are reasonable in the context of the Project. As the Defendants' expert, David Eyzenberg, will testify, the loan terms were reasonable and well within "market" in light of (i) the leverage received by a first-time Manhattan condominium developer for a predevelopment loan on an unassembled site, and (ii) the flexibility afforded to Debtors in the loans.   Among other things, the evidence will show that the Defendants agreed to a massive and virtually unprecedented degree of leverage; that the Debtors' proposed expert, Mr. Tenzer, has never seen a hard money loan at a loan-to-value ratio as high as the Gamma 2 Financing; and that the 7-month loan term was not unusual for bridge financing.

### B.     The Apartment Option Contract Is Not Unconscionable (Claim 10)

53.     The Debtors' Tenth Claim for Relief seeks a declaration that the Apartment Option is void as unconscionable and an order directing the return of all moneys paid by the Debtors in respect of it.   The Apartment Option was granted by the Debtors as additional consideration for the Original Loan in January 2015.  Compl. ¶¶ 143-49.  The Apartment Option granted Gamma Lending S58 LP the right to purchase a condominium of up to 4200 square feet in the building, once it had been constructed, at the Defendants' cost basis.  *Id*. ¶ 143.  While the Debtors complain at length about the terms of this option, it was never exercised.  Instead, as part of the refinancing of the Original Loan, the Debtors repurchased that option, using a portion of the proceeds from the second financing.  *Id*. ¶ 495.

54.     "Under New York law, unconscionability is an affirmative defense to the enforcement of a contract."  *Ng v. HSBC Mortgage Corp.*, No. 07-5434, 2011 WL 3511296, at

*8 (E.D.N.Y. Aug. 10, 2011).  As such, it "is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery." *Arvildsen v. Prystay*, 574 N.Y.S.2d 535, 537 (N.Y. App. Div. 1991) (quoting *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 517 N.Y.S.2d 764 (N.Y. App. Div. 1987)).  "Under both the UCC and common law, a court is empowered to do no more than refuse enforcement of the unconscionable contract or clause." *Id.*

55.     Here, the Defendants have not asserted any claim in these chapter 11 cases based upon the Apartment Option, which has been extinguished.  As such, there is no claim to which unconscionability may function as an affirmative defense.  Similarly, under black letter New York law, there is no basis to award Debtors any affirmative recovery.  In addition to these legal impediments to the claim, nothing about the Apartment Option shocks the conscience.  The testimony will show that options of this nature are commonly granted by developers in New York City to their lenders.[17]  Finally, any claim relating to the Apartment Option was waived by the April Pre-Negotiation Letter, which the Debtors have not challenged.  Accordingly, the Tenth Claim for Relief should be dismissed.

## V.     The Defendants Are Entitled To Judgment On the Criminal Usury Claim (Claim 11)

56.     New York's civil and criminal usury laws do not apply to loans over $2.5 million.  *See* N.Y. Gen. Oblig. Law. §  5-501(6)(b).  Although they borrowed $147.25 million from Sutton 58 Associates in a single financing transaction in June 2015, the Debtors nevertheless allege that one piece of this financing – the Building Loan – was criminally usurious.  They do so even though the Building Loan represents less than 1% of their total borrowings and bears interest at the same rate as the remaining $145.85 million of the financing.  *See* Compl. ¶¶ 805-11.  As set

---

[17] The Debtors describe the Apartment Option as a "mockery," focusing on the fact that it allegedly would not expire until "on or before the 21st anniversary of the date of the death of the last survivor of the lineal descendants now living of former United States Presidents George H.W. Bush and William J. Clinton, and of former Governors of the State of New York George Pataki and Mario Cuomo." Compl. ¶ 146.  But as any first-year law student knows, language such as this is included merely to defeat the "rule against perpetuities."

forth below, however, (i) the Building Loan cannot be severed from the overall financing package, (ii) New York provides no private cause of action for violation of the criminal usury laws, and (iii) intent, a necessary element of a criminal usury claim, is negated here by the presence of a usury "savings clause."  Any one of these deficiencies is alone sufficient to require dismissal of the criminal usury claim.

### A.     The Building Loan Is Part of the Overall $147 Million Gamma 2 Financing

57.     "[N]o New York usury law prohibits, voids, or regulates transactions over $2.5 million, a financial plane above which all players apparently are deemed to be able to fend for themselves." *Schick v. Schmutz (In re Venture Mortgage Fund, L.P.)*, 282 F.3d 185, 189 (2d Cir. 2002) ("[T]he larger the loan transaction, the less likely it is that the borrower needs or deserves financial protection").  In transactions between $250,000 and $2.5 million, however, New York's criminal usury laws, sections 190.40 and 190.42 of the Penal Law, do apply and make it a felony to charge interest in excess of 25% per annum.  Alleging that the amount of the Building Loan is $1.4 million and the annual rate of interest on the loan exceeds 25%, the Debtors assert that Sutton 58 associates is liable for criminal usury.  Compl. ¶¶ 805-811.

58.     The Defendants are entitled to judgment on this claim because the Complaint makes clear that the Building Loan was not an isolated loan, but rather one portion of a single, integrated financing whose amount, $147.25 million, is almost 60 times greater than the $2.5 million threshold above which criminal usury laws do not apply.  The Complaint alleges that, on June 19, 2015, Sutton 58 Associates provided the Debtors with what the Complaint labels the "Gamma 2 Financing."  *See* Compl. ¶¶ 480-489.  According to the Complaint, the "Gamma 2 Financing" consisted of three loan agreements:  the Acquisition Loan Agreement, in the amount of $125,850,000, the Mezz Loan Agreement, in the amount of $20 million, and the Building

27

Loan Agreement, in the amount of $1.4 million, *See id* ¶ 489 (defining "Gamma 2 Financing" to include "the Consolidated Acquisition Note, Building Loan and New Mezz Loan").

59.    Not only does the Complaint refer to these agreements as a single financing transaction, but the evidence shows that they constituted a single, integrated transaction. Among other things:

- Each of the loans in the "Gamma 2 Financing" was made by the same lender, on the same date, in connection with the same real estate project. *See* Compl. ¶¶ 480, 485, 488.

- Each of the loans in the "Gamma 2 Financing" bears the same rate of interest and matures on the same date. *See id.* ¶¶ 480-489.

- The Acquisition Loan and the Building Loan are made to the same borrower, Sutton Owner DE, and secured by the same real property and development rights. *See id.* ¶¶ 480-87. The New Mezz Loan was made to the parent of Sutton Owner DE, Sutton Mezz, and secured by the equity in Sutton Owner DE. *See id*. ¶¶ 488-89.

- The loans were first proposed, and agreed to, as a single $140 million financing transaction. *See id*. ¶¶ 466-68. In fact, elsewhere in the Complaint the Debtors assert a claim against the Defendants for allegedly forcing them to agree to a separate Mezz Loan. *See id*.¶¶ 880-87.

- The agreements were negotiated by the same counsel. *See id*. ¶ 497.

- The three loan agreements cross-reference one another, including by way of cross-default provisions. *See, e.g.*, Building Loan Agreement § 7.1(p) ("An 'Event of Default' shall exist with respect to the Loan if . . . an 'Event of Default' occurs under any Mezzanine Loan Documents or under any Senior Loan Documents."); Acquisition Loan Agreement § 7.1(p) ("An 'Event of Default' shall exist with respect to the Loan if . . . an 'Event of Default' occurs under any Mezzanine Loan Documents or under any Building Loan Documents"); New Mezz Loan Agreement § 7.1(p) ("An 'Event of Default' shall exist with respect to the Loan if . . . an 'Event of Default' occurs under any Senior Loan Documents or under any Building Loan Documents").

- The loans were funded together at a single closing. As Debtors allege, the "closing statement from the Gamma 2 Financing reflects the distribution of $147,250,000 in combined proceeds, which includes the Building Loan." *See* Compl. ¶ 510. In fact, the closing statement (which will be introduced at trial) plainly describes the "Total Loan Amount" as $147,250,000.00, and accounts for the distribution of proceeds collectively, without distinguishing among the constituent loan agreements.

- Each of the Loans is guaranteed by the same three principals of the Debtors, Joseph Beninati, Danny Lee and Chris Jones. *See generally* Acquisition Loan Guaranty of Recourse Obligations; Building Loan Guaranty of Recourse Obligations; New Mezz Loan Guaranty of Recourse Obligations.

- In state court litigation arising out of the Project, the Debtors characterized the Acquisition Loan, Building Loan, and New Mezz Loan as a single loan. *See* Complaint ¶ 73, *Sutton 58 Owner LLC v. Sutton 58 Assocs. LLC*, No. 650832/2016 (N.Y. Sup. Ct. Feb. 17, 2016) (the "State Court Complaint," excerpts of which are attached as **Exhibit 1** hereto).

60.     As such, as admitted by the Debtors themselves, the Gamma 2 Financing is a single loan for purposes of the usury analysis. *See, e.g.*, *Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F.Supp. 2d 336, 340 (S.D.N.Y. 2013) (where defendant borrower undertook four transactions with plaintiff lender – two loans and two stock sales – the "value of the sold stock [was] critical to calculating the initial loan amount and thus the interest rate"); *cf* N.Y. Gen. Oblig. Law § 5-501(6)(B) (in determining whether the $2.5 million threshold is met, loans "aggregating two million five hundred thousand dollars or more which are to be made or advanced to any one borrower in one or more installments pursuant to a written agreement by one or more lenders shall be deemed to be a single loan"). Because the aggregate amount of the "Gamma 2 Financing" far exceeds $2.5 million, the criminal usury statute does not apply.

### B.    There Is No Private Cause of Action for Criminal Usury

61.     The Defendants are also entitled to judgment dismissing the Eleventh Claim because "[t]here is no private cause of action for violations of [N.Y. Penal Law] § 190.40." *In re Merhi*, 518 B.R. 705, 719 (Bankr. E.D.N.Y. 2014). By its terms, the *criminal* usury law (N.Y. Penal Law § 190.40) does *not* authorize the voiding of the loan. The only statute that authorizes the voiding of a usurious loan is General Obligations Law section 5-511, which provides that any loan in which "there shall be reserved or taken . . . any greater sum . . . than is prescribed in section 5-501, shall be void." N.Y. Gen. Oblig. Law § 5-511(1). But General Obligations Law

section 5-501 is the *civil* usury statute, which is expressly inapplicable here.  *See* N.Y. Gen.

Obl. Law § 5-501(6)(a).

62.    The Second Circuit has confirmed that a "close reading of the complex and cross-

referencing statutes that compose New York's usury law" indicates that the "voiding provision

[of section 5-511] only operates to void loans that violate the *civil* usury statute."  *Venture*

*Mortgage*, 282 F.3d at 189.  As the Second Circuit explains:

> § 5-511 voids a loan that violates the civil usury statute (§ 5-501) but says
> nothing about a loan that violates the criminal usury statute.  The criminal
> usury statute, by its terms, does not expressly void a loan that exceeds its
> maximum rate.  So there seems to be no specific statutory authority for
> voiding a loan that violates the criminal usury statute without violating the
> civil usury statute.

*Id.* at 190 n.4.

63.    Later decisions have followed the Second Circuit in refusing to void loans found

to violate the criminal usury laws.  *See Prof. Merch. Advance Cap., LLC v. C Care Servs. LLC*,

No. 13-6562, 2015 WL 4392081, at *5 n.4 (S.D.N.Y. July 15, 2015) ("If the Court were to find

that the Agreement contravened New York's criminal usury law, the Court would nevertheless

not void the Agreement ab initio, but would rather revise the interest obligation to require a non-

usurious rate.") (citing *Venture Mortgage*); *In re Merhi*, 518 B.R. 705, 719 (Bankr. E.D.N.Y.

2014) ("There is no private cause of action for violations of [N.Y. Penal Law] § 190.40.") (citing

*Venture Mortgage*); *Koenig v. Slazer Enters.*, 910 N.Y.S.2d 405 (N.Y. Sup. Ct. 2010) (while

loans fit definition of criminal usury, "there is nothing in the General Obligations Law or Penal

Law that requires that the Court deem these transactions void") (citing *Venture Mortgage*);

*Funding Grp., Inc. v. Water Chef, Inc.*, 852 N.Y.S.2d 736, 743 (N.Y. Sup. Ct. 2008) ("There is

no specific statutory authority for voiding a loan that violates the criminal usury statute.").

64.    Accordingly, even if the Building Loan was criminally usurious (and it is not), it

would provide no basis for the relief the Debtors request:  voiding the loan.

C.    **The Usury "Savings Clause" Precludes a Finding of Criminal Intent**

65.    Finally, even if the criminal usury laws applied, the usury "savings clause" in the

Building Loan Agreement would negate the requisite criminal intent.  The Penal Law provides

that a person is guilty of criminal usury when he "*knowingly* charges" interest at a rate in excess

of 25%.  N.Y. Penal Law § 190.40 (emphasis added).  There is a "strong presumption against the

finding of usurious intent."  *See, e.g., Lehman v. Roseanne Inv. Corp.*, 106 A.D.2d 617, 618

(N.Y. App. Div. 1984).  Here, section 8.15 of the Building Loan Agreement negates that intent,

stating that if the usury laws are ever deemed applicable to the loan, "then it is Borrower's and

Lender's *express intent* that all excess amounts theretofore collected by Lender shall be credited

against the unpaid Principal and all other Debt."  Building Loan Agreement § 8.15 (emphasis

added).  The Court may credit this statement of intent and dismiss the Debtors' claims.  *See*

Decision and Order at 20, *Airlie Opportunity Fund, L.P. v. Scion Commc'n Partners LLC*, No.

09-26679 (N.Y. Sup. Ct. Jan. 24, 2011) ("No such showing [of criminal intent] can be made at

bar given that the Loan Agreement [] includes a 'savings' clause which unequivocally states that

it is the parties' intent to not receive an interest rate in excess of that lawfully permitted.")

(attached as **Exhibit 2** hereto); *see also Hillair Capital*, 963 F. Supp. 2d at 338 n.1 (usury

avoidance clause "may be relevant to the issue of intent").

VI.    **The Defendants Are Entitled To Judgment On the Equitable Subordination or**
       **Equitable Disallowance Claim (Claim 17)**

66.    The Debtors' Seventeenth Claim for relief, titled "Equitable Subordination on

[sic] Equitable Disallowance of Defendants' Claims," seeks to subordinate Defendants' claims

pursuant to section 510(c) of the Bankruptcy Code.  *See* Compl. ¶ 869.[18]  The claim is premised

on (i) Attorney Kalikow's alleged conflicts of interest, Compl. ¶¶ 860-62, 65, (ii) the so-called

---

[18] While the title of the claim makes also reference to "equitable disallowance," there is no request for disallowance
in the numbered paragraphs of the cause of action.  *See* Compl. ¶¶ 859-869.

"Herrick Waiver Letter," Compl ¶¶ 863, 64, 66, and (ii) the allegation that "Lender went into the

loan transaction with the Debtors with the goal of foreclosing," Compl. ¶ 868.   None of these

allegations are sufficient to support the extraordinary remedy of equitable subordination.

### A.    Equitable Subordination Is an "Extraordinary Remedy" That Is Rarely Applied To Non-Insiders

67.    Section 510(c) of the Bankruptcy Code authorizes a bankruptcy court to, "under

principles of equitable subordination, subordinate for purposes of distribution all or part of an

allowed claim to all or part of another allowed claim."   11 U.S.C. § 510(c).   The doctrine is

considered an "extraordinary remedy that is to be used sparingly."   *In re Sabine Oil & Gas

Corp.*, 547 B.R. 503, 564 (Bankr. S.D.N.Y. 2016) (quoting *Kalisch v. Maple Trade Fin. Co. (In

re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008)).

68.    In determining whether to apply equitable subordination, bankruptcy courts have

looked to the test articulated in *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692

(5th Cir. 1977).   *See, e.g.*, *In re Aeropostale, Inc.*, 555 B.R. 369, 397 (Bankr. S.D.N.Y. Aug. 26,

2016) (applying *Mobile Steel* test).   The three factors of the *Mobile Steel* test are: "(i) [t]he

claimant must have engaged in some type of inequitable conduct; (ii) [t]he misconduct must have

resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the

claimant; [and] (iii) [e]quitable subordination of the claim must not be inconsistent with the

provisions of the Bankruptcy Act."   *Mobile Steel*, 563 F.2d at 699-700 (citations omitted).   An

attempt to subordinate a creditor's claim "must contain some substantial factual basis to support

its allegation of impropriety."   *Aeropostale*, 555 B.R. at 397 (quoting *Mobile Steel*, 563 F.2d at

701).   The party seeking equitable subordination bears the burden of proof.   *Id*.

69.    It is particularly uncommon to subordinate the claim of a non-insider.   *See

LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 348

(Bankr. S.D.N.Y. 2014).   "Unless the non-insider has dominated or controlled the debtor to gain

an unfair advantage, the type of inequitable conduct that justifies subordination of a non-insider's claim is 'breach of an existing, legally recognized duty arising under contract, tort or other area of law.'" *Aeropostale*, 555 B.R. at 398 (citations omitted). "In commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor." *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994). "Absent a contractual breach, 'the proponent must demonstrate fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity.'" *Aeropostale*, 555 B.R. at 398 (quoting *80 Nassau Assocs.*, 169 B.R. at 840).

### B.    The Defendants Are Not Insiders of the Debtors

70.    The Bankruptcy Code defines "insider" to include a "person in control of the debtor." 11 U.S.C. § 101(31)(B).[19]  In addition, because the statutory language is non-limiting, courts have recognized the existence of "non-statutory" insiders. Whether an entity qualifies as a non-statutory insider is evaluated "on a case-by-case basis from the totality of the circumstances, including whether the individual has 'at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to [un]qualifiably dictate corporate policy and disposition of corporate assets." *In re AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) (citing *In re Velo Holdings, Inc.*, 471 B.R. 201, 208 (Bankr. S.D.N.Y. 2012)).[20]  The Second Circuit has observed that, notwithstanding the "flexibility" of the test for insider status, "courts have required evidence of extensive control before finding insider status under § 101(31)(C)(v)." *455 CPW Assocs. v. Greater N.Y. Savs. Bank (In re 455 CPW Assocs.)*, 225 F.3d 645, at *5 (2d Cir. 2000). Moreover, "financial power" resulting from a borrower-lender relationship in which

---

[19] The definition also includes a "director of the debtor," an "officer of the debtor," a "partnership in which the debtor is a general partner," a "general partner of the debtor," or a "relative of a general partner, director, officer, or person in control of the debtor." *Id.* None of these apply to Defendants.

[20] The Court's opinion in *AMR* used the word "qualifiably," but an examination of the authority the Court was quoting indicates the actual word was "*un*qualifiably." *See Velo Holdings*, 471 B.R. at 208.

the borrower is in default does not equate to control.  *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01-6209, 2002 WL 31412465, at *5 (S.D.N.Y. Oct. 24, 2002).

71.    Here, the evidence overwhelmingly supports a finding that the Defendants were *not* insiders of the Debtors.  Among other things:

- Defendants had no direct or indirect ownership interest in the Debtors;

- Defendants had no authority to appoint officers or directors of the Debtors;

- Defendants had no authority to hire or fire employees of the Debtors;

- Defendants and Debtors were at all relevant times represented by their own legal and financial advisors; and

- Negotiations between the parties were arm's length and at times contentious.

72.    In addition, the Debtors specifically acknowledged in writing, on at least two occasions, that no special relationship existed between Defendants and Debtors.  First, in the April Pre-Negotiation Letter (which the Debtors have not challenged) the Debtors acknowledged that "Lender has no fiduciary, confidential or special relationship with any of the Borrower Parties."  April Pre-Negotiation Letter § 5.  Second, in an Option Agreement, dated as of June 19, 2015, between BH Sutton Owner LLC and Gamma Real Estate LLC (the "June Option Agreement"), the Debtors acknowledged that (i) "Gamma shall have no ownership interest in, or decision making authority with respect to, the Project," and (ii) "Gamma has no fiduciary or special relationship with Borrower or the Company."  June Option Agreement § 7(a).

73.    In the face of the overwhelming evidence to the contrary, the Debtors attempt to establish control by pointing to the alleged fact that Kalikow Lender was overly involved in the minutia of planning the Project.  In fact, however, the evidence indicates that Kalikow Lender was *not* a frequent participant in discussions and meetings concerning the Project.  And even if Kalikow Lender had adopted a more hands-on approach, it is not unexpected – nor improper – for a lender to a troubled borrower to keep a "careful watch" on management.  *See Cosoff v.*

*Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 610 (2d Cir. 1983) (improper conduct required more than a showing that "banks preferred advice to [debtor], even advice gloved with an implicit threat that, unless it were taken, further loans would not be forthcoming").

74.    The Debtors also allege that Defendants exercised undue control over which vendors were paid, and when.  But as set forth above, the Defendants' management of the "Draw Req Process" was an exercise of their bargained-for rights under the financing documents.  *See Aeropostale*, 555 B.R. at 409 ("Debtors cannot rely on the existence of these rights – agreed to by the Debtors in exchange for consideration, including a $150 million loan – as a basis for relief here.").  Even assuming the Defendants' actions showed some modest degree of control, it falls far short of what courts have required to establish insider status.  *See 455 CPW Assocs.*, 225 F.3d at *5 (person executing loan documents on debtor's behalf not an insider notwithstanding that, in addition to signing the loan documents, he was vice president of the limited partnership that ran day-to-day functions of debtor); *cf., e.g.*, *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 387 (Bankr. S.D.N.Y. 2007) (allegations of control sufficient to survive motion to dismiss where lender was alleged to (i) hold two seats on board, (ii) control board's ability to obtain a quorum, and (iii) hold rights as a preferred stockholder).

**C.    The Alleged Inequitable Conduct Falls Far Short of Supporting a Claim for Equitable Subordination**

**(i)    Attorney Kalikow's Alleged Conflicts Cannot Be Used as a Basis for Subordinating Defendants' Claims**

75.    The Debtors assert that Attorney Kalikow had an "irreconcilable conflict" and that the Defendants "knew of the irreconcilable conflict and took advantage of it."  Compl. ¶ 860.  These allegations, even if proven, do not support a claim for equitable subordination.

76.    First, as a general matter, a party is responsible for its own choice of counsel, and must accept the consequences of that choice.  *See, e.g.*, *Link v. Wabash R.R.*, 370 U.S. 626, 633

(1962) ("Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent."). Certainly, the Defendants – who were *adverse to* the Debtors in negotiating financing – had no "legally recognized duty" to ensure that the Debtors were adequately represented, as required to state a claim for equitable subordination. *Aeropostale*, 555 B.R. at 398.[21]

77.     Moreover, even if the Defendants had a duty to advise their adversary of its counsel's conflict, such a duty surely could not arise unless the Defendants were aware of the conflict in the first place. Here, there is no evidence that they were. To the contrary, the Debtors had signed a conflict *waiver*. That the Debtors have now challenged that waiver is irrelevant. The Defendants, who are businessmen, not experts in the field of legal ethics, could not have been expected to analyze the waiver's legality– a task that the Debtors themselves have now entrusted to a purported expert with over 30 years of experience in the field.

### (ii)    The Herrick Waiver Letter Provides No Basis for Subordination

78.     In urging equitable subordination, the Debtors also rely on what they refer to as the "Herrick Waiver Letter," a second pre-negotiation letter entered into in December 2015 (the "December Pre-Negotiation Letter"). According to the Debtors, the letter (i) reflected a "gross disregard of the standards of ethical consideration provided to a client," Compl. ¶ 863, and (ii) "fraudulently induced the Debtors into waiving all rights so that Defendants could wrest control over the Project," *id.* ¶ 866.

79.     To the extent that this claim is premised on Attorney Kalikow's alleged ethical breaches, it fails for the reasons discussed immediately above. To the extent the claim is premised on the Defendants' own conduct, it falls far short of establishing a "breach of an existing, legally recognized duty arising under contract, tort or other area of law." *Aeropostale*,

---

[21] Indeed, as Mr. Beninati himself put it at deposition: "I don't usually ask people about what they are doing with their lawyers."

555 B.R. at 398 (quotations omitted).   Pre-negotiation agreements such as this one, in which

sophisticated commercial actors waive claims in exchange for the opportunity to engage in

workout discussions, are a common feature of out-of-court restructurings, and are routinely

enforced.   *See, e.g.*, *Vargas Realty Enters., Inc. v. CFA W. 111 St., LLC*, 440 B.R. 224, 236

(S.D.N.Y. 2010) (upholding validity of pre-negotiation agreement); *Bank of Am., N.A. v.*

*Corporex Realty & Inv. Corp.*, -- F. App'x --, 2016 WL 4376434, at *5 (6th Cir. Aug. 17, 2016)

(enforcing pre-negotiation letters); *JPMCC CIBC Bronx Apts., LLC v. Fordham Fulton LLC*, 84

A.D.3d 613 (N.Y. App. Div. 2011) (enforcing pre-negotiation agreements); *U.S. Bank, N.A. v.*

*23rd St. Dev. LLC*, 25 Misc. 3d 1214 (N.Y. Sup. 2009) (enforcing pre-negotiation agreement).

80.     Moreover, it is well settled that a claim should be subordinated "only to the extent

necessary to offset the harm."  *Aeropostale*, 555 B.R. at 399; *see also LightSquared*, 511 B.R. at

349 (bankruptcy court should make a judgment "regarding the proportionality of the remedy to

the injury that has been suffered by those who will benefit from the subordination").   Here, the

relief requested – subordination of Defendants' claims – is completely disproportionate to the

alleged harm cause by the December Pre-Negotiation Letter.   The letter, if enforced, would

prevent the assertion of certain lender liability-type claims.   The appropriate remedy, therefore,

would be to nullify the waiver and allow assertion of the claims.   To go further would put the

Debtors in a far better position than they occupied prior to their execution of the letter.

### (iii)     The Defendants' Alleged "Loan-to-Own" Strategy Provides No Basis for Subordination

81.     The Debtors also assert that equitable subordination is warranted because the

Defendants "went into the loan transaction with the Debtors with the goal of foreclosing."

Compl. ¶ 868.  This assertion, like the others, seeks to impose a non-existent duty on Defendants.

82.     The evidence will show that Defendants began their relationship with the Debtors

not with the goal of owning the Project, but with the goal of providing financing at an attractive

rate of return.    As the Defendants' expert, Mr. Eyzenberg, will testify, the terms and circumstances of the Gamma financing are not indicative of a "loan-to-own" strategy, nor do Defendants meet the profile of a loan-to-own lender.  The Defendants have been lending since the 1970s and have had only approximately 14 defaults out of more than 300 loans.  Moreover, had the Defendants truly wished to take ownership of the Project, they would not have entered into the Gamma 2 Financing but instead would have exercised remedies under the Gamma 1 Financing.  There were covenant defaults under that financing as early as April 2015 and a looming payment default that the Gamma 2 Financing forestalled.

83.    But even if Debtors could establish that Defendants' ultimate desire was to own the Project, a lender's mere desire to pursue a loan-to-own strategy is not itself inequitable.[22] The decision in *Five Star Development Resorts Communities, LLC v. iStar RC Paradise Valley, LLC*., No. 09-2085, 2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012), is instructive.  There, the defendant made a $112 million development loan, which it later refused to fully fund based on alleged breaches by the borrower.  The borrower sued for breach of contract and asserted, among other things, that the lender had invoked technical breaches as a mere pretext to cease funding, foreclose, and "capture the entire value of the property and the future developments profits for itself."  *Id.* at *2.  Assuming for purposes of decision that lender "deliberately breached the Loan Agreement to gain economic advantage at [borrower's] expense," *id.*, the court nevertheless enforced an exculpatory clause in the loan agreement to bar claims for consequential damages.

### D.    That Part of Claim Seventeen Seeking Equitable *Disallowance* Should Be Dismissed Because the Bankruptcy Code Recognizes No Such Claim

84.    To the extent Claim Seventeen asserts a cause of action for equitable *disallowance*, it should be dismissed.  The language of section 510(c) of the Bankruptcy Code is

---

[22] Indeed, if it were, the claims of distressed investors in large chapter 11 cases would be the near-constant target of equitable subordination claims.

quite clear:  under the authority conferred therein, a court may, "under principles of equitable subordination, *subordinate* . . . all or part of an allowed claim."  11 U.S.C. § 510(c) (emphasis added).  There is no statutory basis for *disallowing* a claim on equitable grounds.  Thus, while case law is not completely uniform, the more recent and soundly-reasoned cases reject the continuing validity of the doctrine.  *See, e.g.*, *In re LightSquared, Inc.*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[T]his Court holds that the Bankruptcy Code, pursuant to section 510(c) or otherwise, does not permit equitable disallowance of claims that are otherwise allowable under section 502(b) of the Bankruptcy Code."); *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 157 (Bankr. S.D.N.Y. 2014) (adopting *LightSquared* analysis).[23]

## VII.    The Defendants Are Entitled To Judgment On the Debtors' "Objection to Claim" (Claim 18)

85.     The Debtors' Eighteenth Claim for relief, entitled "Objection to Claim," seeks to reduce Defendants' allowed claim to $110 million on the basis of the alleged wrongful acts discussed in the Debtors' other causes of action.  Compl. ¶¶ 872, 878.  In particular, the Debtors (i) challenge the use of proceeds of the Gamma 2 Financing to pay the exit fee and interest on the Gamma 1 Financing and to buy out the Apartment Option, (ii) assert that simple interest and "Additional Interest" on the Gamma 2 Financing should be disallowed, (iii) assert that the total principal advanced in connection with the Acquisition Loan was at most $111,280,000, and (iv) assert that the New Mezz Loan was a capital contribution, not a loan.  *See* Plaintiffs' Objs. & Resps. to Defendants' Interrogatories, at 4-5.

86.     The first and second of these assertions, in challenging deal terms that the Debtors specifically agreed to, simply restate the Debtors' unconscionability claims.  Indeed, in seeking reduction of the Defendants' claims, the Debtors' "Objection to Claim" relies explicitly on the

---

[23] If the Court were to recognize equitable disallowance, the claim should nevertheless be denied for the same reasons set forth above in the discussion of equitable subordination.  The remedy is more extreme and so should require even more extraordinary circumstances – not present here.

Defendants' alleged "bad acts." Compl. ¶ 872.  However, for reasons set forth elsewhere in this pleading, the Debtors have failed to show procedural or substantive unconscionability (or duress, or any other valid substantive cause of action).  Accordingly, the objection to the fees and interest components of Defendants' claims must be denied.

87.    The Debtors' third assertion – that Defendants advanced at most $111,280,000 on the Acquisition Loan – is completely unsupported by the evidence.  Among other things, the final closing statement for the loan shows a full disbursement of the stated amount of the Acquisition Loan.  And, of course, the Acquisition Loan Promissory Note and Acquisition Loan Mortgage reflect the full principal amount of the Acquisition Loan, i.e., $125,850,000.

88.    Finally, the Debtors' fourth assertion – that the New Mezz Loan was a capital contribution – is flatly contradicted by the documents governing the loan, which repeatedly characterize it as a loan, not a capital contribution.  To the extent the Debtors intend to assert that the loan should be recharacterized as requity, they have utterly failed to make the requisite showing, or even asserted they are seeking such relief in their Complaint.

## VIII.    The Defendants Are Entitled To Judgment On the Lender Liability, Breach of Fiduciary Duty, and Breach of Duty of Loyalty Claims (Claims 21-23)

89.    The Debtors' Twenty-First, Twenty-Second, and Twenty-Third claims for relief, respectively, assert claims for "lender liability," breach of fiduciary duty, and breach of the duty of loyalty.  Each of these claims depends upon the Debtors' establishing that Defendants exercised such control over the Debtors that they ceased to be lenders and became, in effect, controlling insiders or joint venture partners of the Debtors.  Because the Debtors cannot establish such control, these claims must be dismissed.

### A.      The Defendants Did Not Exercise Control Over the Debtors Sufficient to Transform Their Role From Traditional Lender to Fiduciary

90.      Ordinarily, a "debtor-creditor relationship is not by itself a fiduciary relationship."

*See, e.g.*, *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002).  However, in "unusual"

circumstances, such a relationship may arise if there is either (i) "a confidence reposed which

invests the person trusted with an advantage in treating with the person so confiding," or (ii) "an

assumption of control and responsibility."  *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318

(2d Cir. 1993).  Bargaining leverage alone is insufficient to establish control:  "there is generally

no objection to a creditor's using his bargaining position, including his ability to refuse to make

further loans needed by the debtor, to improve the status of his existing claims."  *W.T. Grant*,

699 F.2d at 610; *see Aeropostale*, 555 B.R. at 409 (same).

91.      The Twenty-Second and Twenty-Third claims allege that Defendants breached

their fiduciary duties and duties of loyalty by "usurping the Debtors' opportunity," "forcing

burdensome and onerous legal documents to be signed at the eleventh hour," "frustrating the

Debtors' efforts to refinance its debt," and seeking to "wrest control of the Project."  Compl.

¶¶ 934, 939.  The allegations in the two claims are essentially the same – and the duty of loyalty

claim depends for its existence on the presence of a fiduciary duty in the first instance.  *See*

*Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984) (duty of loyalty "derives

from the prohibition against self-dealing that inheres in the fiduciary relationship").

92.      The Debtors can establish no such fiduciary duty here.  The Defendants and the

Debtors have at all times dealt with one another at arm's length, with no confidence reposed by

Debtors and no control exercised by Defendants.  As discussed in Part VI.B, above, contracts

entered into by the Debtors in April and June of 2015 expressly *disclaimed* the existence of a

special, confidential, or fiduciary relationship.  *See* April Pre-Negotiation Letter § 5; June Option

41

Agreement § 7(a).  Having acknowledged the absence of a relationship of confidence at the time, the Debtors cannot now claim to have relied on Defendants to protect their interests.

93.     Moreover, the same factors that support a finding that Defendants were not insiders – the absence of any ownership interest; the inability to appoint directors, officers, or management; the lack of authority over hiring and firing; and the adversarial nature of negotiations – also support a finding that Defendants were not in control of the Debtors.  Even if the Defendants took a close interest in the Debtors' business, carefully monitored progress on the Project, or even threatened to exercise contractual remedies or refuse future funding, each of these actions is permissible, and none gives rise to a fiduciary duty.  *See, e.g., Roswell Capital Partners LLC v. Alternative Constr. Techs.*, 638 F. Supp. 2d 360, 369 (S.D.N.Y. 2009) (lender that "received ownership of shares [], appointed two members to the Board of Directors, and hampered [debtor's] efforts to obtain additional funding" not a fiduciary); *Pinky Originals, Inc. v. Bank of India*, No. 94-3568, 1996 WL 603969, at *26 (S.D.N.Y. Oct. 21, 1996) (lender that "visited [debtor's] showroom and warehouse and inspected its product line," received debtor's business plans, had "regular meetings and spoke frequently on the telephone [with debtor]," and "closely monitored [debtor's] account" not a fiduciary).

94.     The absence of a fiduciary relationship is fatal to both the breach of fiduciary duty claim (Claim 22) and the claim for breach of the duty of loyalty (Claim 23).

**B.      To the Extent Courts Recognize a Claim for "Lender Liability," the Claim Must Be Dismissed for the Same Reasons As the Fiduciary Duty Claim**

95.     Case law is divided as to the existence of a cause of action for "lender liability." The more recent and well-reasoned cases reject the notion of "lender liability" as an independent cause of action, viewing it instead as an umbrella term for a series of other substantive claims. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 418 (S.D.N.Y. 2000) ("Lender liability is not an independent cause of action, but a term that refers to the imposition of

42

traditional contract or tort liability on a bank or other financial institution."); *In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 569 (S.D.N.Y. 2015) ("Plaintiffs' claim…invokes the doctrine of 'lender liability' law…, which has been largely discredited."); *Airbus DS Optronics GmbH v. Nivisys LLC*, No. 14-2399, 2016 WL 2342060, at *5 (D. Ariz. May 2, 2016) ("Substantial persuasive authority and several secondary sources have addressed the issue, and concluded that 'lender liability' is not itself a cognizable legal claim, but rather an umbrella term – a descriptor – that has been applied to a number of common law and statutory causes of action.").

96.     To the extent some older cases have suggested that such a cause of action may exist, the standard is quite high.  "Lender liability is predicated on an unmistakable showing that the subservient corporation in reality has no separate, independent existence of its own and was being used to further the purposes of the dominant corporation."  *Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995).  As with the fiduciary duty claim, mere "[s]uggestions by a major lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper."  *Id.*  Here, for the same reasons set forth in the discussions of insider status and fiduciary duty, above, the claim for "lender liability," if it exists, must be denied.  *Cf. also Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (analogizing to lender liability "principles" and refusing to impose WARN liability on lender that, after default, pursued a consensual workout, installed new management at the debtor, and funded the debtor's payroll).

## IX.     The Defendants Are Entitled To Judgment On the Fraudulent Transfer Claims (Claim 24)

97.     In their Twenty-Fourth claim, the Debtors assert that the December Pre-Negotiation Letter was a constructively and actually fraudulent transfer pursuant to section 548 of the Bankruptcy Code.  Compl. ¶¶ 942-49.  The constructive fraud claim fails because the

43

Debtors cannot prove insolvency and lack of reasonably equivalent value, and the actual fraud

claim fails because the Debtors have conceded that they did not act with fraudulent intent.

**A.    The Debtors Cannot Meet Their Burden of Proof On the Constructive Fraudulent Transfer Claim**

98.    Under the Bankruptcy Code, a transfer made within two years of bankruptcy may

be avoided as constructively fraudulent if (i) the debtor received less than "reasonably equivalent

value," and (ii) the debtor (a) "was insolvent on the date that such transfer was made . . . or

became insolvent as a result of such transfer," (b) "was engaged in business or a transaction, or

was about to engage in business or a transaction, for which any property remaining with the

debtor was an unreasonably small capital," or (c) "intended to incur, or believed that the debtor

would incur, debts that would be beyond the debtor's ability to pay as such debts matured."  11

U.S.C. § 548(a)(1)(B).   The debtor bears the burden of proof on these issues.  *See Pereira v.

WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 378 (Bankr. S.D.N.Y.

2013); *Murdock v. Plymouth Enters., Inc. (In re Curtina)*, 23 B.R. 969, 974 (Bankr. S.D.N.Y.

1982); *Dimino v. Fisher (In re Dimino)*, 429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010).

**(i)    The Debtors Cannot Prove They Received Less Than Reasonably Equivalent Value**

99.    The Debtors' Complaint makes no attempt to value either the benefits received by

the Debtors or the consideration provided to the Defendants under the December Pre-Negotiation

Letter.   Instead, the Complaint states in conclusory fashion only that "[t]he Debtors did not

receive consideration for the concessions made in [sic] Herrick Waiver Letter."  Compl ¶ 946.

Absent presentation of admissible evidence at trial, the constructive fraud claim is subject to

dismissal on these grounds alone.  *See, e.g.*, *Off. Comm. of Unsecured Creditors v. Blomen (In re

Hydrogen, LLC)*, 431 B.R. 337, 353-54 (Bankr. S.D.N.Y. 2010) (dismissing constructive fraud

claim in light of conclusory allegations as to lack of reasonably equivalent value).

44

100.     In any event, the Debtors *did* receive fair consideration for the concessions made in the December Pre-Negotiation Letter.   It is well settled that indirect benefits – such as forbearance and the opportunity to avoid bankruptcy – can constitute reasonably equivalent value.  *See, e.g.*, *Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01-6209, 2002 WL 31412465, at *6 (S.D.N.Y. Oct. 24, 2002) (forbearance may constitute reasonably equivalent value); *Preifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, No. 13-1320, 2013 WL 3828509, at *5 (Bankr. S.D.N.Y. Jul. 23, 2013) (same); *Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp. (In re Join-In Int'l (U.S.A.) Ltd.)*, 56 B.R. 555, 560 (Bankr. S.D.N.Y. 1986) (in determining reasonably equivalent value, "the court should not only consider the direct benefits conferred upon the debtor but the indirect benefits as well").

101.     Here, by signing the December Pre-Negotiation Letter, the Debtors obtained the opportunity to engage in workout negotiations with the Defendants and avoided the potential of an immediate default, acceleration, and foreclosure.   Those negotiations, while ultimately unsuccessful, were initially promising, and likely served to postpone a bankruptcy filing by at least several months.  In return, the Debtors surrendered the chance to pursue certain speculative claims – claims that, as demonstrated elsewhere in this pleading, had very little chance of success.  This exchange was fair consideration.  *See Vargas Realty Enters., Inc. v. CFA W. 111 St., LLC*, 440 B.R. 224, 237 (S.D.N.Y. 2010) ("The law is [] clear that a bargained-for agreement to negotiate when there is no legal obligation to do so is fair consideration.").

### (ii)     The Debtors Cannot Prove They Were Insolvent

102.     The Debtors' Complaint makes no effort to establish their insolvency as of the date of the December Pre-Negotiation Letter.  Instead, the Debtors simply parrot the language of the insolvency tests set forth in Section 548(a)(1)(B)(ii) of the Bankruptcy Code.  *See* Compl. ¶ 945.  Absent introduction of admissible evidence at trial, the constructive fraud claim is thus

45

subject to dismissal. *See O'Toole v. Karnani (In re Trinsum Grp. Inc.)*, 460 B.R. 379, 394 (Bankr. S.D.N.Y. 2011) (to plead insolvency, "[g]enerally, there must be some sort of financial data or analysis provided so that the court can infer the company's liabilities exceeded its assets at the time the transfers in question took place"); *Lippe v. Bairnco Corp.*, 230 B.R. 906, 915 (S.D.N.Y. 1999) (dismissing fraudulent transfer claim where "conclusory allegations" of insolvency were "contradicted by more specific allegations in the amended complaint").

103.    In any event, as of the date of the December Pre-Negotiation Letter, the Debtors were neither (i) insolvent, nor (ii) left with unreasonably small capital, nor (ii) intending to incur debts beyond their ability to pay. The Debtors' own allegations refute their insolvency claim, as they allege valuations for the Project as of February 2016 far in excess of Defendants' claims. *See* Complaint at 2 ("The Project is valued at $181 mm 'as is,' $256 mm 'fully massed,' $277 mm with a completed foundation and over $1 billion 'as completed.'"). These valuations also negate the claim of unreasonably small capital because, assuming the truth of such valuations, the Debtors could have refinanced. *See Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*, -- F. App'x --, 2016 WL 3315847, at *2 (2d Cir. Jun. 15, 2016) (ability to refinance is relevant to unreasonably small capital test under Pennsylvania UFTA). Finally, the Debtors have not alleged that when entering into the December Pre-Negotiation Letter they *intended* to incur debts beyond their ability to pay, thus negating the third of the three tests set forth in Bankruptcy Code section 548(a)(1)(B)(ii).

### B.    The Debtors' Intentional Fraud Claim Does Not Allege the Requisite Fraud On the Part of the Debtor-Transferor

104.    The Bankruptcy Code permits avoidance of a transfer made within two years of bankruptcy "if the *debtor* . . . made such transfer  . . . with actual intent to hinder, delay or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A) (emphasis added). As the language of the statute makes clear, "it is the intent of the transferor

46

and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code." *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005); *see also Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (same).

105.    Here, the Complaint does not allege that the *Debtors* acted with fraudulent intent. The only party who is alleged to have acted with fraudulent intent in Claim 24 is Attorney Kalikow.  *See* Compl. ¶ 948.  Moreover, Mr. Beninati affirmatively acknowledged at deposition that he had no intent to defraud the Debtors' creditors when he signed the December Pre-Negotiation Letter.  For this reason alone, the intentional fraud claim must be dismissed.

106.    Moreover, even if the Debtors had alleged fraudulent intent on behalf of the proper party, they have not plead fraud with specificity, as required by the Federal Rules.  *See Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).  Generally speaking, "Rule 9(b) pleadings cannot be based upon information and belief." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Here, the allegations of fraudulent intent are made solely "[u]pon information and belief," Compl. ¶ 948, and contain none of the specifics required by Rule 9(b), failing even to identify an entity who the Debtors intended to defraud.  Accordingly, the Claim must be dismissed.

## X.    The Defendants Are Entitled To Judgment On the Preferential Transfer Claim (Claim 25)

107.    The Debtors' Twenty-Fifth claim for relief asserts that the Defendants obtained a preferential transfer when, on March 29, 2016, they applied approximately $16.4 million of reserve funds against the balance of the debt owed under the Gamma 2 Financing (the "March 2016 Transfer").  *See* Compl.  ¶¶ 689-693, 950-959.  In light of the Defendants' secured status, the claim is dependent upon the success of the Debtors' equitable subordination claim.  *See* Compl. ¶ 958 (alleging March 2016 Transfer enabled Defendants to receive "more than they

would receive if . . . Defendants' debt was reclassified to equity"). Because, as set forth above, the equitable subordination claim fails, the preference claim must fail as well.

**XI.** **The Defendants Are Entitled To Judgment On the Improper UCC Sale Claim (Claim 26)**

108.    The Debtors' Twenty-Sixth claim seeks an order declaring that the Defendants' attempted pre-petition foreclosure sale of Sutton Mezz's ownership interests in Sutton Owner DE (the "U.C.C. Sale") was not commercially reasonable. *See* Compl. ¶¶ 960-965. This claim should be dismissed for a variety of reasons.

109.    First, similar relief has already been denied in state court. Before filing for bankruptcy, the Debtors sought a preliminary injunction in state court to stop the U.C.C. Sale, asserting the sale was commercially unreasonable for the same reasons they now assert here. *See* State Court Complaint ¶¶ 47-72 (excerpts attached as **Exhibit 1** hereto). Judge Sherwood of the New York State Supreme Court denied the Debtors' emergency motion, determining that "the likelihood of success [on the merits], to put it mildly, has not been shown and probably can't be shown." Feb. 23, 2016 Hr. Tr. at 38:3-5 (excerpts attached as **Exhibit 3** hereto).

110.    Second, as the Debtors' acknowledge, the U.C.C. Sale was never completed. Thus, the request for an order declaring the sale to be improper is moot, and any declaration by the Court as to the sale's propriety would be an impermissible advisory opinion.

111.    Third, the Debtors are not entitled to any monetary relief on the Twenty-Sixth Claim. Aside from a declaration as to the sale's impropriety, the Debtors also appear to seek attorneys' fees. *See* Compl. ¶ 964. But the Debtors waived any right to such fees in section 8(d) of the Pledge and Security Agreement pursuant to which Sutton Mezz pledged its equity interests in Sutton Owner, which limits the Defendants' liability under the agreement to damages caused by "gross negligence or willful misconduct." *See* Pledge and Security Agreement, dated as of June 19, 2015, by BH Sutton Mezz LLC in favor of Sutton 58 Associates LLC (the "Pledge and

48

Security Agreement") § 8(d).  While the Debtors assert that the U.C.C. Sale was commercially

unreasonable, they do not claim – and cannot show – that the attempted sale allowed by Judge

Sherwood was conducted with gross negligence or willful misconduct.[24]

112.    Finally, to the extent the Court were to reach the matter, it should conclude – just

as the highly experienced State court judge effectively did (after considering expert affidavits) –

that there is no basis for holding that the planned U.C.C. Sale was commercially unreasonable.[25]

The Debtors assert the contemplated sale was unreasonable because (i) the Defendants provided

only a little over a month's notice to the Debtors, Compl. ¶¶ 679, 680, 683, (ii) the Defendants

reserved the right to accept or reject any bid, *id.* at 686, (iii) the terms and conditions of the sale

were made available only to bidders who signed non-disclosure agreements, *id.* at 687, and

(iv) the Defendants retained the right to waive or modify the terms and conditions of the sale, *id.*

at 688.  As to the first of these contentions, the notice was more than sufficient:  both the parties'

contract, and applicable law, required no more than ten days' notice.  *See* Pledge and Security

Agreement § 6(a) ("Any notification of intended disposition of any of the Subject Collateral shall

be deemed reasonably and properly given if given at least ten (10) days before such

disposition."); N.Y. U.C.C. Law § 9-612(a) ("In a transaction other than a consumer transaction,

a notification of disposition sent after default and 10 days or more before the earliest time of

disposition set forth in the notification is sent within a reasonable time before the disposition.").

113.    As to the Debtors' remaining contentions, Defendants are aware of no statute or

case law holding such provisions unreasonable.  There is no evidence that the procedures

---

[24] The Debtors assert in conclusory fashion in the title of their Twenty-Sixth claim that the sale was "fraudulent," *see* Compl. pp. 120, but their actual allegations concerning the U.C.C. Sale do not contain any such assertion (let alone any particular or specific allegations as to any purported fraud).  *See* Compl. ¶¶ 672-688.

[25] In the state court litigation, the Debtors asserted that the creditor bore the burden of proof as to commercial reasonableness.  However, the case law the Debtors cited appeared to suggest only that a secured creditor that is seeking a deficiency judgment after a foreclosure sale may bear the burden of proof.  That case law is clearly inapplicable here, where the Debtors, not the Defendants, are seeking affirmative relief in the form of damages.

governing the sale chilled potential bidding; to the contrary, nine potential bidders signed the Defendants' proposed Confidentiality Agreement and were provided access to a data room. Moreover, as the Court knows, sale procedures such as the ones the Defendants find objectionable here are routinely requested, and often approved, in connection with Bankruptcy Code section 363 sales.[26]  The Debtors have not offered any evidence or authority showing that similar provisions render a U.C.C. foreclosure sale commercially unreasonable.

## XII.    The Debtors' Recovery Is Limited to Direct, Not Consequential, Damages

114.    Even assuming the Debtors were to prevail on any of their claims, their damages are contractually limited to direct (not consequential) damages.  Accordingly, Debtors cannot recover for damage to reputation, attorneys' fees, or lost investment opportunity.

### A.    The Debtors Have Waived Consequential Damages

115.    The law is well-settled in New York that contractual limitation on liability clauses generally will be enforced.  *See, e.g.*, *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y. 2d 430, 436 (N.Y. 1994) ("A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor."); *My Play City, Inc. v. Conduit Ltd.*, 589 F. App'x 559, 562 (2d Cir. 2014) (same).

116.    Here, each of the Acquisition Loan Agreement, Building Loan Agreement, and New Mezz Loan Agreement contain an identical limitation on liability clause stating:  "Borrower hereby unconditionally and irrevocably waives, to the maximum extent not prohibited by applicable law, any rights it may have to claim or recover against Lender in any legal action or proceeding any special, exemplary, punitive or consequential damages."   Acquisition Loan

---

[26] In the state court litigation, the Debtors' counsel conceded, under questioning from the judge, that provisions permitting the lender to reject any bid in its discretion and to cancel the sale or adjourn the sale were standard. *See* Feb. 23, 2016 Hr. Tr. at 18:24-19:20 (excerpts attached as **Exhibit 3** hereto).

Agreement § 8.10; Building Loan Agreement § 8.10; New Mezz Loan Agreement § 8.10.  This waiver is valid and enforceable according to its terms.  *See, e.g., Five Star Dev.*, 2012 WL 4119561, at *3 (enforcing similar provision in real estate development loan).[27]

**B.    The Debtors' Claims for Lost Profits, Lost Investment Opportunity, Damage to Reputation, and Attorneys' Fees Must Be Disallowed**

117.    The Debtors have asserted they are entitled to recover for "reputational damage" and attorneys' fees.  *See* Plaintiffs' Objs. & Resps. to Defendants' Interrogatories, at 5.  In addition, though not expressly asserted, it appears in light of the astronomical damages sought in the Debtors' complaint (no less than $100 million), that Debtors may be seeking to recover for a lost investment opportunity.  For a variety of reasons, none of these damages are recoverable.

118.    First, in the context of a contract to make a loan, the only *direct* (non-consequential) damages for breach are the loss of the "funds themselves or interest on them." *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955 (7th Cir. 1982); *see also Cent. Coordinates, Inc. v. Morgan Guar. Trust Co.*, 494 N.Y.S.2d 602, 604 (N.Y. Sup. Ct. 1985) (same).[28]  Any "dislocation in [the borrower's] business triggered by the failure to pay" is a consequential damage.  *Evra Corp.*, 673 F.2d at 955; *see also Five Star Dev.*, 2012 WL 4119561, at *1 n.2 (damages sought by borrower under real estate development loan premised on a "lost-investment theory" were consequential damages).[29]

---

[27] Courts may decline to enforce such a waiver if it is unconscionable.  The Debtors have not challenged the waiver on these grounds (and as set forth elsewhere herein, the loan documents as a whole were not unconscionable).

[28] The measure of direct damages in this circumstance would be the cost of substitute financing.  *See Binghamton Masonic Temple, Inc. v. City of Binghamton*, 602 N.Y.S. 2d 310, 312 (N.Y. Sup. Ct. 1993) ("[T]he measure of damages [for breach of a loan agreement] is based on the increased cost of obtaining the same amount of money for the same term as was to be obtained from defendant."); *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990) (if defendant had breached loan commitment agreement, plaintiff "would be entitled only to money damages reflecting the difference between the interest rate it had agreed to with [defendant] and such higher interest rate as it was reasonably forced to pay another lender as a result of [defendant's] breach").

[29] Any damages relating to Debtors' dealings with third parties, to the extent Debtors assert them, would also be consequential damages.  *See 437 Madison Ave. Assocs. v. A.T. Kearney, Inc.*, 488 N.Y.S. 2d 950, 951 (N.Y. App. Div. 1985) ("[C]onsequential damages which do not arise out of the immediate transaction between the contracting

119.    Here, as stated above, the Debtors expressly waived the right to recover consequential damages.  Accordingly, even if they could prove damage to reputation or loss of investment opportunity resulting from a failure to perform under the Gamma 2 Financing Documents, those damages have been waived.

120.    Second, even if consequential damages had not been waived, the Debtors have failed to prove the existence or amount of any lost profits or damage to reputation with the "reasonable certainty" the case law requires.  *See, e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000).  Specifically, "[a]lthough lost profits needs not be proven with 'mathematical precision,' they must be 'capable of measurement based upon known reliable factors without undue speculation.'"  *Id.* (citation omitted).  In the context of a new business venture, evidence of lost profits receives "greater scrutiny," and "[p]rojections of future profits based upon a 'multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty."  *Id.* (citations omitted).  Here, the Debtors have yet to produce *any* evidence valuing lost profits or damage to reputation.

121.    Third, leaving aside the foregoing hurdles, "New York law generally does not permit damages for loss of reputation in breach of contract actions."  *I.R.V. Merch. Corp. v. Jay Ward Prods., Inc.*, 856 F. Supp. 168, 175 (S.D.N.Y. 1994); *see also Saxton Commc'n Grp., Ltd. v. Valassis Inserts, Inc.*, No. 93-0388, 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) (dismissing claim for damages based upon unparticularized assertions of harm to reputation and loss of future business).

122.    Fourth, to the extent there has been any damage to reputation here, it is damage to Mr. Beninati's reputation.  The Debtors are special purpose entities created for purposes of the Project whose reputation outside the context of the current Project is essentially irrelevant.  Mr.

---

parties, but which stem from losses incurred by the nonbreaching party in its dealings with third parties, are not recoverable unless those damages were reasonably foreseeable by the breaching party at the time of contract.").

Beninati may have suffered (self-inflicted) damage to his reputation, but that is not recoverable in an action to which he is not a plaintiff.

123.    Finally, attorneys' fees are consequential damages as well.  *See, e.g.*, *Evra Corp.*, 673 F.2d at 955 (costs of arbitration proceeding arising out of dispute were consequential damages).  And even if they were not, "[i]t is also well settled that attorney's fees may not be awarded in the absence of a statute expressly authorizing their recovery, or an agreement or stipulation to that effect by the parties."  *Schwartz v. Leonard*, 526 N.Y.S.2d 506, 508 (N.Y. App. Div. 1988); *see also, e.g.*, *Brownie's Army & Navy Store, Inc. v. Burke*, 72 A.D. 2d 171, 174 (N.Y. App. Div. 1980) (same); *Asturiana De Zinc Mktg., Inc. v. LaSalle Rolling Mills, Inc.*, 20 F. Supp. 2d 670, 674 (S.D.N.Y. 1998) (same).  Here, Debtors can point to neither.

## XIII.    The Withdrawn Claims Should Be Dismissed With Prejudice

124.    By letter to the Court dated October 25, 2016, the Debtors stated they would not be pursuing their Eighth, Twelfth through Sixteenth, and Nineteenth Claims for relief.  The Debtors did not specifically state that those claims were withdrawn with prejudice.  However, in light of the substantial time and expense incurred in investigating and preparing to try those claims, the Debtors' withdrawal of those claims on the eve of trial has resulted in substantial dislocation and cost to the Defendants.  Accordingly, based on the Debtors' decision not to pursue the claims at this time, the Court should dismiss those claims with prejudice.

125.    Dismissal of the claims with prejudice is also warranted because the claims are completely without merit.  Among other things:

- "Waste and diminution in value" is a claim that lenders assert against their borrowers, not vice versa.  *See, e.g., Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 120 (2d Cir. 1994) ("New York Courts have recognized two general categories of waste.  First . . . New York courts recognize 'a substantive cause of action for waste against one in control of real property who does no more than allow the property to deteriorate and decrease in value.'  Second, New York courts recognize a cause of action for waste by a mortgagee against a mortgagor who impairs the mortgage.").

- The December Pre-Negotiation Letter does not "shock the conscience" but in fact is a standard form of agreement that is routinely enforced by the courts. *See, e.g., Vargas Realty Enters., Inc. v. CFA W. 111 St., LLC (In re Vargas Realty Enters., Inc.)*, 440 B.R. 224, 236 (S.D.N.Y. 2010); *Bank of Am., N.A. v. Corporex Realty & Inv. Corp.*, -- F. App'x --, 2016 WL 4376434, at *5 (6th Cir. Aug. 17, 2016); *JPMCC 2007-CIBC19 Bronx Apts., LLC v. Fordham Fulton LLC*, 84 A.D.3d 613 (N.Y. App. Div. 2011); *U.S. Bank, N.A. v. 23rd St. Dev. LLC*, 25 Misc. 3d 1214, at *3 (N.Y. Sup. Ct. 2009).

- The merger of Sutton NY into Sutton DE was effective upon the filing of the certificate of merger with the Secretary of State. *See* Del. Code Ann. tit. 6, § 18-209(d); N.Y. Ltd. Liab. Co. Law § 1003(b).   Under New York law (which by definition must apply to the resurrection of a defunct New York entity), "there is no legal mechanism for the annulment of a certificate of merger or resurrection of a former corporate entity by the 'unmerging' of a merged corporation." *Windings, Inc. v. Secretary of the State of N.Y.*, 189 Misc. 2d 417, 418 (N.Y. Sup. Ct. 2001). Accordingly, Sutton NY, once merged out of existence, ceased to exist. *See, e.g., Westside Fed. Savs. & Loan Ass'n of New York City v. Fitzgerald*, 136 A.D. 2d 699 (N.Y. App. Div. 1988) (once merger has been effected, "the absorbed corporation immediately ceases to exist as a separate entity").   Even if Delaware law applied (which may permit the unwinding of mergers in limited circumstances), it would be highly inequitable to unwind the merger so long after its effective date after the Debtors have consistently ratified the merger, including at the closing of the Gamma 2 Financing and in proceedings before this Court. *See, e.g., FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 863 (Del. Ch. 2016) ("[T]he ordinary rule is that it is impractical to unwind a consummated merger."); *Cede & Co v. Technicolor, Inc.*, 542 A.2d 1182, 1191 (Del. 1988) ("At this late date, there is a strong reluctance to 'unwind' a merger."); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983) ("Since it is apparent that this long completed transaction is too involved to undo . . . the award, if any, should be in the form of monetary damages."). Finally, were the merger to be unwound, the Defendants would be entitled to a constructive trust, equitable lien, or equitable mortgage, per their counterclaims. *See, e.g., Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 93 (2d Cir. 1989) ("[B]ut for the debtor's misconduct, the trust beneficiary would have perfected his security interest in the res of the trust and thus would have prevailed over the debtor as well as the debtor-in-possession.").

- The duress claim fails because the Debtors had alternatives to entering the Gamma 2 Financing (including a sale or a bankruptcy filing) and the Debtors did not act promptly in repudiating the contract. *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 251-52 (2d Cir. 1985) ("There was no basis for inferring that, if the defendants' conduct was indeed improperly coercive, Durante could not have resorted to legal process to enforce enforceable agreements or fend off unwarranted punitive actions by the Bank."); *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08-Civ-11365, 2010 WL 1257300, at *11 (S.D.N.Y. Mar. 31, 2010) (existence of bankruptcy alternative defeated duress claim); *Stoerchle v. Stoerchle*, 101 A.D.2d 831, 832 (N.Y. App. Div. 1984) ("The law is well settled that a party

seeking to repudiate a contract procured by duress must act promptly lest he be deemed to have elected to affirm it.").

C<small>ONCLUSION</small>

WHEREFORE, Defendants respectfully request that judgment be entered in their favor dismissing with prejudice all of the claims in the Complaint.

Dated: October 28, 2016
    New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ P. Bradley O'Neill
    Adam C. Rogoff
    P. Bradley O'Neill
    Gregory A. Horowitz
    Natan M. Hamerman
    David E. Blabey Jr.
    1177 Avenue of the Americas
    New York, New York 10036
    Tel.: (212) 715-9100

*Attorneys for Defendants*

**Exhibit 1**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------- x
SUTTON 58 OWNER, LLC                          :    Index No.:
and BH SUTTON MEZZ LLC,                        :    Date Purchased:
                                               :
                         Plaintiffs,           :    **SUMMONS**
                                               :
          -against-                            :    Plaintiff designates New York
                                               :    County as the place of trial
SUTTON 58 ASSOCIATES LLC,                      :
                                               :    The basis of venue is
                         Defendant.            :    CPLR 501 and 503
                                               :
------------------------------------------------------------- x

To the above-named Defendant:

     YOU ARE HEREBY SUMMONED and required to serve upon Plaintiffs' attorney an

answer to the Complaint in this action within twenty (20) days after the service of this Summons,

exclusive of the day of service, or within thirty (30) days after service is complete if this

Summons is not personally delivered to you within the State of New York.  In case of your

failure to answer, judgment will be taken against you by default for the relief demanded in the

Complaint.

Dated:  New York, New York
        February 17, 2016                **MEISTER SEELIG & FEIN LLP**


                                         By:    /s/ Stephen B. Meister
                                                Stephen B. Meister, Esq.
                                                Kevin Fritz, Esq.
                                                Chelsea Silverstein, Esq.
                                         125 Park Avenue, 7th Floor
                                         New York, New York 10017
                                         Phone:  (212) 655-3500
                                         *Attorneys for Plaintiffs*


TO:     SUTTON 58 ASSOCIATES LLC
        101 Park Avenue, Suite 2602
        New York, New York, 10178
        Attn: N. Richard Kalikow

                                         1

**EXHIBIT**

Beninati    77
10/25/16    ᴛᴅ

**DX-J**

Sutton-KL_0029036

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x
SUTTON 58 OWNER, LLC                                    :   Index No.:
and BH SUTTON MEZZ LLC,                                 :
                                                        :   **VERIFIED**
                          Plaintiffs,                   :   **COMPLAINT**
                                                        :
              -against-                                 :
                                                        :
SUTTON 58 ASSOCIATES LLC,                               :
                                                        :
                          Defendant.                    :
                                                        :
-----------------------------------------------------------------x

         Plaintiffs Sutton 58 Owner, LLC and BH Sutton Mezz LLC (collectively, "Plaintiffs"),

by their undersigned counsel, as their Verified Complaint against Sutton 58 Associates LLC

("Defendant" or "Lender"), allege, upon knowledge with respect to their own acts and upon

information and belief with respect to all other matters, as follows:

                                 <u>NATURE OF THIS ACTION</u>

         1.      In June of 2015, Plaintiffs Sutton 58 Owner, LLC ("Owner") and its parent entity,

BH Sutton Mezz LLC (the "Mezz Borrower") respectively received advances of funds under

"separate" mortgage and mezzanine loans, though both loans were made by the same lender –

Defendant Sutton 58 Associates LLC.

         2.      The June 2015 loans advanced by Defendant replaced and paid off smaller

mortgage and mezzanine loans advanced by Defendant's affiliate in January of 2015.

         3.      Owner assembled a development site at 428 – 432 East 58th Street in Manhattan,

and procured the relevant approvals for the construction of a 68-story, nearly 1,000 foot tall

luxury apartment building on the site (the "Project Site").

[7196-1/4893226/1]                        1

Sutton-KL_0029037

the Mezzanine Loan, which is a fraction of the Property's value. A true and correct copy of the Proposal is attached hereto as **Exhibit F**.

45.     The same day (January 20, 2016), Lender sent the Mezz Borrower a Notification of Disposition of Collateral (the "Original Sale Notice"), scheduling a U.C.C. auction sale of the Collateral to the highest qualified bidder on February 11, 2016 at the Manhattan offices of the Lender's counsel (the "U.C.C. Sale"). A true and correct copy of the Original Sale Notice is attached hereto as **Exhibit G**.

46.     On February 5, 2016, Lender sent the Mezz Borrower another Notification of Disposition of Collateral (the "Second Sale Notice"), rescheduling the U.C.C. Sale for February 29, 2016. A true and correct copy of the Second Sale Notice is attached hereto as **Exhibit H**.

**E.     The U.C.C. Sale is Not Commercially Reasonable**

47.     Section 9-610(b) of the N.Y. U.C.C. provides, in pertinent part: "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."

48.     The N.Y. U.C.C. thus unambiguously requires a commercially reasonable sale at which a price is determined after the public has a meaningful opportunity for competitive bidding, thereby insuring that the collateral is not sacrificed at a price below its actual value.

49.     The U.C.C. Sale that Lender noticed and then, after realizing the originally noticed sale was not commercially reasonable, re-noticed commercially unreasonable under Section 9-610(b) due to its hasty nature and for the further reasons described below.

50.     The Second Sale Notice was issued on February 5, 2016, just 24 calendar days (13 business days) prior to the U.C.C. Sale scheduled for February 29, 2016.[1]

---

[1] February 12, 2016 and February 15, 2016 are legal holidays.

Sutton-KL_0029045

51.      On February 10, 2016, just 19 calendar days before the rescheduled U.C.C. Sale, the U.C.C. Sale was advertised for the first time on page 12 of the weekly publication *Real Estate Alert* (the "Advertisement"). A true and correct copy of the Advertisement is attached hereto as **Exhibit I.**

52.      *Real Estate Alert* is a weekly publication with very limited readership. According to its website, it "is sent weekly by mail and email to *hundreds* of professionals involved in the real estate investment arena," has an average weekly readership of only 21,000, and only 21% paid subscribers are developers/investors. (https://www.realert.com/advertise/readers.pl). Thus, the scope of potential bidders is much narrower than if the U.C.C. Sale had been properly advertised in a daily publication with a large circulation and otherwise marketed in a commercially reasonable manner by a professional broker.

53.      Moreover, the Advertisement contains some, *but not all,* of the essential terms of the U.C.C. Sale, and those terms that were disclosed are clearly designed to chill the bidding.

54.      For instance, the Lender "reserves the right to accept or reject any bid and shall not be obligated to make any sale pursuant to this notice...."

55.      As another example of a sale term designed to chill bidding, the Advertisement states that the U.C.C. Sale "will be subject to terms and conditions more particularly described in certain Bidding Procedures and Terms of Public Sale" which is only available if the potential bidder signs "an acceptable non-disclosure agreement."

56.      Even worse, the Lender will not disclose other terms and conditions until the moment of the U.C.C. Sale, which terms and conditions can be "waived or modified by the [Lender] in its discretion."

Sutton-KL_0029046

57.    In addition, the Notice fails to apprise bidders that the Mortgage Loan are in default and that they must pay off the Mortgage Loans.

58.    Further shortening the already inadequate 19-calendar-day time frame (only 10 business days), Lender set February 24, 2016 as the deadline for bid submissions, which reduces the due diligence and underwriting period to a mere 14 calendar days (8 business days).

59.    Moreover, according to the Advertisement, the Lender can reject any bids, regardless of the objective reasonableness thereof: "The Secured Party reserves the right to determine the qualifications of any bidder, including the bidder's ability to close the transaction, in its sole and absolute discretion."

60.    Remarkably the Lender can also adjourn the U.C.C. Sale without advertising the adjourned date thereof: "The Secured Party may adjourn or cancel the sale hereby advertised or cause such sale to be adjourned from time to time, without written notice or further publication, by announcement at the time and place appointed for such sale, or any adjournment, and, without further notice or publication, such sale may be made at the time or place to which the sale may have been so adjourned."

61.    Lender failed to make readily available to prospective bidders, by way of access to a website or electronic "data room," standard due diligence materials, including, but not limited to, zoning analyses and agreements, articles of incorporation, by-laws, lien and judgment searches, certificates of good standing, title reports, surveys, development, engineering and architectural plans, environmental reports, engineering reports, information regarding the Loans (including copies of the loan documents and current loan balances) and other information that would typically by used and evaluated by a prospective bidder in deciding to participate in the U.C.C. Sale.

Sutton-KL_0029047

62.    Instead, if a potential bidder wants to conduct due diligence, according to the Advertisement, first the bidder must be deemed "qualified" by the Lender, and then the qualified bidder has to "contact" broker Eastdil Secured. However, Eastdil Secured has not even timely responded to all inquiries about the U.C.C. Sale that it has received. Next, the bidder must sign an onerous confidentiality agreement (the "Confidentiality Agreement") that prohibits the bidder from disclosing the due diligence to potential lenders, which makes it impossible for the bidder to secure the financing needed to competitively bid at the U.C.C. Sale. In addition and tellingly, the onerous Confidentiality Agreement provides that a bidder who makes make a disclosure misstep is liable to Defendant for unlimited money damages, instead of merely providing for injunctive relief. A true and correct copy of the form Confidentiality Agreement from Eastdil Secured is attached hereto as **Exhibit J**.

63.    Much of the relevant information concerning the Project is in the public realm *though not easily obtained in short order by potential bidders*. For example, many of the relevant zoning agreements and all title matters appear in a public record. Likewise the project approvals and permits are in the public realm. As a result much of – indeed likely the bulk of – the information in Eastdil Secured's possession – and which is made the subject of the onerous Confidentiality Agreement, is within the public realm. Yet Defendant and Eastdil Secured made no effort to separate the public and non-public information and only subject the latter to the Confidentiality Agreement. Moreover, even some of the non-public information is non-proprietary in nature or is adequately protected by copyrights and intellectual property laws. Thus, it is apparent that the real purpose behind the onerous Confidentiality Agreement was to chill the bidding, not protect information.

Sutton-KL_0029048

64.    Furthermore, neither Eastdil Secured nor the Lender possesses up-to-date information or the latest materials regarding the Property and the Project, which information is in Plaintiffs' possession.

65.    Stated differently, Lender is offering to provide potential bidders who sign onto the onerous confidentiality agreement (but not their lenders) with wrong, incomplete or misleading information that diminishes the value of the Equity Collateral and that will depress bids, such as:

- Intricate details of the Owner's involvement in the City's Inclusionary Housing Program, which promotes economic integration in areas undergoing substantial new residential development by offering an optional floor area bonus in exchange for the creation or preservation of affordable housing, on-site or off-site;

- The relationship between the aforementioned floor area bonus and the Owner's Zoning Lot Development Agreement (ZLDA);

- Why the ZLDAs reflect that the sellers did not convey all of their available air rights;

- Cantilever agreement and issues related thereto, such as seismic separation between lots with cantilevered structures;

- Access agreements, monitoring agreements and consents related to development of areas outside the Property's boundaries;

- Agreements with over 20 consultants;

- Fire studies;

- Status of the EB5 applications; and

- Status of the acquisition of 447 East 57th air rights.

66.    Under no circumstances would 14 calendar days (8 business days) be a commercially reasonable period for any bidder to obtain all updated due diligence materials,

Sutton-KL_0029049

review such materials, and make an appropriate bid for the Property – an assemblage of multiple parcels on which a 68-story residential building is planned.

67.    Realizing that the Advertisement in the *Real Estate Alert* was woefully inadequate and that this lawsuit was coming, on February 17, 2016, Lender advertised the U.C.C. Sale in the *Wall Street Journal* (the "WSJ Advertisement"). However, the WSJ Advertisement fails to cure the inadequacy of the Defendants' advertising efforts, as it was placed just 7 calendar days before bids are due. No serious investor could process the relevant information and make a decision in that short timeframe. A true and correct copy of the WSJ Advertisement is attached hereto as **Exhibit K**.

68.    The Equity Collateral is not listed on any stock exchange and does not publicly trade over the counter or otherwise.

69.    The inadequate advertisement, and failure to specify all of the essential terms and conditions of the U.C.C. Sale and provide prospective bidders with easy access to accurate and updated due diligence materials, were intentionally designed and structured by the Lender in a manner calculated to chill competitive bidding and ensure that the Lender can successfully "credit bid" its debt in order to purchase the Equity Collateral and, thus, steal ownership of the Property from Plaintiffs.

70.    As a result of the commercially unreasonable nature of the U.C.C. Sale, the Lender has not taken the necessary and crucial steps to insure that the Lender receives fair value for the Equity Collateral, which would result in irreparable harm to Plaintiffs.

71.    Moreover, if Lender purchases the Equity Collateral at a price well below the fair value, then Lender will likely pursue Plaintiff for the deficient judgment that would not have

[7196-1/4893226/1]                  14

arisen but for the Lender's failure to properly market the Equity Collateral and seek the best price obtainable.

72.    Cushman & Wakefield, a leading global real estate services firm, has appraised the property at $269 million "as is" and $1.045 billion upon completion. A true and correct copy of the appraisal is attached hereto as **Exhibit L**.

### F.    Lender is Clogging the Owner's Equity of Redemption

73.    More fundamentally, there was never any business purpose to Lender bifurcating what was really a single $147.25 million loan into a $127.25 million mortgage loan ($125.85 million acquisition loan and $1.4 million building loan) and $20 million mezzanine loan  The Equity Collateral is structurally subordinate to the Mortgage, and the entire aggregate loan could easily have been secured by the Mortgage.

74.    In reality, the loans were bifurcated for the tactical purpose of circumventing the procedures and protections offered to borrowers under the N.Y. Real Property Actions and Proceedings Law "RPAPL"), including the un-waivable right of a borrower to its equity of redemption.

75.    Lender is both the lender under the Mortgage Loans and the Mezz Loan. Only 13 percent of the aggregate loan is secured by the Mezz Loan.

76.    The only reason the Lender split off a small portion of the aggregate loan and had it ostensibly secured by the Equity Collateral was to be able to do exactly what Lender is trying to do now—sidestepping the RPAPL and avoiding a *judicial* mortgage foreclosure action (in favor of a short-noticed non-judicial U.C.C. sale), thereby depriving Plaintiffs of the protections and procedures offered by the RPAPL including clogging the Owner's equity of redemption.

Sutton-KL_0029051

## Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------------X

AIRLIE OPPORTUNITY FUND, L.P.,

                  Plaintiff,

       - against -

SCION COMMUNICATION PARTNERS, LLC,
SCION CAPITAL PARTNERS, LLC, RICHARD E.
BERRITT,

                Defendants.

-------------------------------------------------------------------X

Index No. 26679-2009

**NOTICE OF ENTRY**

      PLEASE TAKE NOTICE that attached hereto is a true copy of the Decision and

Order of Judge Mary H. Smith that was filed and entered in the office of the Westchester

County Clerk on January 24, 2011.

Dated:  New York, New York
          January 27, 2011

                          Respectfully submitted,

                          OTTERBOURG STEINDLER
                          HOUSTON
                              & ROSEN, P.C.

                          By: _____
                                Stanley L. Lane, Jr.
                                  A Member of the Firm
                    230 Park Avenue
                    New York, New York  10169
                    (212) 661-9100
                    Attorneys for Plaintiff Airlie
                    Opportunity Fund, L.P.

1792138.1

# DECISION AND ORDER

FILED & ENTERED
/ 𝑄𝑞//11

To commence the statutory
period of appeals as of right
(CPLR 5513[a]), you are advised
to serve a copy of this Order,
with notice of entry, upon all
parties.

SUPREME COURT OF THE STATE OF NEW YORK
IAS PART, WESTCHESTER COUNTY

Present:   HON. MARY H. SMITH
           Supreme Court Justice

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
AIRLIE OPPORTUNITY FUND, L.P.,

                                        MOTION DATE: 11/5/10
                                        INDEX NO.: 26679/09

                            Plaintiff,

        -against-

SCION COMMUNICATION PARTNERS LLC, SCION
CAPITAL PARTNERS, LLC, RICHARD E. BERRITT,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

        The following papers numbered 1 to 24 were read on this motion
by plaintiff for summary judgment, etc., and on this cross-motion
for an Order "pursuant to CPLR 3212(f) dismissing (sic)[1]
plaintiff's complaint ...", etc.

                                        Papers Numbered

Notice of Motion - Affidavit (S. Cameron) - Exhs. (A-K) -

------------------------------

[1]Defendants' cross notice of motion improperly seeks
pursuant to CPLR 3212, subdivision (f), an Order dismissing the
complaint rather than properly seeking an Order denying as
premature plaintiff's summary judgment motion; defendants have
not presented legal arguments in favor of dismissal of the
complaint pursuant to CPLR 3211 and/or CPLR 3212.

-1-

Affidavit (D. Cameron) - Affidavit (Lane) - Exhs. (1-29)
Statement of Uncontested Facts - Memorandum of Law ........1-8
Notice of Cross-Motion - Affidavit (Berritt) - Exhs. (A-I) -
Affirmation (Feldman) - Exhs. (A-E) - Affidavit (Kuykendall)
- Affidavit (Baugues) - Exhs. (A-C) - Responses to
Plaintiff's Statement of Facts - Memorandum of Law ........9-18
Replying Affidavit (Lane) - Exhs. (A-E) - Affidavit
(S. Cameron) - Exhs. (A-C) - Affidavit (D. Cameron) -
Memorandum of Law ...................................19-24

Upon the foregoing papers, it is Ordered and adjudged that this motion and cross-motion are disposed of as follows:

It is alleged that defendant Scion Communication Partners, LLC ("SCP"), a company whose stated purpose is to engage in voice over internet communication services, had been comprised of four members: defendant Scion Capital Partners, LLC ("Scion Capital"), plaintiff Airlie Opportunity Fund, L.P. ("Airlie"), K&Z, LLC, and Orion Technologies, Inc.[2] Defendant Scion Capital, whose manager is defendant Richard E. Berritt, was also SCP's manager and plaintiff Airlie was SCP's principal working capital lender. Airlie Opportunity Capital Management, L.P. ("AOCM") is plaintiff's general partner and investment advisor.

On December 3, 2003, Airlie and SCP had entered into an

---

[2]Defendants contend that subsequently, in February, 2004, K&Z, Inc.'s and Orion Technologies, Inc.'s interests were transferred to Scion Capital, which thereupon owned 80 percent of the company. Plaintiff argues however that there is no documentary proof establishing that Orion's 30% interest reverted to or that K&Z had conveyed its 30% interest to Scion Capital and that it holds more than the 20% interest set forth in the Operating Agreement.

-2-

Operating Agreement and a separate Loan and Security Agreement ("Agreement") pursuant to which Airlie had agreed to make loans and extend other financial accommodations to SCP; this Agreement had been executed by defendant Berritt as manager of defendant Scion Capital. Under the terms of the Agreement, Airlie had agreed to make revolving credit loans and advances to SCP up to the aggregate amount of one million dollars or 85 percent of SCP's "eligible accounts," as same is defined in the Agreement. Airlie also had made a separate loan of $125,000.00. The Agreement provided that the principal amount on any revolving loan would be due and payable by SCP to Airlie on a date one year from the closing date and the term loan would be due and payable by SCP to Airlie on June 3, 2004, together with interest in the amount of $12,500.00. The Agreement further stated that the revolving credit loans would bear interest at the rate of 12% per annum, which rate would increase to 15% in the event of default by SCP. Further, in accordance with alleged practice of revolving credit lenders, the Agreement provided that SCP would pay Airlie an "Unused Facility Fee" of 2 percent per annum, calculated on a formula set forth in the Agreement. A market rate 4% closing fee was also charged, according to plaintiff, for plaintiff's committing to the $1

million revolving credit facility.[3] On April 13, 2004, Airlie disbursed to SCP pursuant to the latter's request $400,000 on account of the revolving credit loans under the Agreement.

Seth Cameron, principal of AOCM, states in his supporting affidavit that the December 9, 2004, due date for repayment of same subsequently had been extended by the parties' agreement to March 7, 2005. SCP thereafter had failed to repay on the extended maturity date of March 7, 2005, the outstanding revolving credit loans in the amount of $420,778.08.[4] SCP's failure to have repaid the balance due within five days after the maturity date had constituted a default event under the express terms of the Agreement, according to Airlie, triggering an interest increase after March 12, 2005, to 15 percent. SCP had failed to pay in December, 2004, its quarterly interest and fee payment, and on March 24, 2005, SCP had made an interest payment of $15,000.00 on account of the revolving loans, but the outstanding balance of those loans had remained in default. Plaintiff contends that as of October 31, 2009, the total amount past due and owing from SCP to Airlie on the revolving credit loans was $684,901.37, with per diem

---

[3]This $40,000 charge on the $1 million revolving credit line had been paid from the proceeds on the $125,000.00 term loan, resulting in a net payment to SCP on that loan in the amount of $85,000.00, on December 9, 2003.

[4]Said amount is comprised of $400,000.00 unpaid principal and $20,778.08 in accrued but unpaid non-default interest.

-4-

interest at the rate of $164.38. Mr. Cameron avers that Airlie had waited patiently for re-payment and ultimately had concluded that its $400,000 investment had been lost in the failure of SCP's business venture.

Mr. Cameron further avers that other funds managed by AOCM were dealing with Mr. Berritt on other projects, with mixed results.  AOCM and Scion Capital presently are involved in other litigation pending in the Delaware Chancery Court.[5]  Through discovery taking place in the Delaware action, including the obtaining of bank statements and interrogatory responses[6], Mr. Cameron claims herein that he first became aware that defendant Berritt had failed to use all of the resources available to SCP to make SCP operational and that Berritt had used SCP resources in furtherance of his other investments goals which in no way furthered SCP's legitimate business goals.

Plaintiff thereafter had commenced this action, asserting seventeen causes of action, some of which are directly stated, others derivatively stated, alleging that defendants had breached

---

[5] By Decision and Order, dated March 10, 2010, this Court had denied defendant Berritt's motion seeking to stay this action pending resolution of the Delaware litigation.

[6] Mr. Cameron avers that defendants' interrogatory responses demonstrate that at least 48 separate disbursements were made from Scion Capital's account between June 14, 2004, and March 31, 2005, that consisted, in part at least, of funds diverted to Scion Capital from SCP.

various loan agreements and engaged in tortious and fraudulent

conduct for which plaintiff seeks compensatory and punitive

damages, as well as recovery of its attorney's fees.[7]   Plaintiff

contends that, contrary to the Loan Agreement which expressly

provides that the funds to be lent SPC would be used only for the

furtherance of the legitimate business activities of SCP and which

expressly prohibits SCP from disposing of its assets other than in

the ordinary course of its business and from entering into any

transaction outside the ordinary course of SCP's business,

defendant Berritt had authorized SCP to use revolving credit funds

extended by Airlie for the benefit of other businesses, including

BMPI and Scion Capital, which were in no way related to or in

furtherance of SCP's legitimate business activities and which

action, plaintiff Airlie submits, had been taken on the perceived

basis that such stood to benefit Berritt and Scion Capital to SCP's

detriment.[8]   Plaintiff Airlie argues that defendants never apprized

plaintiff of their use of SCP's revolving credit funds for non-SCP

related purposes, nor had they sought Airlie's consent to such

---

[7]Plaintiff seeks damages for willful misconduct and gross
negligence, breach of fiduciary duties under both Limited
Liability Corporation Law section 409 and common law, conversion,
tortious interference with contractual relations and fraud.

[8]In addition to a $50,000.00 transfer to BMPI, between June
14, 2004, and January 31, 2005, Scion Capital caused SCP to make
six other separate transfers, totaling $242,500.00, from the
proceeds of Arlie's revolving credit loan to SCP.

usage, and defendants have not and cannot identify any legitimate purpose of SCP that was furthered by these transfers, nor have they or can they even state the ultimate use or disposition of these transferred proceeds. According to plaintiff, the only consideration that defendants have identified in their Interrogatory Responses as having been received by SCP in exchange for almost all of the various transfers of Airlie's revolving credit funds from SCP to other entities was the "continuation of service of Scion Capital as Managing member of SCP." Plaintiff however rejects said explanation, arguing that Scion Capital was already contractually obligated to perform for SCP, of which it was a member, pursuant to the Operating Agreement. Although the Operating Agreement gave Scion Capital broad discretion in conducting SCP's business activities for the benefit of SCP's members, Airlie argues that Scion Capital was required to use its best efforts to further SCP's stated business purpose as specified in the Operating Agreement, and amendments to the Operating Agreement could be effected only upon the submission by manager Scion Capital of the specific amendment to all of the individual members of SCP and the approval of same by both Scion Capital and a majority of the members. Moreover, plaintiff argues that the Loan Agreement similarly expressly states that no amendment of the Loan Agreement was permissible except by written instrument

-7-

executed both by SCP and Airlie.

Plaintiff presently is moving for summary judgment. As to causes of action First against defendant SCP for breach of contract and Sixth through Fifteenth against defendants wherein plaintiff seeks for each claim a specific dollar amount of damages, plaintiff is moving for entry of judgment on liability and damages in the variously stated amounts, plus interest and punitive damages. Anent causes of action Second (direct cause of action for breach of the Loan Agreement), Third (direct cause of action for breach of the Loan Agreement), Fourth (derivative cause of action for breach of the Operating Agreement) and Fifth (derivative cause of action for breach of the Operating Agreement), plaintiff seeks entry of judgment on liability and the Ordering of an assessment as to the amount of damages. Finally, plaintiff seeks severance and continuation of causes of action Sixteenth and Seventeenth, pleading fraud and entitlement to attorney's fees, respectively.

Defendants oppose the motion, summarizing Airlie's position as being that defendants wrongfully had expended the funds loaned to SCP on other matters exclusively for the benefit of Scion Capital and/or Berritt, and that this was done in violation of the parties' agreements and to the detriment of SCP. According to defendants, however, Airlie wrongly is "cherry-pick[ing]" transactions and "presents only a sliver of the over four year business relationship

between Airlie and Scion, which involved 6 investment deals totaling almost $95,000,000, in support of its claim." Defendants do not dispute that $485,000.00 had been provided it by Airlie, and they claim that, of that amount, approximately $340,000.00 was spent during the 18 months of SCP's existence to achieve a successful System Test, and the remaining $150,000 was spent on three investments that were "made in furtherance of Airlie and Scion's business relationship and Airlie benefited (sic) from them all."[9] Defendants submit that plaintiff is not entitled to summary judgment because there exists several issues of fact: firstly, with respect to whether the loans in issue, properly including fees and costs charged by plaintiff, resulted in an actual rate of interest of 32.67%, which is in excess of the criminal usury statute; secondly, whether the expenditure of the loan proceeds was appropriate as a "business judgment" "based upon the operative provisions of the agreements and based upon the understandings of the parties as the business was formed and operated; thirdly, whether these proceeds were in fact loans and not instead an investment in an entity for which Airlie did not contemplate

---

[9]Detailed specification of what were these benefits that allegedly were conferred upon plaintiff have not been stated, and it appears from that submissions at bar that plaintiff had not been a party to the Bull Mountain Montana coal mining investment transaction, nor the Las Vegas Sports Entertainment and Military Housing Project into which Berritt admittedly invested the subject loan proceeds.

repayment unless the business proved to be successful; and finally
whether this motion is premature given outstanding discovery,
including the production by Airlie of relevant and material
documents, specifically numerous email exchanges between Dort
Cameron, Seth Cameron and Andy Dwyer, principals of Airlie, the
common and regular method they had used in discussing "all aspect
(sic) of their deals and potential deals," and the parties
thereafter being deposed, where they would be questioned regarding
their "understandings, course of conduct and application of certain
costs to increase the amount of plaintiff's return on the loans at
issue."

According to defendant Berritt, whose affidavit is offered in
opposition to plaintiff's motion, at issue is not a "mere loan."

> The loan between [Airlie] and SCP was not a typical
> arms-length, third-party transaction, but rather the
> funding for a much broader business relationship
> between [Airlie] and Scion Capital, independently and
> as members of SCP.  Moreover, the loan was just one
> of many transactions that the Airlie entities
> and/or its general partners directly participated in
> with the Scion entities.  Throughout SCP's existence,
> all funds loaned by [Airlie] were either used to pay for
> SCP's operations expenses and management fees or to
> pursue business opportunities in furtherance of all
> parties' interest and the development of the overall
> business relationship between them, as [Airlie] was
> well aware.

Defendant Berritt claims that he had met with Dort Cameron, Chief
Investment Officer of Airlie, in early December, 2003, prior to

-10-

SCP's receipt of the $85,000 Term Loan proceeds,[10] and that "it was clear that Dort had a longer and broader view of our relationship and was looking to support my activities as Scion Capital in furtherance of its origination of investment and co-investment opportunities for us." Berritt avers that "Dort specifically told me that the proceeds from the loans could be used in any manner I saw fit. He explicitly told me 'do whatever you want with the money.'" According to Berritt, he had used $137,500 of the Revolving Credit monies to repay the Term Loan with interest, and the remainder "was used to pay operational expenses and management fees and to pursue other opportunities in Airlie's and Scion's interest ..." Noting that Airlie and Scion Capital had the same building address, Berritt states that Airlie had received regular updates regarding SCP, and that he had had conversations with Seth Cameron detailing SCP's progress or lack thereof, and that Airlie never once had complained about Scion Capital's management of SCP. Rather than using SCP as his "personal piggy bank" as claimed by Airlie, Berritt contends that more than $340,000 of funds loaned by Airlie were used to pay for SCP operational expenses, SCP management fees and SCP transactional losses, with the balance of cash, $150,000.00 used to pursue business opportunities that were

---

[10]A $40,000.00 "closing fee" representing 4 percent of the $1 million revolving credit loan had been charged and deducted from the proceeds of the $125,000.00 Term Loan.

in all parties' interests.   Berritt maintains that the Operating

Agreement provided him, as manager, with broad discretion to expend

SCP's funds and that section 8.1 thereof provided him with full,

exclusive and complete authority in the management and control of

the business of SCP.   Moreover, Berritt avers that, although the

stated purpose of SCP was to engage in Voice over Internet Protocol

telephone, it actually never had engaged in that business and that

the business plan, from the outset, had been modified with Airlie's

consent whereby SCP was concerned with reselling terminated minutes

in overseas routes/countries.

Moreover, defendants argue, contrary to plaintiff's argument,

that no amendment to the Operating Agreement had been required

since Scion Capital had become the owner of 80% of the membership

interests of SCP, had controlled 3 of the 4 votes required, and SCP

and plaintiff had waived compliance with the modification procedure

set forth in the Agreement through their conduct.

Defendants further argue that plaintiff's motion must be

denied pursuant to CPLR 3212, subdivision (f) because plaintiff has

failed to fully comply with outstanding discovery demands and

appear for its deposition, defendants claiming that plaintiff's

discovery production has been "limited in its scope and time in a

clear effort to engineer a story supporting its claims."

Plaintiff rejects defendants' criminal usury defense, arguing

-12-

that the Loan Agreement expressly provides for an interest rate of 12%, increased to 15% upon default, and which, even if the 2% Unused Facility Fee also is treated as additional interest, is well below the 25% criminal usury threshold, and that the Loan Agreement further includes a "savings" clause (Section 3(c)) where the parties had expressed their intent that any interest charged under the Agreement would be limited to that which was permissible under the law.

To the extent that defendants also are relying upon the inclusion of the additional 4% Closing Fee to reach the criminal usury threshold, plaintiff argues that case law make clear that the 4% commitment fee does not constitute interest for purposes of calculating the 25% usury threshold but that even including said amount still does not render the interest to be criminally usurious.

In any event, plaintiff also argues that defendants' criminal usury defense is not a defense to any of the eight derivative actions asserted by plaintiff in its capacity as a member of SCP against defendants Berritt and Scion Capital for their wrongful diversion of monies from SCP.  Thus, plaintiff argues that defendants usury defense must be stricken.

Plaintiff also maintains that defendants' asserted defense that the Loan and Operating Agreements had been orally modified to

-13-

permit SCP's unrestricted use of the Loan proceeds is not only unsupported by the Loan Agreement which prohibits oral modification (section 17), the Operating Agreement which prohibits oral modification and requires the consent of at least three of SCP's four members, but also is prohibited by General Obligations Law section 15-301, and completed unsupported by any evidence other than defendants' allegation.

Upon the Court's careful consideration of the record at bar and the parties' respective arguments, and application of the controlling principles of law whereupon the Court finds that plaintiff prima facie has demonstrated entitlement to judgment and that defendants have failed to raise a true issue of fact with respect thereto, the Court grants plaintiff's motion for summary judgment as follows:

The Clerk shall enter judgment:

in plaintiff's favor against defendant Scion Communication Partners, LLC on the first cause of action alleging breach of the Revolving Loan Agreement in the sum of $684,901.37, together with interest calculated on the sum of $400,000 at the rate of 15% per annum from November 1, 2009; and

in plaintiff's favor against defendants Scion Capital Partners, LLC and Richard E. Berritt on the sixth, eighth and tenth shareholders' derivative causes of action, and on the twelfth and

-14-

fourteenth direct causes of action in the sums of $50,000.00, together with interest at the contract rate of 15% from March 7, 2005; and

in plaintiff's favor against defendants Scion Capital Partners, LLC and Richard E. Berritt on the seventh, ninth and eleventh shareholders' derivative causes of action, and on the thirteenth and fifteenth direct causes of action in the sums of $242,500.00, together with interest at the contract rate of 15% from March 7, 2005.

Anent plaintiff's seventeenth cause of action seeking an award of attorneys' fees and costs against all defendants based upon plaintiff's prevailing on its derivative action claims, the Court finds that same properly may be resolved at this time in light of the fact that plaintiff herein has prevailed on its derivative action claims.

While Business Corporation Law section 626(e) provides that a successful plaintiff in a shareholder's derivative action may recoup legal expenses and attorneys' fees from the proceeds of a judgment in favor of the corporation it does not authorize imposition of such expenses upon the losing party. See Glenn v. Hoteltron Systems, Inc., 74 N.Y.2d 386, 393 (1989); Agency Associates, Inc. ex rel. Landmark Planning Group Ltd. v. John R Sauer, Inc., 21 Misc.3d 1136(A) (Sup. Ct. Nass. Co. 2008).

-15-

Accordingly, this Court grants plaintiff summary judgment on its seventeenth cause of action seeking an award of legal fees and costs as against SCP only, and finds that plaintiff properly may seek recoupment of such expenses from the judgment it has obtained on behalf of defendant Scion Communication Partners, LLC. The Court denies plaintiff judgment on its seventeenth cause of action to the extent that plaintiff seeks judgment thereon against the other defendants. To that extent, plaintiff's claim is sua sponte hereby dismissed. A determination as to the value of the legal services rendered with respect to prosecution of the derivative action claims and the costs incurred with respect thereto shall be made at the time of trial or other settlement of the remaining claim herein; a judgment with respect thereto may thereafter be entered.

Further, the Clerk is directed to enter judgment in plaintiff's favor against defendant Scion Communications Partners, LLC on the issue of liability only on the second and third causes of action alleging breach contract. An assessment of damages whereat the issue of all damages sustained by plaintiff, including lost business opportunity as a result of said breaches, shall be held at the time of trial or other settlement or resolution of the remaining claims herein.

Finally, the Clerk is directed to enter judgment in

plaintiff's favor as against defendants Scion Capital Partners, LLC
and Richard E. Berritt on the issue of liability only on the fourth
and fifth causes of action alleging breach of contract.    An
assessment of damages whereat the issue of all damages sustained by
plaintiff, including lost business opportunity as a result of said
breaches, as a result of said breaches shall be held at the time of
trial or other settlement or resolution of the remaining fraud
claim herein.

The Court however rejects plaintiff's demand for imposition of
punitive damages on causes of action sixth through sixteen based
upon defendants Scion Capital and Berritt's alleged willful
misconduct and gross negligence.    It is well settled that punitive
damages are not recoverable for an ordinary breach of contract as
their purpose is not to remedy private wrongs but to vindicate
public rights.    See Garrity v. Lyle Stuart, Inc., 40 N.Y.2d 354,
358 (1976).    Thus, a private party seeking to recover punitive
damages must not only demonstrate egregious tortious conduct by
which he was aggrieved and which is actionable as an independent
tort, but also that such conduct was part of a pattern of similar
conduct directed at the public generally which evidenced wanton
disregard for the public's safety.    See New York University v.
Continental Insurance Co., 87 N.Y.2d 308, 315-316 (1995); Rocanova
v. Equitable Life Assurance Society of United States, 83 N.Y.2d

-17-

603, 613 (1994); Longo v. Armor Elevator Co., Inc., 307 A.D.2d 848
(1st Dept. 2003); RTC Industries, Inc. v. Goodtimes Home Video
Corp., 1997 WL 35524 (S.D.N.Y. 1997). "Punitive damages are
available only in those limited circumstances where it is necessary
to deter defendant and others like it from engaging in conduct that
may be characterized as 'gross' and 'morally reprehensible' and of
'such wanton dishonesty as to imply criminal indifference to civil
obligations'" New York University v. Continental Insurance Co.,
supra, at 316. Such allegations are found to be lacking in the
matter at bar and thus plaintiff's demands for punitive damages are
hereby dismissed.

Initially, the Court rejects as being without merit
defendants' argument that this dispositive motion should be denied
based upon plaintiff's failure to fully comply with its discovery
obligations. Notably, defendants never previously sought relief
with respect to the herein alleged inadequacy of plaintiff's July,
2010, discovery response. Moreover, in light of this Court's
finding hereinafter that the interposed usury defense is
unavailing, the Court cannot agree that plaintiff's alleged failure
to have produced documents relating to this defense and which
defendants contend constitute facts essential to justify opposition
warrants denial of its summary judgment motion. In conclusion, the
Court finds that defendants have failed to cite to any material

-18-

issue of fact affecting the outcome of this motion which would be raised by plaintiff's further discovery. <u>See Nash v. Baumblit Const. Corp.</u>, 72 A.D.3d 1037, 1040 (2nd Dept. 2010).

Plaintiff has demonstrated entitlement to judgment on the first cause of action pleading Scion Communication Partners, LLC's breach of the Loan Agreement based upon its failure to have paid the loan and accrued interest at the time of maturity. The Court finds that defendants' interposed criminal usury defense is unavailing since the stated loan interest amount is 12%, increasing to 15% upon said defendant's default, and established case law holds that the 4% commitment fee charged at the loan's inception as and for a closing fee does not constitute interest for the purposes of determining whether the charged interest exceeds the criminal usury threshold. <u>See People v. Central Federal Savings and Loan Ass'n. Of Nass. Co.</u>, 46 N.Y.2d 41, 43-44 (1978). Notably, defendants' own calculations establish an effective yield under the Loan Agreement over a 465 day term; defendants have not properly established the effective yield on a 365 day term. <u>See</u> Penal Law, Section 190.40. Properly adjusting defendants calculation over a 365-day period results in an interest rate of 23.8% per annum.[11]

-----

[11]Defendants' 29.73% effective yield divided by the 456-day term equals a daily rate of 0.0652% which, when multiplied by 365 days, equals per annum interest of 23.8%, which is lower than the 25% criminal usury interest threshold.

On the record at bar, the Court cannot find that there is any question of fact regarding the parties' intent in collecting the "Closing Fee," found here to be akin to a commitment fee, nor any legal authority supporting defendants' further claim that SCP's paid $10,000.00 legal fee for the drafting of the subject Loan and Operating Agreements, which had been paid out of the term loan proceeds, also properly must be included in the interest calculation.

In any event, there is a strong presumption against a finding of criminal usury, see Koeing v. Slazer Enterprises, Owner, LLC, 27 Misc.3d 1212(A) (Sup. Ct. Rock. Co. 2010), and for a defendant to prevail in setting aside a commercial loan as criminally usurious under Penal Law Section 190.40, a defendant must prove that the lender knowingly charged and took annual interest exceeding 25 percent, which requires proof that the lender generally intended to charge a rate in excess of the legal rate. See Funding Group, Inc. v. Water Chef, Inc., 19 Misc.3d 483 (Sup. Ct. N.Y. Co. 2008). No such showing can be made at bar given that the Loan Agreement also includes a "savings" clause which unequivocally states that it is the parties' intent to not receive an interest rate in excess of that lawfully permitted. Cf. Freitas v. Geddes Sav. And Loan Ass'n., 63 N.Y.2d 254, 265 (1984). There is no proof that plaintiff had intended to charge a criminally usurious interest

-20-

rate, without which element a criminal usury defense cannot be found. See Hanover Funding Co. v. Keri Associates, Inc., 180 A.D.2d 945, 947 (3rd Dept. 1982).

Finally with respect to this issue, even if the Court were to find that defendants correctly have added in all of the extra charges and fees charges such that the loan at bar in fact exceeds annual interest of 25%, the criminal usury statute does not provide for the relief requested by defendants, that being a voiding of the loan and the payments due thereunder. See Koeing v. Slazer Enterprises, Owner, LLC, supra; see, also In re Venture Mortgage Fund, L.P., 282 F.3d 185, 189 (2nd Cir. 2002).

Plaintiff also prima facie has established that defendant Scion Communication Partners, LLC is liable under the second and third causes of action for breach of the Loan Agreement by its having misused the proceeds from that revolving loan by disbursing $50,000.00 to a coal mining company on January 20, 2005, and by transferring $242,500.00 of those funds to Scion Capital between June 14, 2004, and January 31, 2005. This Court agrees with plaintiff's arguments that, by their terms and pursuant to General Obligations Law section 15-301, the Loan and Operating Agreements could not be orally modified. See Cohen Fashion Optical, Inc. v. V & M Optical, Inc., 51 A.D.3d 619 (2nd Dept. 2008). Defendants have failed to proffer any documentary support for their claimed

-21-

amendment of the Loan Agreement, and indeed they have admitted that none exists.

Further, with respect to the Operating Agreement, defendants have not and cannot establish the further requirement set forth in said Agreement that at least three of the four members agreed to the alleged oral modification.

Defendants' asserted defense of oral modifications of the parties' Agreements and specifically that the parties' "course of conduct" had the effect of amending the no oral amendment/modification clause also is found to be wanting. Defendants have failed to proffer any evidence supporting application of such exception; they point to no "partial performance" which had been on notice to plaintiff and which unequivocally is referable to the purported new agreement. See Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113 (2nd Cir. 1998); Club Haven Inv. Co., LLC v. Capital Co. Of America, LLC, 160 F. Supp. 2d 590 (S.D.N.Y. 2001). Rather, it appears that there are other possible reasons, including the personal profit motive of the defendants, which readily can be used to explain defendants' actions herein of using the loan proceeds for investments in third party businesses, and thus defendants' performance must be found to be "equivocal" and not "unequivocally referable" to a new contract." Id. at 122. Moreover, no partial performance can be

-22-

found where the relied upon action "confers no benefit on the party against whom enforcement is sought," Id. at 122; Club Haven Inv. Co., LLC v. Capital Co. Of America, LLC, supra, p. 592, and here there is no proof establishing that plaintiff in any way benefitted from defendants' use of the loan proceeds in a manner contrary to the express terms of the Loan Agreement.

Finally with respect to this issue, the Court rejects defendants' legally unsupported claim that the "no oral modification" clause in the Loan Agreement should be ignored because plaintiff had ignored other terms in the Loan Agreement and thus had waived its right to asset enforce the no oral modification provision. The Loan Agreement also contains a clause (Paragraph 22(e)) wherein it is stated that, "Lender's failure, at any time, or times hereafter, to require strict performance by Borrower of any provision of this Agreement ... shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith."

Plaintiff also successfully established its entitlement to judgment as a matter of law with respect to the derivative claims set forth in the fourth and fifth causes of action against defendants Scion Capital and Berritt. Firstly, as a member of Scion Communication Partners, LLC, plaintiff manifestly had standing to assert derivative action claims on its behalf. See

-23-

<u>Tzolis v. Wolff</u>, 10 N.Y.2d 100, 109 (2008).

Secondly, the unrefuted facts at bar conclusively establish that defendants Scion Capital and its manager Berritt had breached the Operating Agreement by causing SCP to misuse $50,000.00 and $242,500.00 of the loan proceeds for purposes that as a matter of law are found to not have been working capital purposes in furtherance of the stated business purpose of SCP to engage in voice over internet communication services. Indeed, the proceeds have been proven and admitted to have been used for defendant Scion Capital's funding of its investment in the coal mining enterprise and to satisfy individual obligations to third persons unrelated to SCP and/or to advance said defendants' own investment interests, to the detriment of SCP.[12]

Plaintiff's motion is thus granted to the extent herein above stated; concomitantly, defendants' cross-motion is denied.

Plaintiff's fraud cause of action set forth in the sixteenth cause of action is hereby severed and Ordered continued. To that extent, the parties shall appear in Room 800, at 9:30 a.m., on February 15, 2011 for a compliance conference. This date shall not be adjourned without the Court's consent. Any party's failure to

---

[12]That it appears plaintiff ultimately had purchased in September, 2005, Bull Mountain Companies which included the subject Montana coal mining company is irrelevant to whether defendants properly had utilized proceeds from the subject loan as investments in that coal mining company.

-24-

appear may result in the imposition of costs and/or sanctions.

Dated: January 24, 2011
       White Plains, New York

                                        _____
                                        MARY H. SMITH
                                        J.S.C.

Otterbourg, Steindler, Houston & Rosen, P.C.
Attys. For Pltf.
230 Park Avenue
New York, New York 10169

Rosenberg Feldman Smith, LLP
Attys. For Defts.
551 Fifth Avenue
New York, New York 10176

Carolyn Carpenito

Otterbourg, Steindler, Houston & Rosen, P.C.

Index No.  26679-2009                                    **Year**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

AIRLIE OPPORTUNITY FUND, L.P.,

                                                        Plaintiff,

           - against -

SCION COMMUNICATION PARTNERS, LLC,
SCION CAPITAL PARTNERS, LLC, RICHARD E. BERRITT,

                                                        Defendants.

## NOTICE OF ENTRY

### Otterbourg, Steindler, Houston & Rosen, P.C.

Attorneys for Plaintiff Airlie Opportunity Fund, L.P.

Office and Post Office Address, Telephone
230 Park Avenue
New York, N.Y. 10169-0075
(212) 661-9100

**To**

**Attorney(s) for**

**Service of a copy of the within**                **is hereby admitted.**
**Dated,**

                    ....................................................
                    **Attorney(s) for**

**Exhibit 3**

1

1                         PROCEEDINGS

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK:   TRIAL TERM PART 49
3    - - - - - - - - - - - - - - - - - - - - X
     SUTTON 58 OWNER, LLC and
4    BH SUTTON MEZZ LLC,

5
                                PLAINTIFFS,
6
            - against -
7

8    SUTTON 58 ASSOCIATES LLC,

9
                                DEFENDANT.
10   - - - - - - - - - - - - - - - - - - - - X
     INDEX NO: 650832/16       60 Centre Street
11                             New York, New York 10007
                               February 23, 2016
12

13   BEFORE:    HONORABLE O. PETER SHERWOOD, Justice

14

     APPEARANCES:
15

16      MEISTER SEELIG & FEIN, LLP
        Attorneys for Plaintiffs
17      125 Park Avenue
        New York, New York  10017
18      BY:    STEPHEN B. MEISTER, ESQ.
               KEVIN A. FRITZ, ESQ.
19             CHELSEA SILVERSTEIN, ESQ.

20
        KRAMER LEVIN NAFTALIS & FRANKEL, LLP
21      Attorneys for Defendant
        1177 Avenue of the Americas
22      New York, New York 10036
        BY:    RONALD S. GREENBERG, ESQ.
23             SCOTT RUSKAY-KIDD, ESQ.
               DANIEL LENNARD, ESQ.

24

25                             NINA KOSS, C.S.R., C.M.
                               OFFICIAL COURT REPORTER
26

DX-K

18

1          PROCEEDINGS

2    was a representative of a European investor, referencing the

3    property, as of a signing of this affidavit, which was about

4    11 o'clock today there hadn't been a call.  I asked him to

00:29:09    5    call me back at 2 o'clock.  He did.

6              THE COURT:  All right.  Continue with your

7    argument.

8              MR. MEISTER:  Okay.  So, what I am saying is, kind

9    of flip the irreparable harm on its head as a thought

00:29:20    10    experiment, if you would for a moment.

11             The property has appraisal, which they are not

12    challenging, of $115 million more.  They don't put in

13    another appraisal than the debt.  Their notice of, their

14    notice of their advertisement, which contains the terms of

00:29:40    15    the sale, expressly says they can adjourn the sale.

16             Why can't we do what I was hoping would get done

17    voluntarily, and volitionally put the sale off for a brief

18    period of time and have some meaningful exposure to the

19    marketplace?

00:30:01    20             THE COURT:  Well, I will hear that from Mr.

21    Greenberg eventually, but go ahead.  Let's not dwell on

22    that.

23             MR. MEISTER:  We won't dwell on that.

24             What we would say to your Honor, your Honor, is

30:13    25    that, by the way, I do want to mention also the terms of

26    sale specifically permit the lender to reject any bid in its

NK

19

PROCEEDINGS

1

2   discretion, for no reason, and to cancel the sale or adjourn

3   the sale.  So, we think that also has a chilling effect.

4   The mortgage, as I said, is due.

00:30:42   5        THE COURT:  You don't really think that, Mr.

6   Meister, somebody with the kind of knowledge and experience

7   in this area that you have, because both those things are

8   pretty standard, aren't they?

9        MR. MEISTER:  You do see that.

00:30:56   10       THE COURT:  I would be astounded if you said

11  anything other than "yes, Judge."

12       MR. MEISTER:  I would say, Judge, that I have never

13  seen a two-week marketing exposure period, and I have never

14  seen the case --

00:31:09   15       THE COURT:  That's a wonderful rejoinder to a non

16  question.

17       MR. MEISTER:  Your Honor, I am agreeing with you

18  that that may be regarded as standard boilerplate.

19       THE COURT:  Thank you.  That's all I was trying to

00:31:22   20  get you to say.

21       MR. MEISTER:  I understand.  I am not going to

22  fight you on this.  You know, you have a habit, and a good

23  habit, of asking hard questions.  My job is to answer them.

24  So, I agree with you there.

31:34   25       I simply am adding to the non question, that the

26  two weeks is really not commercially reasonable.  So,

NK

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | If the Court determines in a few more days, after |
| 3 | some depositions, that my case is correct about commercially |
| 4 | unreasonable, they weren't returning phone calls, that they |
| 00:56:53   5 | really were under instructions not to find a third-party |
| 6 | bidder, then you are going to end up, at least, giving me |
| 7 | the 45 days, and then there could be a financing. |
| 8 | So, that's what we would ask the Court to consider. |
| 9 | THE COURT:  All right.  Thank you very much. |
| 00:57:11   10 | So, I am going to deny the motion for a preliminary |
| 11 | injunction because the Plaintiff here has not carried its |
| 12 | burden of showing likelihood of success on the merits, and |
| 13 | certainly, has not shown irreparable harm, and at least for |
| 14 | those, and quite frankly, I am not convinced that you have |
| 00:57:56   15 | even shown the balance of the equities tipping decidedly in |
| 16 | your favor. |
| 17 | The last question I asked you, with respect to the |
| 18 | last point only, the last question I asked you is telling, |
| 19 | in that I asked well, what makes you think anything is going |
| 00:58:17   20 | to be different from what your client has been after for the |
| 21 | last year? |
| 22 | What shouted out at me was your non answer.  What I |
| 23 | heard was a speculation that maybe something will happen if |
| 24 | I get another couple of days.  That's not very reassuring, |
| 00:58:42   25 | especially in the circumstances where, going back to the |
| 26 | first point which has to do with likelihood of success on |

NK

```
                                    PROCEEDINGS
 1
 2    the merits, the Defendants here have made out a, certainly
 3    have certain rights, they are not disputed, and so, the
 4    likelihood of success, to put it mildly, has not been shown
 5    and probably can't be shown.
 6            And, likewise, there has been no evidence of
 7    irreparable harm given the specific loan that we are talking
 8    about.  A remedy in the form of money can be obtained as a
 9    complete remedy, and so you haven't made out that
10    requirement.
11            Bottom line, you haven't made out any of the three
12    requirements as to which you have the burden, the burden of
13    proof; likelihood of success on the merits, the irreparable
14    harm and balance of the equities.
15            Accordingly, the motion is denied.  The injunction
16    is lifted.
17            Thank you.
18            MR. MEISTER:  Your Honor, would it be possible for
19    two things; one --
20            THE COURT:  No, sir, with respect to the affidavit,
21    no, sir.  You can show it to the Appellate Division if you
22    want, but it's not going to be part of this record.
23            MR. MEISTER:  Okay.
24            (Whereupon, there was a discussion had off the
25    record, among the Court and the attorneys, at this time.)
26
```