**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

In re:                                                                      Chapter 11

BH SUTTON MEZZ LLC, <u>et al.</u>,                                         Case No.: 16-10455 (SHL)

                    Debtors.                                                (Jointly Administered)

-------------------------------------------------------------------x
BH SUTTON MEZZ LLC, a Delaware Limited Liability
Company, SUTTON 58 OWNER LLC, a Delaware
Limited Liability Company, and SUTTON 58 OWNER
LLC, a New York Limited Liability Company,                                  Adv. Pro. No.: 16-01187 (SHL)

                    Plaintiffs,

          -against-

SUTTON 58 ASSOCIATES LLC, GAMMA LENDING
S58 LP, GAMMA LENDING S58 II LP, GAMMA
FUNDING LP, GAMMA FUNDING MANAGEMENT
LP, GAMMA FUNDING, LLC and GAMMA REAL
ESTATE LLC,

                    Defendants.

-------------------------------------------------------------------x

## <u>POST-TRIAL MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S:**

**LAZER, APTHEKER, ROSELLA & YEDID, P.C.**
*Special Litigation Counsel for the Plaintiffs*
   By:   Russell L. Penzer, Esq.
            Eric Horbey, Esq.
225 Old Country Road
Melville, New York 11747

**LAMONICA HERBST & MANISCALCO, LLP**
*General Counsel for the Plaintiffs*
   By:   Joseph S. Maniscalco, Esq.
            Holly R. Holecek, Esq.
3305 Jerusalem Avenue
Wantagh, New York 11793

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
*Counsel for the Defendants*
  By:   P. Bradley O'Neill, Esq.
        Adam C. Rogoff, Esq.
        Gregory A. Horowitz Esq.
        Ronald S. Greenberg, Esq.
        Natan M. Hamerman, Esq.
        Scott Ruskay-Kidd, Esq.
        Priya K. Baranpuria, Esq.
1177 Avenue of the Americas
New York, New York 10036

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the merits of this adversary proceeding filed by BH Sutton Mezz

LLC, a Delaware Limited Liability Company ("Sutton Mezz DE"), Sutton 58 Owner LLC, a

Delaware Limited Liability Company ("Sutton Owner DE"), and Sutton 58 Owner LLC, a New

York Limited Liability Company ("Sutton Owner NY").  The Court will refer to these three

entities collectively as the "Plaintiffs" or "Debtors".  This adversary proceeding revolves around

the Debtors' proposed development of a 950-foot residential tower in Midtown Manhattan (the

"Project"), a project that was led by three principals of the Debtors, Joseph Beninati, Christopher

Jones, and Daniel Lee.  The Defendants are Sutton 58 Associates LLC, Gamma Lending S58 LP,

Gamma Lending S58 II LP, Gamma Funding LP, Gamma Funding Management LP, Gamma

Funding, LLC and Gamma Real Estate LLC, which the Court will refer to collectively as the

"Defendants" or the "Lenders").  The Defendants provided financing to the Debtors for the

Project in the form of two different set of secured financing transactions which we will refer to

as Gamma 1 and Gamma 2.  Plaintiffs seek to subordinate and reduce the amount they owe the

Defendants on these loans by alleging improper conduct by the Defendants, through their

principals, N. Richard Kalikow ("N.R. Kalikow") and Jonathan Kalikow ("J. Kalikow").  The

alleged improper conduct includes more than a dozen specific claims—which the Court will

2

outline in more detail in a moment—and includes allegations that the Defendants breached the contracts between the parties, and also breached non-contractual duties owed by these Defendants to the Debtors.  These duties are based upon an allegedly special relationship developed between the Debtors and the Defendants during the Project.

On July 13, 2016, Plaintiffs filed the complaint in this adversary proceeding asserting twenty-six claims for relief (the "Complaint" or "Compl.").  Joint Pre-Trial Order ¶ 31 [Dkt. No. 57].  Plaintiffs subsequently abandoned half of these claims.  *See* Dkt. No. 24 (letter dropping Counts 8, 12, 13, 14, 15, 16 and 19 of the Complaint).  The Court notes that one of the main theories extensively focused on by the Debtors during their bankruptcy case was abandoned.  This theory was that the Lenders' liens were invalid with respect to the Debtors' assets because a merger between Sutton Owner NY and Sutton Owner DE was ineffective and invalid due to, among other things, a lack of proper authority for the merger and the improper use of signatures with respect to the merger.  This theory, and the related Counts 13, 14, 15 and 16 have been abandoned.  The Court notes this as one example of how the theory of this case has evolved over time.

On November 1, 3, 7, 9, and 17, 2016, this Court held a trial on the remaining claims, which included but were not limited to claims for breach of fiduciary duty and breach of contract.[1]

The Defendants break the remaining thirteen counts down into seven different groupings.  The Court agrees that this grouping is a useful and fair way to look at this case.   The first of these seven categories is unconscionability, which includes counts 9 and 10.  The second

---

[1]     The remaining claims included the first, second, third, fifth, ninth, tenth, eleventh, seventeenth, eighteenth, twenty-first, twenty-second, twenty-third and twenty-fourth claims for relief in the Complaint.  *See* Joint Pre-Trial Order at 1-2.

category is lender liability, which includes counts 21, 22 and 23 of the Complaint. The third

group of claims is for breach of contract, which includes counts 1, 2 and 3. A related fourth

category is breach of implied covenant, which is count 5. The fifth is equitable subordination,

which is count 17. The sixth category is fraudulent transfer, which is count 24. The seventh

category alleges criminal usury in count 11 of the Complaint. In total, these seven categories

cover twelve of the Plaintiffs' thirteen counts; the remaining surviving claim of the Complaint is

count 18—entitled "claim objection"—which seeks to reclassify and reduce the Defendants

claim consistent with the Debtors' other arguments. Prior to the trial, the parties prepared and

submitted a joint pre-trial order that set forth the issues for trial, that order was approved by the

Court. *See* Joint Pre-Trial Order.

At trial, the Court heard testimony from ten live witnesses. Plaintiffs filed declarations in

lieu of direct testimony for three witnesses: Joseph Beninati, Kevin J. DeLuise, and Gary M.

Tenzer, and presented the live direct testimony of one witness, Christopher Jones. Defendants

filed declarations in lieu of direct testimony for six witnesses, J. Kalikow, N.R. Kalikow, Van

Nguyen ("Nguyen"), David Eyzenberg ("Eyzenberg"), Richard R. Kalikow ("R. Kalikow or

Kalikow Attorney"), and Keith Kurland ("Kurland"). The parties had the opportunity to elicit

live cross-examination and redirect testimony from all ten witnesses. The parties also submitted

deposition designations of two witnesses who did not provide live testimony, David Shapiro

("Shapiro") and Foster + Partners Architects New York, Inc. ("F+P") (by its corporate

representative James Barnes ("Barnes")).

Based on all the evidence introduced at trial, the Court concludes that the Debtors have

failed to establish a basis for relief on twelve of the thirteen counts. The remaining count is

criminal usury, where the Court concludes that one of the loans at issue had a rate in excess of

4

the New York statute.  This bench ruling constitutes the Court's findings of fact and conclusions of law after trial in this adversary proceeding.[2]

## BACKGROUND

## 1. FACTS LEADING UP TO AND INCLUDING GAMMA 1 FINANCING

Joseph Beninati ("Beninati"), Christopher Jones ("Jones"), and Daniel Lee ("Lee") (together, the "Sutton Principals") are the principals of Bauhouse Group, LLC ("Bauhouse"), which planned the development of the Project, a 950-foot residential tower in midtown Manhattan.  Beninati Decl. at 1, ¶ 7.[3]  The Sutton Principals indirectly own 100% of the membership interests in Sutton Mezz DE, which owns 100% of the membership interests in Sutton Owner NY and Sutton Owner DE.  Joint Pre-Trial Order at 4, ¶ 4.

While the Plaintiffs have not developed real estate in New York City nor dealt with the acquisition of air rights and extensive vertical development, 11/1 Tr. 155:13-156:20, they possess considerable experience in real estate development and real estate financing using both debt and equity financing.  R. Kalikow Decl. ¶ 17; 11/1 Tr. 32:5-36:11; 11/3 Tr. 14:3-15:24.  Bauhouse's principals Beninati, Jones, and Lee collectively have developed, owned, and managed more than ten million square feet of real estate projects.  11/3 Tr. 11:13-12:4.  Beninati is a real estate developer who has completed billions of dollars in acquisitions, development, construction and real estate finance, including debt and equity financings.  11/1 Tr. 38:18-25.

---

[2]    All parties agreed that a speedy resolution of this adversary proceeding was necessary for the bankruptcy case to proceed and preserve value for all stakeholders.  Indeed, the parties contemplate an auction and sale of the property before the end of this year.  For that reason, a summary of this opinion was presented as a bench ruling on November 30, 2016.  Due to its origin as a bench ruling and the need for an expeditious resolution, this decision is more informal in tone.

[3]    References to "11/__ Tr." are to transcripts of the trial in this Adversary Proceeding.  The parties' written direct testimony is cited as "[Witness] Decl."  All of the Defendants' exhibits are identified by letters, while the Plaintiffs' exhibits are identified by numbers.

Beninati came to the Project already familiar with the complex nature of real estate development and project structuring, including finance, legal, contract, design, zoning, management, construction, marketing, and sales issues.  R. Kalikow Decl. ¶ 17; 11/1 Tr. 38:24-39:15, 60:19-61:16; 11/3 Tr. 15:20-16:15.  Beninati began his career as an investment banker at Dean Witter before serving as the CFO of a SEC reporting company with 2,000 employees.  11/1 Tr. at 31:10-13, 31:14-24.  Beninati co-founded a company called Antares that, beginning in 2002, participated in substantial real estate development projects.  *Id.* at 31:25-32:11, 36:8-11, 37:21-38:17.  Beninati has experience with multiple large real estate projects that involved raising hundreds of millions of dollars in financing.  *Id.* at 32:24-33:25, 34:1-36:7.  His partner, Mr. Jones, has "a lot of real estate development experience," and is a twenty-five-year real estate veteran who has overseen numerous large-scale development projects totaling over $4 billion.  11/3 Tr. 8:10-11:5; 9:3-19; and 10:6.

To complete the Project, the Plaintiffs planned to acquire: (a) the property on which the tower would be constructed; (b) approximately 267,000 square feet of zoning development rights (the "Development Rights") from neighboring properties; and (c) surrender agreements from the tenants of the existing buildings such that those buildings can be demolished.  Beninati Decl. at 1-2, ¶ 8; PX-83 at 3, 5, 14.  Plaintiffs determined with their architects and engineers that a tower with the assembled square footage of 267,950 of floor area would yield the highest rate of return for the Project.  *See* PX-83 at 5.

Beninati put together an "all-star team of professionals" to advise Plaintiffs in connection with the Project.  Beninati Decl. ¶ 14.  Plaintiffs hired Jones Lang LaSalle Americas, Inc. ("JLL"), which served as its debt and equity adviser for the Project and helped it source and evaluate financing for the project.  Beninati Decl. ¶ 18; PX-3; 11/1 Tr. 40:3-14; Kurland Decl.

6

¶ 4; DX-KJ.  The Plaintiffs retained the architectural firm, F+P, which served as design architect for the Project. *See* Barnes Tr. 11:3-5. Upon their retention, F + P began the process of designing the tower based on an 80-foot base (which assumed the future acquisition of 426 East 58th Street (the "426 Property")). 11/1 Tr. 198:1-6.

Plaintiffs also hired other advisors:  (a) UBS Investment Bank ("UBS") as an equity financing advisor, Beninati Decl. ¶ 98; 11/1 Tr. 41:9-20; (b) Carlton Group ("Carlton") as a debt and equity financing advisor, J. Kalikow Decl. ¶ 67 n.10; 11/1 Tr. 43:7-25; and (c) Cushman & Wakefield ("Cushman") as a broker to try to sell the Project outright.  J. Kalikow Decl. ¶ 78; 11/1 Tr. 41:21-42:3.

Plaintiffs and the people that worked for them also created detailed spreadsheets to model the finances of the Project. 11/1 Tr. 60:22-25.  Beninati oversaw the creation and modification of those financial models, understood them, and made comments on them.  *Id.* at 61:1-66:10; Shapiro Dep. Tr. 44:7-48:19, 49:10-13, 50:2-51:17, 55:24-56:15, 58:5-59:24, 63:9-65:13, 66:2-11; DX-BX; DX-FA; DX-CK.

On June 24, 2014, Sutton Owner NY retained Richard R. Kalikow, Esq. of the law firm Herrick, Feinstein LLP ("Herrick") to represent it with respect to the Project.  Joint Pre-Trial Order at 4, ¶ 12; Beninati Decl. at 3, ¶ ¶ 15-16; *see also* PX-2.  Kalikow Attorney had previously represented the Sutton Principals on a prior unrelated transaction.

Consistent with the Plaintiffs' development plan for the project, Sutton Owner NY made deposits in the summer of 2014 on various purchase and sale agreements relating to real property and development rights for neighboring and adjacent properties.  Beninati Decl. ¶¶ 10-12; R. Kalikow Decl. ¶ 19.  Among other things, in June 2014, Plaintiffs entered into an agreement to purchase three adjacent lots at 428-430-432 East 58 Street (the "Property") for $32,000,000.

Beninati Decl. ¶ 9.  In connection with this agreement, Plaintiffs paid the seller a non-refundable

deposit of $3,200,000, with the remaining purchase price to be paid at a closing that was initially

scheduled for September 11, 2014.  Beninati Decl. ¶ 10.  At the time, it was contemplated that

the Debtors would also acquire the neighboring property, the 426 Property, which would allow

the Sutton Principals to construct a tower with an 80 foot base, as opposed to 60 feet.  PX-83 at

12.  In addition to the Property, the Sutton Principals negotiated and entered into purchase

agreements with the Property's western neighbors to purchase their unused zoning development

rights (the "Western Development Rights").  Beninati Decl. ¶ 11.  The parties at trial consistently

referred to all the property and air rights they were hoping to use for the Project as "the

Assemblage."

In the fall of 2014, JLL circulated offering materials to numerous recipients and received

expressions of interest from multiple equity investors and from multiple debt investors.  Kurland

Decl. ¶¶ 6, 7, 11-12.  In or about October 2014, the Plaintiffs entered negotiations for financing

with Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("Inbursa"),

while simultaneously discussing financing and equity options with other potential sources. *See*

Beninati Decl. at 4, ¶¶ 20-21.

While these negotiations were ongoing, on or about November 8, 2014, Kalikow

Attorney and Beninati discussed pitching the Project to his cousin, N.R. Kalikow, a 45-year

veteran of New York City real estate development and finance.  *See* Beninati Decl. at ¶¶ 32-33;

N.R. Kalikow Decl.[4] at 2, ¶ 2; *see also* PX-6 (In a November 8, 2014 email to the Sutton

Principals describing a telephone call with Kalikow Attorney on the Project's financing, Beninati

---

[4]    The parties dispute who suggested pitching the Project to N.R. Kalikow.  But the origin of the idea is less
significant than that fact that all the parties welcomed the idea as something in their individual best interest.

stated that "Richie want [sic] to show this to his cousin Richie Kalikow."). N.R. Kalikow and

Attorney Kalikow are second cousins. Joint Pre-Trial Order ¶ 15.

On November 19, 2014, Beninati and David Shapiro ("Shapiro"), an independent

contractor with Bauhouse, met with N.R. Kalikow and his son, J. Kalikow (who together the

parties at trial often referred to as "Kalikow Lender"), at the offices of Kramer Levin Naftalis &

Frankel LLP ("Kramer Levin"), their attorneys, to discuss the Project and its financing needs.

Beninati Decl. at 5-6, ¶ 35; J. Kalikow ¶ 8. Jonathan Kalikow is the President of Gamma Real

Estate, LLC, which controls the day-to-day operations of each of the Defendants. Joint Pre-Trial

Order ¶ 10; J. Kalikow Decl. ¶ 1. Following the meeting on November 19, 2014, and at Kalikow

Lender's request, the Sutton Principals sent Kalikow Lender additional information relating to

the Project. Beninati Decl. at 6, ¶ 36.

On November 26, 2014, Sutton Owner NY and Inbursa executed a term sheet for a loan

in the principal amount of the lesser of: (a) $70,000,000; or (b) the equivalent of 45% loan-to-

value (LTV) (the "Inbursa Term Sheet"). Beninati Decl. at 4, ¶ 26; PX-5. The Debtors hoped

that the Inbursa loan would provide the first phase of the acquisition financing, which would

fund the purchase of the Property and the Western Development Rights and the deposits

necessary to execute purchase agreements for the remainder of the Development Rights to the

east of the Property (the "Eastern Development Rights"), all of which would serve as collateral

for the loan. Beninati Decl. at 4, ¶ 22; 11/1 Tr. 49:8-17. But about a week later, Inbursa advised

that the value of the anticipated collateral would not be sufficient to satisfy their 45% LTV

requirement. Beninati Decl. at 6, ¶ 37; DX-EW. While the Debtors contemplated a total

assemblage of approximately 265,500 square feet of Development Rights, the Debtors at this

time had secured only the first 120,000 square feet, with the remainder pending under contract.

*See* PX-119 at 3.  Inbursa, however, would not consider those pending contracts in its evaluation, resulting in an insufficient LTV ratio.  *See* Beninati Decl. at 6, ¶ 37; *see also* DX-EW (Inbursa's counsel stating that it "does not seem possible" that Beninati would meet Inbursa's loan-to-value ("<u>LTV</u>") requirement unless Beninati acquired additional equity or mezzanine financing).

The Lenders offered bridge financing sufficient to close on the Property Agreement and the Western Development Rights. Beninati Decl. at 6, ¶ 38.  At a December 3, 2014 meeting, the Defendants made more than one financing proposal to Plaintiffs, including one proposal for financing that required no points at closing, 11% interest paid currently, and an 11% exit fee. DX-EX; R. Kalikow Decl. ¶ 27.  The evening after that meeting, Beninati sent J. Kalikow a counterproposal asking to add $1.5 million for soft costs to "keep the machine running for the next several months" and to lower the interest rate to 9%.  J. Kalikow Decl. ¶ 13; R. Kalikow Decl. ¶ 27; DX-EX.  Beninati also negotiated for an 18-month loan term, instead of the six month term that was initially proposed.  J. Kalikow Decl. ¶ 13.  Beninati's counterproposal offered Gamma an option to take $2 million of its payout as equity rather than loan repayment. R. Kalikow Decl. ¶ 27; DX-EX.  That same evening, Beninati sought advice from his advisors, informing them that he thought this proposal gave Plaintiffs "monster flexibility."  DX-BU; DX-BV.

The next day, N.R. Kalikow communicated that Gamma would provide the $1.5 million for soft costs, and lower the interest rate to 9%, with 2% to be paid currently basis, and the remaining 7% to accrue.  R. Kalikow Decl. ¶ 28; DX-EY. Gamma was interested in the equity option that Beninati had proposed, but did not know exactly how to structure it.  R. Kalikow Decl. ¶ 28; DX-EY.  Shortly after noon that day, Beninati told Attorney Kalikow by email that Beninati could shake hands with N.R. Kalikow that afternoon.  DX-EY.  Beninati also stated

10

"[I] don't want to slow things up on equity.  When our deal is settled on equity, he can look at it, and if he likes it, he can come in, and if he does not, fine."  *Id.*

On December 5, 2014, Kramer Levin sent the Plaintiffs a draft term sheet between Bauhouse and Gamma Funding, LP, or one of its lending affiliates ("Gamma Funding") to Kalikow Attorney.  Beninati Decl. at 7, ¶ 44; PX-10.  Also on December 5, 2014, Kalikow Attorney presented the Sutton Principals with an attorney conflicts letter addressed to Bauhouse and Gamma Funding, LLC, attention N.R. Kalikow (the "Conflict Letter").  Beninati Decl. at 7, ¶ 45; PX-11.  This conflict letter waived any conflict of interest arising out to Herrick's past and future representations of Gamma in unrelated matters.  DX-EN; R. Kalikow Decl. ¶ 32; N.R. Kalikow Decl. ¶ 19; 11/3 Tr. 25:11-27:22.  Such conflict waiver letters apparently are not uncommon in real estate deals.  R. Kalikow Decl. ¶ 32; N.R. Kalikow Decl. ¶ 17-19; 11/3 Tr. 25:19-26:10.

On December 11, 2014, the Sutton Principals and Gamma Funding executed a term sheet for proposed financing (the "Gamma 1 Term Sheet").  Beninati Decl. at 8, ¶ 52; PX-13.  The Gamma 1 Term Sheet provided for a $25 million loan secured by the Property and a $20.25 million mezzanine loan secured by a pledge of 100% of the equity of fee owner.  *See* PX-13.  The loan would bear interest at a rate of 9% per annum, with 2% to be paid on a monthly basis and 7% to accrue in accordance with the terms of the loan documents.  *See id.*  It also included "bad boy" guarantees by the Sutton Principals.  DX-N.  Additionally, the loan would include an exit fee of 11% of the total loan amount, or $4,895,000, due at maturity or any earlier payoff of the loan. *See id.*  The Gamma 1 Term Sheet also set forth terms related to the possible future subordination of the Gamma 1 loan to a senior lender, and it included a condition whereby Gamma Funding would have the option to purchase certain residential units in the to-be-

11

completed Project in an aggregate amount of approximately 4,200 square feet at a purchase price equal to the actual cost (the "Apartment Option"). *See id*. The Apartment Option was recorded against the Property. *See* PX-21.

Plaintiffs' financing expert, Gary M. Tenzer, agreed that the terms of Gamma 1 were reasonable. 11/3 Tr. 118:18-25.

In mid-January 2015, Plaintiffs closed on Kalikow Lender's proposed bridge financing (the "Gamma 1 Financing"). *See, generally*, PX-EX at 18, 19, 22, 23. At the closing, Sutton Owner NY executed a loan agreement (the "Original Loan Agreement") with Gamma Lending S58 LP ("Gamma Lending S58") that provided for a loan in the principal amount of $43,000,000 (the "Original Loan"), collateralized by a mortgage on the Property and the Development Rights, bearing interest at 9% per year (4.5% paid monthly and 4.5% accruing), with an exit fee of 11% of loan principal due at maturity or prepayment, and a maturity date of August 1, 2016. *See* PX-18.

Section 4.16 of the Original Loan Agreement set forth the conditions required for the subordination of the Original Loan to a third-party, senior lender. PX-18 at 18, § 4.16(ii). These conditions included, among other things, that: (i) Plaintiffs close on fee title to the 426 Property; (ii) the aggregate amount of financing encumbering the property not exceed $150 million, and that the financing not exceed $560 per square foot of the then-contemplated Project; (iii) the potential new financing would constitute all additional financing required, and that Plaintiffs close on development and air rights, so that Borrower could construct a building of at least 267,950 square feet; and (iv) the interest rate on the additional first mortgage (inclusive of all points and fees) not exceed the U.S. one-month LIBOR rate plus 5.50%. The agreement further provided that, if these conditions were satisfied, "then Lender agrees to execute a subordination

agreement acceptable to Lender *in its sole discretion*, subordinating the Lien of the Loan

Documents to the lien of such additional first mortgage financing." *Id.* As we will discuss later,

the parties dispute whether the conditions for subordination were ever met.

As part of the Gamma 1 Financing, Sutton Mezz DE executed a loan agreement (the

"Original Mezz Agreement") with Gamma Lending S58 that provided for a loan in the principal

amount of $20,000,000 (the "Original Mezz Loan"), collateralized by its equity interest in Sutton

Owner, bearing interest at 9% per year (4.5% paid monthly and 4.5% accruing), with an exit fee

of 11% of loan principal due at maturity or prepayment, and a maturity date of August 1, 2016.

*See* PX-19.

## 2.  EVENTS AFTER GAMMA 1 AND BEFORE GAMMA 2 AND COMMUNICATIONS AMONG THE PARTIES

J. Kalikow drafted certain reports for investors in the Gamma 1 Financing and Gamma 2

Financing, which reports were circulated by J. Kalikow to investors in the Gamma 1 Financing

and Gamma 2 Financing.  Joint Pre-Trial Order, Stipulated Facts, ¶ 24.  These were commonly

referred to at trial as "investor letters," and they commented on many facets of the Project and

the Gamma 1 and 2 financing, including but not limited to the status of the Project over time, and

the steps and options being contemplated by both the Plaintiffs and the Lenders.  We will discuss

some of these investor letters later when discussing the merits of Plaintiffs' claims.

Over the course of the loans, the parties had meetings about the Project.  J. Kalikow had

"probably, thirty to forty-five" meetings with Plaintiffs and "numerous" phone calls.  11/7 Tr.

85:12-22.  J. Kalikow and his father "regularly" met with Beninati at Kalikow Lender's offices

to provide their views about various issues relating to the Project.  *Id.* at 73:14-17; *see* 11/1 Tr.

181:24-182:10 (over the course of the relationship, Beninati had "dozens" of meetings with

representatives of Kalikow Lender).  There was one meeting between the parties that was the

focus of significant testimony at trial.  That meeting took place on April 24, 2015 at Gamma

Lending's headquarters.  It was attended by Beninati, Jones, Lee, N.R. Kalikow, J. Kalikow, Van

Nguyen,[5] Kalikow Attorney, Tzvi Rokeach, Esq. of Kramer Levin, and a construction expert of

Defendants meet at the headquarters for Gamma Lending.  11/1 Tr. 198:7-199:2.   We will

discuss this April 2015 meeting later in more detail.

But putting aside that specific meeting, it's safe to say that N.R. Kalikow and J. Kalikow

offered the Sutton Principals advice related to the design of the Project.  Beninati Decl. at 10, ¶

62; PX-15 (Email from J. Kalikow, dated December 18, 2014, Subject is "From NRK", "I would

like to meet to discuss several thoughts I have regarding the apartment layouts. Besides, closets,

fireplaces for top units and generators, we thought about low floor units that could be purchased

by tenants for maids and domestic help . . . We have some other ideas we want to run by you as

well."). N.R. Kalikow also sought an additional meeting in December 2014 to further discuss the

Project's design.  *See* PX-15 (Email from J. Kalikow, dated December 20, 2014, stating, "[m]y

father is around next week and would love to meet and talk design").

And as the exhibits just cited demonstrate, the parties communicated frequently by email.

On April 30, 2015, for example, Beninati sent an email, to which J. Kalikow responded, that

addressed the nature of the parties' relationship.  It stated:

> The intention is to raise proforma construction debt and joint venture equity while
> working as a team post loan closing. The proceeds of those new sources of money
> would be to retire the second Gamma loan, and build the project according to an
> agreed upon general budget that we all approve and which is in the UBS materials.
> **Correct**
> Richard would be the leader of the major construction decision, and would
> supervise the consultants and direct project employees that are working on building
> the building. Joe would be the back up to Richard on that.
> **Correct**

---

[5]    Van Nguyen ("Nguyen") is an investor in both the Gamma 1 and Gamma 2 Financing.  *See Declaration of Van Nguyen in Lieu of Direct Testimony*, which was docketed by Defendants with the Court [Dkt. No. 30] and accepted in lieu of direct testimony (the "Nguyen Decl."), at 1, ¶ 1.

> We would portray to the market that this is a Bauhouse development, but I am clear that Richard is taking a major leadership role on the construction, and mention this to convey the spirit in my mind is partnership as I aspire for this to lead into cooperation on 520 as well, eventually, and subject, again, to legal limitations during times when loan are outstanding.
> **Correct**

PX-36.  But in that very same email, Mr. Beninati stated that the "[c]oncept is that during term (from closing in early May until 12.31.15) gamma would only be lender and I would be owner. During that time I could sell, but that is not my intention."  PX-36.  He also stated that "Gamma would not be a partner until all of their debt is amortized. I will let the legal guys figure out this concept, as I don't want to bust any rules.").  PX-36.

Because in New York City, air rights can be aggregated only if parcels are contiguous, the air rights to 434 East 58th Street (the "434 Property") were important to the assemblage and were required to aggregate air rights from other properties that were part of the proposed assemblage.  J. Kalikow Dec. ¶ 22.  To close on the sale of the 434 Property's Development Rights, the owner (a 48 unit co-op) had to obtain a waiver from its mortgagee's servicer, NCB. See PX-65. By early May 2015, Plaintiffs had satisfied all of the pre-requisites for this waiver, but in early June 2015, the co-op was threatening to delay the closing of the 434 Property Development Rights in an attempt to leverage an additional payment from the Sutton Principals. *See id.*  In discussing this situation with investors, J. Kalikow directly emailed William Fried ("Fried"), a litigation partner at Herrick, sometimes without copying the Sutton Principles.  *See* PX-111; PX-112.  Fried responded to J. Kalikow only without including the Sutton Principals. PX-113.  With regard to these direct communications between Kalikow Lender and Mr. Fried, J. Kalikow testified that "Mr. Beninati requested our help with getting those air rights closed, and specifically told us that we were aligned in our desire to get the 434 air rights closed and, therefore, we could communicate with Mr. Fried. . . ."  11/7 Tr. 119:11-20.  J. Kalikow

understood that Mr. Fried was communicating their thoughts with the Debtors based on discussions during meetings with the 434 co-op board.  11/7 Tr. 119:21-120:2.

There were also direct email communications between J. Kalikow and Mr. Fried regarding an investor in the project, Mr. Nguyen.  These emails were to alert Mr. Fried that a call would be coming from Mr. Nguyen.  11/7 Tr. 120:17-121:10.  J. Kalikow testified that he had gone to Mr. Fried directly because Mr. Nguyen was a potential anchor investor in Gamma 2 and Mr. Nguyen's counsel had questions regarding lender liability.  *Id.*  J. Kalikow believed the quickest way to resolve this issue was for Mr. Nguyen to get the Debtors' position on the matter directly from Debtors' counsel.  *Id.*

The parties entered into a pre-negotiation agreement dated April 1, 2015 (the "April PNA").  DX-FX.  It is a waiver and release agreement that looks backwards as well as forwards. *Id.*  The April PNA broadly defines the term "Discussions" to include all communications, past and future concerning the Gamma 1 Loan, the Property, and the Gamma 1 Loan Documents. DX-FX at 0145248-49.

The April PNA states "Lender is willing to participate and continue the Discussions" only on the terms set forth in the April 1, 2015 Agreement.  *Id.* at 0145249.  Those terms include:

- That "Borrower Parties acknowledge and agree that Lender has no fiduciary, confidential or special relationship with any of the Borrower Parties *and* no such relationship is created by the execution of this Agreement or the participation by Lender in the Discussions contemplated by this Agreement."

- That  "Nothing contained in this Agreement or in any Discussions or any prior actions by Lender shall be deemed to contemplate or constitute a joint venture or partnership agreement of any kind between Lender and the Borrower Parties or otherwise create the relationship of joint venturers or partners between Lender and the Borrower Parties, or characterize Lender as a 'mortgagee-in-possession', 'pledgee-in-possession' or a party 'in control' of any Borrower Party."

16

- The covenant, waiver, release and discharge: "Each of the Borrower Parties, collectively and individually, hereby covenants and agrees that they shall not raise (directly or indirectly, actively or passively) any defenses, offsets, cross-claims or counterclaims in connection with any actions, suits or proceedings now or hereafter instituted by the Lender with respect to the Loan, and each of the Borrower Parties waives, releases and discharges any right any of them may now or in the future have to raise any defense and/or to make any claim against Lender . . . based on a theory of 'lender liability', laches or estoppel *or* any similar theory in connection with the Loan."

- The agreement about non-final documents: "No statement, comments or representations made by Lender or any Lender's Representative, whether orally or in writing, during or in respect of any such discussion or communications may be relied upon by any of Borrower Parties or any other party unless and until incorporated into a Definitive Agreement."

*Id.* at 0145250-51 ¶¶ 2, 4-6.

After the Gamma 1 closing, Plaintiffs explored a number of alternatives with third parties including equity investment, sale, or other borrowing. DX-FS; 11/1 Tr. 112:3-18; R. Kalikow Decl. ¶ 44. JLL continued to search for additional debt financing for the Project. Kurland Decl. ¶¶ 18, 30; R. Kalikow Decl. ¶ 44. Plaintiffs also hired UBS to assist in efforts to find an equity investor for the Project. R. Kalikow Decl. ¶ 44. There were discussions with potential lenders and equity providers. *Id.* ¶¶ 45, 47, 50. Plaintiffs also worked with Cushman to pursue potential sales of the Project and several potential purchasers were identified. R. Kalikow Decl. ¶ 51; DX-FS.

**3.  THE CLOSING ON THE GAMMA 2 FINANCING**

On April 16, 2015, J. Kalikow proposed to Beninati that Kalikow Lender provide financing totaling $140,000,000. *See* PX-32. On June 19, 2015, Plaintiffs closed on Kalikow Lender's senior financing (the "Gamma 2 Financing"). At the closing, Sutton Owner DE executed a loan agreement (the "Acquisition Loan Agreement") with Sutton 58 Associates LLC ("Sutton Lender"), that provided for a loan in the principal amount of $125,850,000 (the

"Acquisition Loan"), collateralized by a mortgage on the Property and the Development Rights,

bearing interest at 6% per year, with an exit fee of $25,170,000 due at maturity or prepayment,[6]

and a January 19, 2016 maturity date, *i.e.*, a 7-month term.  *See* PX-38.

Sutton Owner DE also entered into a building loan agreement (the "Building Loan

Agreement") with Sutton Lender that provided for a loan in the principal amount of $1,400,000

(the "Building Loan"), collateralized by a mortgage on the Property and the Development

Rights, bearing interest at 6% per year, with an exit fee of $280,000 due at maturity or

prepayment, and a January 19, 2016 maturity date, *i.e.*, a 7-month term.  *See* PX-39.

Sutton Mezz DE also executed a loan agreement (the "New Mezz Agreement") with

Sutton Lender that provided for a loan in the principal amount of $20,000,000 (the "New Mezz

Loan"), collateralized by Sutton Mezz DE's equity in Sutton Owner DE, bearing interest at 6%

per year, with an exit fee of $4,000,000 due at maturity or prepayment, and a January 19, 2016

maturity date, *i.e.*, a 7-month term.  *See* PX-40.

The Gamma 2 Financing imposed an exit fee of 20% upon the maturity or prepayment of

the loan.  *See, e.g.*, DX-AR at 2, § 1.1.2.

Sutton Owner NY executed a $32,250,000 Promissory Note on January 16, 2015 (the "G-

1 Note") and a $10,750,000 Gap Promissory Note on January 23, 2015 (the "G-1 Gap Note").

*See* DX-X, DX-AE.  These notes were consolidated into a $43,000,000 Consolidated, Amended

and Restated Promissory Note, dated January 23, 2015 (the "G-1 Consolidated Note").  *See* DX-

AI.  The G-1 Note and G-1 Gap Note—aggregated together through the G-1 Consolidated

Note—evidence the $43,000,000 loan made pursuant to the Original Loan Agreement.

---

[6]    For the Gamma 2 Financing, the loan documents refer to the exit fee as "additional interest." Substantively, the so-called "additional interest" is an exit fee. *See* Tenzer Decl. at 7, ¶ 21.

At the closing on the Gamma 2 Financing, Sutton Owner DE executed the Acquisition Loan Agreement in the amount of $125,850,000. DX-AR. As evidence for the Acquisition Loan, Sutton Owner DE executed an $82,850,000 Gap Promissory Note on June 19, 2015 (the "G-2 Gap Note"). *See* DX-BJ. Sutton Owner DE also executed a $125,850,000 Consolidated, Amended and Restated Promissory Note (the "G-2 Consolidated Note"), which combined the G-1 Consolidated Note with the G-2 Gap Note. *See* DX-AU.

Based on a loan-to-cost ("LTC") metric, where the value of the collateral is determined by the cost to acquire it, the Gamma 1 Financing was leveraged at 94% and the Gamma 2 Financing was leveraged at 97%. 11/9 Tr. 141:13-16.

The Gamma 2 loan documents state, among other things:

- "Prior Agreements. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents." DX-AR § 8.12; accord DX-AS § 8.12; DX-AW § 8.12.

- Representation of No Defenses to Prior Notes. "Maker represents and warrants as of the date hereof [June 19, 2015] that there exist no defenses, offsets or counterclaims with respect to its obligations under the Prior Notes." DX-AU at 2.

Beninati described Gamma 2 as "high octane" and noted that it involved a "very big" "vig"—but he also believed that its advantages justified its expense. DX-FS; DX-CM; 11/1 Tr. 113:24-115:5, 117:8-118:7. He discussed pros and cons of Gamma 2 with his advisors before agreeing to it. DX-FS; DX-CF.

As part of the Gamma 2 Financing, the parties executed an Option Agreement (the "Option Agreement"), which provides that after the Gamma 2 Financing is repaid, the Sutton Principals can exercise their option pursuant to which Kalikow Lender would be obligated to make an equity contribution to the Project, and the parties would continue the development as a

joint venture. *See* DX-BA at 11, § 5(b). The Option was never exercised by the Sutton Principals.

The Option Agreement placed certain obligations on Kalikow Lender with respect to the Project, even before the Option was exercised. *See* DX-BA at 11, § 5(a). Specifically, upon the reasonable request of Mr. Beninati, Kalikow Lender was "obligated to endeavor to cooperate with, and consult with Beninati in his efforts to raise debt and equity for the Project, formulating a Project Budget, and consulting on value engineering, construction issues, and design elements for the project." *Id.* This was provided that all decisions regarding the foregoing and the responsibility for securing debt and raising equity would reside in Mr. Beninati. *See id.*

The Option Agreement also provided that, unless and until the Option was exercised "Gamma would have no ownership interest in, or decision making authority with respect to, the Project." *Id.* at 11-12, § 7(a). Furthermore, the Option Agreement stated that "[n]othing contained in this Agreement *or any actions taken by Gamma pursuant hereto or any actions taken prior hereto by Gamma shall be deemed to contemplate or constitute a joint venture or partnership agreement of any kind, or otherwise create the relationship of joint venturers or partners*" between Gamma and the Debtors. *Id.* (emphasis added).

## 4. EVENTS AFTER GAMMA 2

The Acquisition Loan Agreement contemplated the purchase of the 426 Property, obtaining surrender agreements from the tenants at the 426 Property and demolishing the 426 Property. *See* PX-38 at 22, § 4.28. Pursuant to the Acquisition Loan Agreement, $17,319,500 was to be held by Sutton Lender in a reserve account to purchase the 426 Property, obtain the surrender agreements from the tenants and demolish the 426 Property. *See id.*; Beninati Decl. at 22, ¶ 134.

20

Negotiations to obtain a surrender agreement with one rent-controlled tenant were ultimately unsuccessful. *See* Beninati Decl. at 22, ¶ 135. The Sutton Principals developed an alternative plan to extend a cantilever—a kind of overhang—to 20 feet over the 426 Property (the "426 Cantilever Plan"). Beninati Decl. at 22, ¶ 136; 11/1 Tr. at 205:3-14. The 426 Cantilever Plan cost approximately $1,000,000. Beninati Decl. at 22, ¶ 137; 11/1 Tr. 140:1-15.

On August 6, 2015, the Sutton Principals, Kalikow Attorney, J. Kalikow and N.R. Kalikow met at F + P's offices to discuss the Project. Plaintiffs claim that during this meeting N.R. Kalikow sat at the head of the table and ran the meeting. Beninati Decl. ¶ 139; 11/1 Tr. 206:19-207:12. This is disputed by the Defendants. Barnes Depo. Tr. 27:8-10, 44:18-21, 86:4-11; N.R. Kalikow Decl. ¶ 29. The Lenders subsequently refused to release any funds from the $17,319,500 reserve from the Acquisition Loan to close on the purchase of the easement or related costs. Beninati Decl. at 23, ¶ 144.

There were several other disputes regarding reserve requests and the draw requisition process. For instance, regarding the draw requisition process, the Debtors complain that the Lenders sent checks directly to vendors and the Lenders made certain admittedly unrelated payments to Kramer Levin from the reserve accounts under the Gamma 2 Financing. There is also a dispute regarding the Lenders' refusal to make disbursements from the Contract Property Purchase Reserve, which was established for the purchase of the real property located at the 426 Property. The Debtors also allege that the Lenders' failed to make timely payments from the Architecture and Engineering Reserve to F+P and other professionals. The Debtors also complain about delay in releasing funds from the Demolition Reserve, which was established for the demolition of the Project site. The Court will address these disputes in more detail below.

In the fall of 2015, the Defendants asked the Plaintiffs to sign another pre-negotiation

agreement (the "December PNA").  Defendants' counsel sent Attorney Kalikow a draft of a new

PNA and informed him that Defendants would not meet with Plaintiffs unless a PNA was signed.

R. Kalikow Decl. ¶ 64; DX-FY.  The Bauhouse principals executed the December PNA on

December 8, 2015.  DX-GA.  The December PNA releases Plaintiffs' claims against Defendants,

including Lender Liability claims under the Gamma 2 loans, arising out of "Discussions"

between the parties.  DX-GA ¶ 6.  As with the April PNA, "Discussions" are broadly defined to

include "any and all negotiations and/or discussions, whether relating to the Loans, the Loan

Documents, the Property and/or the Development Plan or otherwise," including "prior" as well

as future communications.  *Id.* at 2.  The December PNA contains backwards-looking and

forward-looking agreements like those in the April PNA, including:

- "The Borrower Parties acknowledge and agree that Lender has no fiduciary, confidential or special relationship with any of the Borrower Parties" – "and no such relationship is created by the execution of this Agreement or the participation by Lender in the Discussions contemplated by this Agreement."  *Id.* at ¶ 5.

- "Nothing contained in this Agreement or in any Discussions *or prior actions* by Lender or any other Lender Parties shall be deemed to contemplate or constitute a joint venture or partnership agreement of any kind between [Lender] or any other [Lender] Parties and the [Debtors] or otherwise create the relationship of joint venturers or partners" between these parties, or characterize Lender as "in control."  *Id.* at ¶ 5 (emphasis added).

- "Each of the Borrower Parties . . . covenants and agrees that they shall not raise . . . any defenses . . . based upon any of the Discussions, and each of the Borrower Parties waives, releases and discharges . . . any defenses . . . based upon the Discussions and relying on a theory of 'lender liability' . . . or any similar theory."  *Id.* at ¶ 6.

## DISCUSSION

### 1. UNCONSCIONABILITY (COUNTS 9 AND 10)

The first category of claims are those of unconscionability.  The Debtors argue that the

exit fees and maturity dates relating to the Gamma 1 Financing and the Gamma 2 Financing, as

well as the Apartment Option relating to Gamma 1, are procedurally and substantively

unconscionable under New York law.

A contract provision will be held unenforceable due to unconscionability only when

found to be both 'procedurally' and 'substantively' unconscionable.  *See NML Capital v.*

*Republic of Arg.*, 621 F.3d 230, 237 (2d Cir. 2010) (citing *Gillman v. Chase Manhattan Bank,*

*N.A.*, 73 N.Y.2d 1, 10 (1988)).  The court must "examine unconscionability at the time the

contract was made, rather than considering events occurring after the contract's formation."

*NML Capital v. Republic of Arg.*, 2009 U.S. Dist. LEXIS 21530, at *10 (S.D.N.Y. Mar. 18,

2009) (citing *Gillman*, 73 N.Y.2d at 10; *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 113 (2d

Cir. 1996)).  Procedural unconscionability arises when there was a "'lack of meaningful choice'

arising from the contract formation process, in light of the circumstances of the transaction and

the sophistication and bargaining power of the parties."  *NML Capital v. Republic of Arg.*, 2009

U.S. Dist. LEXIS 21530, at *10 (quoting *Gillman*, 73 N.Y.2d at 10).  In determining if a

provision is substantively unconscionable, a court must examine "'the substance of the bargain to

determine whether the terms were unreasonably favorable' to one party in light of 'their

commercial context, their purpose, and their effect.'"  *NML Capital*, 2009 U.S. Dist. LEXIS

21530, at *10 (quoting *Gillman*, 73 N.Y.2d at 12).

"'The doctrine of unconscionability seeks to prevent sophisticated parties with grossly

unequal bargaining power from taking advantage of less sophisticated parties.'"  *NML Capital*,

23

621 F.3d at 237 (quoting *United States v. Martinez*, 151 F.3d 68, 74 (2d Cir. 1998)). "The

bedrock of the doctrine of unconscionability is the prevention of oppression and unfair surprise .

. . and not of disturbance of allocation of risk." *Westinghouse Elec. Corp. v. N.Y.C. Transit

Auth.*, 82 N.Y.2d 47, 55 (1993).

Thus, "'[w]hen the contract is between two commercial entities, unconscionability must

be viewed 'in light of the general commercial background and the commercial needs of the

particular trade or case,' and there is a presumption of conscionability when the contract is

between business in a commercial setting. Courts have rarely found a clause to be

unconscionable in a commercial contract.'" *Ally Financial Inc. v. Wells Fargo Bank, N.A. (In re

Residential Capital, LLC)*, 531 B.R. 25, 44 (Bankr. S.D.N.Y. 2015) (quoting *Am. Dredging Co.

v. Plaza Petroleum Inc.*, 799 F. Supp. 1335, 1339 (E.D.N.Y. 1992)). Indeed, the Second Circuit

itself has noted that there is no authority "finding an agreement involving parties of like

sophistication unenforceable on substantive unconscionability grounds." *NML Capital*, 621 F.3d

at 238; *see also Gillman v. Chase Manhattan Bank., N.A.*, 521 N.Y.S.2d 729, 732 (App. Div. 2d

Dep't 1987) ("[T]he doctrine of unconscionability has little applicability in the commercial

setting because it is presumed that businessmen deal at arm's length with relative equality of

bargaining power."), *aff'd*, 73 N.Y. 2d 1 (N.Y. 1988). Parties cannot simply "renegotiate the

terms of the contract for which it bargained simply because things did not turn out favorably for

it" or "convince the Court 'to rewrite the contract to fulfill [its] unspoken expectation.'" *In re

Residential Capital*, 531 B.R. at 45 (citing *Indus. Representatives, Inc. v. CP Clare Corp.*, 74

F.3d 128, 130 (7th Cir. 1996) and quoting *Buena Vista Home Entm't, Inc. v. Wachovia Bank,

N.A. (In re Musicland)*, 374 B.R. 113, 121 (Bankr. S.D.N.Y. 2007)).

### A) <u>Procedural Unconscionability</u>

The Debtors argue that the terms at issue are procedurally unconscionable due to the

Debtors' inadequate representation by counsel and an inequitable bargaining position between

the Debtors and the Lenders.

"The procedural element of unconscionability requires an examination of the contract

formation process and the alleged lack of meaningful choice. The focus is on such matters as the

size and commercial setting of the transaction, whether deceptive or high-pressured tactics were

employed, the use of fine print in the contract, the experience and education of the party claiming

unconscionability, and whether there was disparity in bargaining power." *Gillman v. Chase*

*Manhattan Bank*, 73 N.Y.2d 1, 10-11 (1988).

Applying these principles here, the Plaintiffs have not established procedural

unconscionability.  The Court found Beninati to be a sophisticated and experienced real estate

developer, having worked on three projects involving financing of $190, $200 and $250 million.

*See* 11/1 Tr. 32:24-39:5; *see also* 11/3 Tr. 8:10-10:6 (Jones was 25 year veteran in real estate

who'd overseen large scale development projects totaling more than $4 billion).  The mere fact

that the Plaintiffs were new to the New York City real estate market does not change his level of

sophistication.  *See Process Am., Inc. v. Cynergy Holdings, LLC*, 2016 U.S. App. LEXIS 18038,

at *30 n.6 (2d Cir. Oct. 5, 2016) ("Business entities negotiating in a commercial setting do not

warrant any special solicitude as 'unsophisticated' parties simply because they are new to a

particular industry and choose to forego representation by counsel.").  And Beninati acted like a

sophisticated real estate developer—he had his team develop financial models for the project,

upon on which Beninati commented.  *See* DX-BX; 11/1 Tr. 64:24-66:10; DX-CK.  He also hired

a team of financial advisors to assist the Plaintiffs.  These included: JLL as debt and equity

25

advisor; UBS Investment Bank as equity financing advisor; Carlton Group as debt and equity

advisor; and Cushman & Wakefield as sales broker.  And Beninati consulted these advisors for

both of the Gamma transactions.  *See* DX-BU (email from Beninati to JLL seeking advice on

Gamma 1); Kurland Decl. ¶ 15 (Kurland of JLL testifying that he advised Beninati that an

alternative equity deal with CIM-DDG was superior but Beninati disagreed); DX-FS (email from

Beninati to Cushman & Wakefield describing Gamma 2 as "high octane" and seeking their

"counsel and feedback" on the deal); DX-BV (email from Beninati discussing terms of Gamma 1

Financing with Mr. Hakim and stating the deal gives the Debtors "monster flexibility"); DX-CM

(email exchange between Beninati and UBS regarding Gamma 2 in which Beninati states "there

are many virtues of gamma route [sic]").

Beninati also demonstrated his sophistication and independence from the lenders by

negotiating changes to the lenders' proposed financing for both Gamma 1 and Gamma 2.  *See*

DX-EX; DX-CL.  In both instances, the Plaintiffs had other options but ultimately concluded that

Defendants were the best choice.  *See, e.g.*, DX-BU (Beninati describing Gamma 1 as providing

"monster flexibility"); DX-FS (Beninati email of April 2015 noting that has "multiple bids in

hand for approximately $150 mm of total proceeds" with Gamma being the "most simple and

fastest" option); DX-CM (Beninati concluding that Gamma 2 had "many virtues"); *see also* 11/1

Tr. 112:3-15 (Beninati had two potential purchasers as of April 2015).  Among his options was a

sale, which Beninati consistently rejected because he wished to capture of the upside of the

project, notwithstanding the risk.  *See* 11/1 Tr. 112:3-15 (considered sale to potential purchasers

as option as of April 30, 2015); DX-FS; PX-59 (investor letter noting that Plaintiffs had engaged

Cushman & Wakefield to solicit interest); J. Kalikow Decl.  ¶ 67 (Defendants urged Beninati to

sell numerous times during Gamma 2); 11/3 Tr. 142:4-20 (Plaintiffs' expert agreeing that

Beninati opted not to sell the project because Beninati had "stars in his eyes," meaning that he

hoped for a "really huge score").

Debtors' reliance on their counsel for procedural unconscionability also fails. Courts

have rejected efforts to avoid contractual obligations based on claims of inadequate

representation by counsel. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Oliver*, 2016 U.S.

Dist. LEXIS 9539, at *7 n.1 (S.D.N.Y. Jan. 27, 2016) (rejecting argument agreement was

unconscionable, and noting: "most of [defendant's] complaints appear to be directed as his own

counsel's conduct, which is not a basis for voiding an otherwise valid agreement") (citing

*Martens v. Smith Barney, Inc.*, 2002 U.S. Dist. LEXIS 8037, at *13 n.4 (S.D.N.Y. May 3, 2002)

("[U]nder fundamental principles of contract law, the fact that [plaintiff] may be unhappy with

her lawyers' performance does not provide a basis for rescission of the agreement she

independently negotiated with [defendant].")); *see, e.g., In re Winer*, 39 B.R. 504, 507 (Bankr.

S.D.N.Y. 1984) (holding that "one who signs a document is bound by its contents" and rejecting

request to void contract based on alleged conflict); *Wells Fargo Trade Cap. Servs., Inc. v.

Sinetos*, 2012 N.Y. Misc. LEXIS 6334, at *10 (N.Y. Sup. Ct. Dec. 19, 2012) (where plaintiff

acknowledged signing guaranty, his "claim that his former lawyer sent out the signed document

without his permission does not affect the validity of the Guaranty"); *Taylor v. Gordon Flesch

Co.*, 793 F.2d 858, 864 (7th Cir. 1986) ("To the extent that [plaintiff's] decision may have been

based upon the incompetency of his counsel, his remedy lies in an action for legal malpractice,

not in an action seeking to renege on a settlement agreement.").

Citing to *Gendot Assoc., Inc. v. Kaufold*, 866 N.Y.S.2d 361 (App. Div. 2d Dep't 2008),

the Debtors argue that reliance on an attorney that provided improper advice due to a conflict of

interest is sufficient to satisfy procedural unconscionability. But *Gendot* is distinguishable. In

27

that case, the court overturned a lower ruling that granted summary judgment on

unconscionability grounds due to the conclusion that an impermissible conflict of interest

existed.  In those circumstances, there had been a failure of the plaintiff's attorney to disclose

ongoing matters in which he represented the defendant, though past representations had been

disclosed.  *See id.* at 362.  The court stated that "[w]here there is doubt, as in the case at bar, as to

whether a contract is fraught with elements of unconscionability, there must be a hearing where

the parties have an opportunity to present evidence with regard to the circumstances of the

signing of the contract, and the disputed terms' setting, purpose and effect."  *Id.* at 363.  It noted

that there were unresolved triable issues of fact as to whether any conflict of interest resulted in

the execution of an unconscionable contract.  *See id.*  Unlike the *Gendot* case, the Court here has

considered the full evidentiary record at trial and concluded that the evidence does not support a

finding of unconscionability given the Plaintiffs' level of sophistication and the rest of the

evidentiary record.

### B)  <u>Substantive Unconscionability</u>

As for substantive unconscionability, the Defendants argue as a threshold matter that the

loans at issue cannot be found substantively unconscionable because they are too large to be

covered by New York's usury statutes.  But that argument is inconsistent with the case law.  *See*

*Schwartzbaum v. Emigrant Mortg. Co.*, 2010 U.S. Dist. LEXIS 60201, *15-17 (S.D.N.Y. June

16, 2010) (finding "it unavailing that default interest rates are not covered by New York usury

laws because there are still plausible factual scenarios in which an otherwise legal interest rate

would be unconscionable with respect to the Plaintiffs in this case."); *cf. Carboni v. Arrospide*, 2

Cal. App. 4th 76, 81-82 n. 4 (Cal. App. 1st Dist. 1991) (voiding a contract as unconscionable

even where it was exempt from California's usury law); Corbin L. Arthur, Corbin on Contracts §

5.16 (Perillo M. Joseph, rev. ed. 1993) ("in the absence of a usury statute, a contract that requires the payment of a very high rate of interest will be enforced, up to the point at which 'unconscionability' becomes an operative factor."). Moreover, at least one court has found an exit fee to be unconscionable. *See Adduci v. Krane*, 2015 U.S. Dist. LEXIS 13078, at *4-6 (D. D.C. Feb. 4, 2015) (holding that an exit fee of $900,000 on a $100,000 loan is unconscionable).

But the Plaintiffs' substantive unconscionability claim is nonetheless flawed given the Court's conclusions about Plaintiffs' level of sophistication as real estate developers. As the Second Circuit has observed, there appear to be no cases finding an agreement between two sophisticated parties to be unenforceable on substantive unconscionability grounds. *See NML Capital v. Republic of Argentine*, 621 F.3d 230, 238 (2d Cir. 2010). The Plaintiffs' claim of substantive unconscionability is also undermined by the Court's conclusions about the benefits of the financing when compared with the Debtors' other options. Key to these conclusions is the undisputed fact that the Plaintiffs had significant difficulties getting financing because they had invested so little of their own money in the project, thus making traditional lenders unwilling to bankroll the project—something even the Plaintiffs' expert conceded. Under these circumstances, the Plaintiffs worked out two short term financings from the Defendants, both of which were expensive but offered the Plaintiffs the chance to move the project forward, seek more permanent financing and complete the assemblage. *See, e.g.*, DX-FS (Gamma 2 gave Plaintiffs, *inter alia*, "money to close on the balance of the assemblage," proceeds to complete demo, cash to buyout tenants, proceeds for foundation and building permits and time to find an equity partner). Each time, Beninati thought the financing was worthwhile, as he consistently ignored advice to consider a sale—advice that even came from the Defendants. Thus, the market demonstrated what constituted a reasonable financing deal under these circumstances, a

29

conclusion consistent with the opinion of the Defendants' expert, whom the Court credits on this

point. *See* Eyzenberg Decl. ¶¶ 2, 50, 52, 54 (Defendants' expert concluding that terms of loan

were reasonable given all the circumstances here); *id.* ¶¶ 36-37, 52 (Defendants' expert noting a

loan to cost ratio of 93% and 97% for Gamma 1 and 2, respectively, and stating that he had never

seen a debt position go so high into the capital stack on a predevelopment deal); *cf.* 11/3 Tr.

114:4-8 (Plaintiffs' expert expressing no opinion on what terms a private hard money lender

would require with a loan-to-value ratio of greater than 90%); *id.* at 111:7-17 (Plaintiffs' expert

noting that Debtors could not satisfy the loan-to-value ratio of 60-65% typical for hard money

lenders).

The Plaintiffs' reliance on the Apartment Option also fails. The option was never

exercised and was instead repurchased using a portion of the proceeds from the Gamma 2

Financing. "Under New York law, unconscionability is an affirmative defense to the

enforcement of a contract." *Ng v. HSBC Mortg. Corp*., 2011 U.S. Dist. LEXIS 88549, at *22

(E.D.N.Y. Aug. 10, 2011) (citing cases). As such, it "is to be used as a shield, not a sword, and

may not be used as a basis for affirmative recovery." *Arvildsen v. Prystay*, 574 N.Y.S.2d 535,

537 (App. Div. 1st Dep't 1991) (quoting *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 517

N.Y.S.2d 764 (App. Div. 2d Dep't 1987)). "Under both the UCC and common law, a court is

empowered to do no more than refuse enforcement of the unconscionable contract or clause."

*Id.* Because the Apartment Option was extinguished, the Defendants have not asserted a claim

relating to it and therefore unconscionability is not being used as an affirmative defense to that

agreement. It cannot be used to seek an affirmative recovery as to the other agreements.

Moreover, there was no evidence that the consideration paid to repurchase the option was

unreasonable. DX-EF; DX-IC; DX-II; PX-83 at 4.

Last but not least, the Plaintiffs' willingness to use the proceeds of the loans throughout the life of the project undermines the unconscionability claim. "[U]nder New York law, an unconscionable agreement is voidable, not void." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Oliver*, 2016 U.S. Dist. LEXIS 9539, at *8 n.1 (S.D.N.Y. Jan. 27, 2016) (citing *United States v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011)). "[A] party who has failed to promptly repudiate a voidable contract will be deemed to have waived that right." *Merrill Lynch*, 2016 U.S. Dist. LEXIS 9539, at *8 n.1 (holding that because plaintiff failed to promptly repudiate an agreement and accepted the consideration received pursuant to it, the plaintiff could not now avoid its terms through an argument of unconscionability) (citing *DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982)).

## 2. **LENDER LIABILITY (COUNTS 21, 22 AND 23)**

The next category of claims is entitled lender liability, which includes the Debtors' Twenty-First, Twenty-Second and Twenty-Third claims that are captioned, respectively, lender liability, breach of fiduciary duty and breach of the duty of loyalty.

As a threshold matter, all parties at the closing argument agreed that lender liability is not being presented here as an independent cause of action. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 418 (S.D.N.Y. 2000) ("Lender liability is not an independent cause of action, but a term that refers to the imposition of traditional contract or tort liability on a bank or other financial institution. It may be predicated on, *inter alia*, breach of contract, breach of fiduciary duty, common law fraud, duress, tortious interference with contract, defamation or negligence. . . . To the extent there is basis for such claims, plaintiffs will prevail. But the stand-alone 'lender liability' claim is entirely duplicative."); *In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 569 (S.D.N.Y. 2015) ("Plaintiffs' claim. . . invokes the doctrine of 'lender liability'

law. . . , which has been largely discredited."); *Airbus DS Optronics GmbH v. Nivisys LLC*, 2016 U.S. Dist. LEXIS 58684, at *16-17 (D. Ariz. May 2, 2016) ("Substantial persuasive authority and several secondary sources have addressed the issue, and concluded that 'lender liability' is not itself a cognizable legal claim, but rather an umbrella term—a descriptor—that has been applied to a number of common law and statutory causes of action.") (citing cases); *cf. Nat'l Westminster Bank USA v. Century Healthcare Corp.*, 885 F. Supp. 601, 603 (S.D.N.Y. 1995) ("Lender liability is predicated on an unmistakable showing that the subservient corporation in reality has no separate, independent existence of its own and was being used to further the purposes of the dominant corporation. Suggestions by a major lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper.").

The parties and the Court instead use the lender liability label here to generally refer to Plaintiffs' claims against the Lender that are not based on the parties' contracts but rather upon their relationship; that is, the claims that rely on that relationship as a basis to impose on the Lenders duties to the Plaintiffs beyond those set forth in the parties' written agreements. To prevail on such a fiduciary duty claim under New York law, the Debtors must establish "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."[7] *Johnson v. Nextel Communs., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 883 N.Y.S. 2d 305, 308 (N.Y. App. Div. 2d Dep't 2009)).

---

[7] The Court notes that the Plaintiffs define the legal issues to be decided by the Court in these three counts as whether the Defendants had a fiduciary duty or duty of loyalty to Plaintiffs and, if so, whether the Defendants breached the duty. *See* Joint Pre-Trial Order at 10. A claim for violation of the duty of loyalty depends of whether a fiduciary duty exist. *See Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984) (the duty of loyalty "derives from the prohibition against self-dealing that inheres in the fiduciary relationship"). Accordingly, the threshold issue to be decided for this category of claims is whether such a fiduciary duty existed.

"'When parties deal at arms' length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.'"  *Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)).  Thus, a lender-borrower relationship will not normally create a fiduciary duty.  *See id.*  But such a relationship "may give rise to fiduciary duty under New York law where there exists 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility.'"  *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 442 (S.D.N.Y. 2010) (quoting *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993)).

The Plaintiffs base their fiduciary duty claim on: 1) the Lenders' alleged control of the Debtors; 2) the Lenders' position of trust with the Debtors; and 3) the reserve funds created by the contract.  The Court will address these three issues separately, although the Court's conclusion on the first two are obviously related and reinforce each other.

### A)  Exercise of Control

Turning first to the issue of control, "courts require a strong showing that the creditor assumed actual, participatory and total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control. . . .'"  *Indus. Tech. Ventures LP v. Pleasant T. Rowland Revocable Trust*, 2015 U.S. Dist. LEXIS 55347, at *28 (W.D.N.Y. Apr. 28, 2015) (quoting *Krivo Indust. Supply Co. v. Nat'l Distillers and Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir. 1973)).

The Debtors assert that the Lenders exercised of control over the Debtors.  The Debtors argue such control is evidenced by a number of events, including the Lenders' conduct in a

33

dispute relating to the 434 Property, the Lenders' domination of a meeting with F+P, the

Defendants' attempts to limit the Debtors' options following the Gamma 1 Financing and to limit

the Debtors' abilities to pursue equity investment and sales after the Gamma 2 Financing by

failing to pay F+P.  But while the evidence demonstrates that the Defendants' took an active part

in the Debtors' affairs, the Plaintiffs have failed to satisfy their burden of showing that the

Defendants assumed actual, participatory and total control of the debtors.  As a threshold matter,

it is undisputed that the Defendants had no ownership interest in the Debtors, no ability to

appoint directors, officers, or management, no authority over hiring and firings.  N.R. Kalikow

Decl. ¶¶ 22, 48-49.  Beninati has exclusive authority to manage the affairs of Sutton 58 Owner

and Sutton Mezz, and he is the sole manager of Sutton Owner Delaware.  11/1 Tr. 85:8-16.  He

is the final decision maker at each of the Plaintiffs.  *Id*.  While the Debtors cite the Defendants

intent to obtain an equity stake in the project, the parties contemplated that this would not happen

until Gamma 2 was paid off.  *See* DX-CL.

And as explained earlier, the totality of the evidence at trial also reflects that the Debtors

made their own decisions about whether to enter into the Gamma 1 and Gamma 2 transactions

after weighing the pros and cons of these financings and consulting with their advisors.  Of

course, the parties here did meet and regularly communicated with each other, often talking

about the project in detail.  But the credible evidence in the record does not support the

conclusion that the Defendants controlled the Debtors.  Indeed, the Defendants credibly testified

that if this was their project, they would have had many, many more meetings than what took

place here.  *Compare* 11/7 Tr. 122:24-123:4 (Lenders had two meetings with architect F+P for

this project), *with* 11/7 Tr. 123:5-9 (if their project, Lenders would have had weekly meeting

with architect); *compare* 11/7 Tr. 123:25-124:2 (Lenders had no meeting with demolition

company for this project), *with* 11/7 Tr. 123:3-7 (if their project, Lenders would have had daily

meetings); *compare* 11/7 Tr. 124:10-16 (Lenders had two meetings with Debtors'

brokers/advisors JLL, one with Carlton, one with USB), *with* 11/7 Tr. 124:17-20 (if their project,

Lenders would have had many, many more meetings with these kinds of professionals); *see also*

11/7 Tr. 123:15-22; 125:15-126:18 (comparing frequency of meetings in this project with other

professionals as compared with Lenders' practice for their own projects). Indeed, the evidence at

trial only established two meeting with the architect F+P where N.R. Kalikow was present, and

N.R. Kalikow testified that he went to one of those meetings at the request of Mr. Beninati. N.R.

Kalikow Decl. ¶ 29. The fact that there were only two meetings is utterly inconsistent with

Debtors' theory that Defendants totally dominated the Project or that the Defendants had a loan-

to-own strategy from the very beginning. The Court also concludes that the credible evidence,

particularly the third-party testimony of Jim Barnes of F+P, does not support Plaintiffs' claim

that Defendants dominated one meeting in question with F+P. *See* Barnes Depo. Tr. 27:8-17;

44:18-21; 84:14-88:5. And even if they did, it is unclear how dominance of one such meeting

would satisfy the legal requirements for control given all the facts of circumstances here. *See,*

*e.g., id.* at 87:1-8; 87:25-88:5 (F+P never sought design approval from the Lenders and was not

directed to send work to the Lenders).

The Court also rejects Plaintiffs' arguments of control or trust based on the Defendants

direct communication with Debtors' counsel Bill Fried. The communications with Debtors'

counsel occurred on two topics: 1) a dispute with the co-op board of the 434 Property, and 2) an

anchor investor in Gamma 2 seeking clarification about the Debtors' view on a legal issue. As to

the first issue, the Defendants were asked by Beninati to help and told they could communicate

with Bill Fried about this dispute, an issue where the Debtors and Defendants both had the same

35

common interest to protect as to obtaining the necessary air right to complete the assemblage.
*See* Tr. 11/7 at 119:7-20.  Moreover, the Defendants suggestion about how to handle this
dispute—initiate litigation—was not followed.  J. Kalikow Decl. ¶¶ 59-60.  As to the second
issue, the investor was not seeking Fried's legal counsel but rather his explanation of the Debtors
position on an issue.  *See* 11/7 Tr. 121:1-10.  In sum, neither set of communications supports a
finding of control.  Relatedly, the Court rejects the notion that the conflict waiver letter
established control by the Lenders of sophisticated parties like the Debtors; there is nothing in
the record to suggest that conclusion, particularly given the unrebutted testimony that such
waiver letters are common in the industry.  The credible evidence is that the Plaintiffs believed
that waiving the conflict was in their best interest.

For similar reasons, the Court rejects the Plaintiffs' argument that the Defendants
asserted their control indirectly, rather than directly, with the most obvious example being N.R.
Kalikow giving suggestions to Mr. Jones rather than directly to the architect.  *See, e.g.,* PX-123.
The evidentiary record is frankly inadequate for such a conclusion.  Moreover, such an approach
does not square with the credible evidence of the Defendants providing input—but not
direction—while at the same time aggressively safeguarding their contractual rights to ensure
that their considerable economic stake was protected.

Based on the credible evidence, the Court concludes that the Defendants were more
involved in this project than a traditional lender because the project had more risk than a
traditional project (as evidenced by the very high loan to cost ratio) and thus it was prudent for
the Defendants to monitor the status of the Debtors' efforts to complete the assemblage.  The
credible evidence also establishes that this approach appears normal for a so called hard money
lender, a lender who is used when more risk adverse traditional lenders won't finance a project

36

because of the high level of risk. *Rigby v. Mastro (In re Mastro)*, 465 B.R. 576, 585 (Bankr. W.D. Wash. 2011) ("Hard money loans are loans too risky to meet the criteria of a bank or other conventional lender, typically involving loan fees and interest rates substantially higher than those charged by conventional lenders."). But the evidence does not support the conclusion that the Defendants ceased to be Lenders and took control of the Debtors.

Further supporting the Court's conclusions that there is no fiduciary duty is the fact that the parties consistently disclaimed such a relationship in their agreements or communications. This occurred repeatedly. For example, the parties entered into a PNA in April 2015 after Gamma 1 and before Gamma 2. DX-FX. The April PNA addresses the significance and use of the parties' "Discussions", a term which it broadly defines to include all communications, past and future concerning the Gamma 1 Loan, the Property, and the Gamma 1 Loan Documents. DX-FX at 0145248-49. The April PNA states "Lender is willing to participate and continue the Discussions" only on the terms set forth in the April 1, 2015 Agreement. *Id.* at 0145249. Those terms include but are not limited to a statement that:

- "Borrower Parties acknowledge and agree that Lender has no fiduciary, confidential or special relationship with any of the Borrower Parties *and* no such relationship is created by the execution of this Agreement or the participation by Lender in the Discussions contemplated by this Agreement."

- The PNA also provides that "Nothing contained in this Agreement or in any Discussions or any prior actions by Lender shall be deemed to contemplate or constitute a joint venture or partnership agreement of any kind between Lender and the Borrower Parties or otherwise create the relationship of joint venturers or partners between Lender and the Borrower Parties, or characterize Lender as a 'mortgagee-in-possession', 'pledgee-in-possession' or a party 'in control' of any Borrower Party."

*Id.* at 0145250-51 ¶¶ 2, 4-6 (emphasis added). The April PNA also made clear that no agreement pursuant to discussions would be binding until such time as it was embodied in a formal written agreement. *Id.* at Section 1.

The parties subsequently reaffirmed this lack of a fiduciary relationship only months later when they entered into an Option Agreement as part of Gamma 2. In that Option Agreement, the Debtors once again acknowledged that (i) "Gamma shall have no ownership interest in, or decision making authority with respect to, the Project," and (ii) "Gamma has no fiduciary or special relationship with Borrower or the Company." June Option Agreement § 7(a). And last but not least, the parties entered into another PNA in December 2015. Like the April PNA, it acknowledged that the parties have no fiduciary, confidential, or special relationship; and have no joint venture or partnership agreement. DX-GA, Section 5; 11/1 Tr. 147:22-148:20; 149:16-24 (acknowledging that his attorney told him before signing the December PNA that it severely limits his ability to sue Gamma).

The existence of these waivers on multiple occasions by a party as sophisticated as the Plaintiffs gravely undercuts their fiduciary duty claim. While the Debtors urge that the statements in these written agreements should be ignored, such agreements to waive claims of a fiduciary relationship are permissible under New York law. *See Summit Props. Int'l LLC v. Ladies Prof. Golf Ass'n*, 2010 WL 2382405, *7 (S.D.N.Y. June 14, 2000); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 270 (S.D.N.Y. 2012) ("[W]hen sophisticated commercial entities negotiate a broad release of fiduciary duties, '[t]hey cannot . . . invalidate that release by claiming ignorance of the depth of their fiduciary's misconduct.'") (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 278 (2011)). Moreover, it is not just the written agreements between the parties that reflect this understanding of their relationship; this is also reflected in the parties' communications. *See* DX-CL (parties agreeing that during term of Gamma 2 that "Gamma would only be lender and [Beninati] would be owner. During that time [Beninati] could sell, but that is not [his] intention"); *id.* (Beninati

38

stating that "Gamma would not be a partner until all their debt is amortized.  I will let the legal

guys figure out this concept, as I don't want to bust any rules.").

In the end, the Defendants took a close interest in the Debtors' business, monitored

progress on the Project, and even threatened to exercise contractual remedies or refuse further

funding.  But all of these are permissible actions that do not give rise to a fiduciary duty under

applicable law.  *See, e.g., Roswell Capital Partners LLC v. Alternative Constr. Techs.*, 638 F.

Supp. 2d 360, 369 (S.D.N.Y. 2009) (that lender "received ownership of shares [], appointed two

members to the Board of Directors, and hampered [debtor's] efforts to obtain additional funding"

does not indicate "superior knowledge or control" over debtor, but rather the "exercise of

contractual rights achieved through a bargain conducted at arms' length"); *Pinky Originals, Inc.

v. Bank of India*, 1996 U.S. Dist. LEXIS 15575, at *82 (S.D.N.Y. Oct. 21, 1996) (lender that

"visited [debtor's] showroom and warehouse and inspected its product line," received debtor's

business plans, had "regular meetings and spoke frequently on the telephone [with debtor]," and

"closely monitored [debtor's] account" not a fiduciary relationship but rather "merely describes

normal oversight in a commercial banking relationship"); *see also Zorbas v. U.S. Trust Co.*, 48

F. Supp. 3d 464, 487 (E.D.N.Y. 2014) (subjective claims of reliance on a defendant's expertise

are insufficient); *RNK Capital LLC v. Natsource LLC*, 76 A.D. 3d 840, 842 (N.Y. App. Div.

2010) (same).  To be sure, the Court does not think it likely that the Defendants only expressed

their opinions when asked.  Such a claim seems inconsistent with the personalities of N.R.

Kalikow and J. Kalikow and also is at odds with Mr. Beninati's obvious desire for as much input

as possible from the Defendants.  But the evidence at trial paints a picture of Defendants'

involvement that falls well short of a fiduciary relationship.  It instead reflects the Defendants

aggressive exercise of their contractual rights while leaving Mr. Beninati with ultimate control

over the project.  The mere fact that Beninati's options were limited by the Plaintiffs' lack of

equity in the project does not magically transform the Defendants' loans into control over the

project.

The Debtors point to the case of *WNC Holdings, LLC v. Alliance Bank & Trust Co.*, 2012

NCBC LEXIS 53 (N.C. Super. Ct. Oct. 2, 2012) to argue that a fiduciary duty by a lender exists

where the lender reviewed property development agreements and made suggested changes,

performed inspections, and completed financial feasibility pro forma statements that were

traditionally completed by the debtor.  *See id*.  But this case is of little help to plaintiffs here

given its far different procedural posture.  In denying a summary judgment motion, the court in

*WNC* accepted the allegations of the complaint as true, concluded that the plaintiff had "allege[d]

conduct that exceed[ed] the mere creditor knowledge of a business plan" under North Carolina

law and therefore held that plaintiffs had sufficiently plead a fiduciary relationship.  *Id.* at *62.

By contrast, the Court here has held a full and robust trial on the issues and has had an

opportunity to evaluate and weigh all the evidence.  Based on this entire trial record, the Court

concludes that the Plaintiffs have failed to satisfy their burden of providing a fiduciary

relationship.

### i) <u>Subordination Conditions</u>

The Debtors also argue that a fiduciary relationship exists by virtue of the Defendants'

attempt to limit the Plaintiffs' project options after both Gamma 1 and Gamma 2.  The Court

does not agree, finding that such allegations are unsupported by the evidence.  That evidence

reflects that the Lenders actions—while aggressive—were in line with their contractual rights

and not otherwise improper.  While the Court will not address each allegation that the Plaintiffs

raise on this issue, the Court will spend some time addressing the Plaintiffs' main argument here.

40

That main argument relates to the subordination conditions in Gamma 1, where the Plaintiffs allege that the Lenders essentially impermissibly blocked the Plaintiffs from obtaining other financing offered by third parties Inbursa and Fortress.  But the evidence tells a different story.

The Gamma 1 Financing permitted the Debtors to bring in a third-party senior lender so long as certain conditions were first met.  The conditions for subordination of the Lenders' mortgage lien were set forth in Section 4.16 of the Original Loan Agreement.  DX-P at 18. Those conditions required that:  (a) the Lenders have the right to approve the potential new lender's loan documents in form and substance; (b) the Lenders and the potential new lender enter into an intercreditor agreement "acceptable" to the Lenders; (c) execute and deliver amended Gamma 1 loan documents, as reasonably requested by the Lenders; (d) the Debtors close on fee title to the 426 Property; (e) the aggregate amount of financing encumbering the property not exceed $150 million, and that the financing not exceed $560 per square foot of the then-contemplated Project; (f) certain prepayments be made; (g) the potential new financing would constitute all additional financing required to close on unused floor area development rights such that the Debtors could construct a building of at least 267,950 square feet; (h) additional interest be reserved sufficient to pay interest until Gamma 1's maturity date; (i) the interest rate on the additional first mortgage (inclusive of all points and fees) not exceed the U.S. one-month LIBOR rate plus 5.50%; and (j) the 434 Property air rights and CMBS mortgage issue be addressed.  DX-P at 18.  The agreement further provided that, if these conditions were satisfied, "then Lender agrees to execute a subordination agreement acceptable to Lender *in its sole discretion*, subordinating the Lien of the Loan Documents to the lien of such additional first mortgage financing."  DX-P at 18 (emphasis added).

41

In early 2015, the Debtors were negotiating with Inbursa and Fortress for senior financing.  DX-FI; DX-EU; Beninati Decl. ¶¶ 94-97.  The Lenders assert that the Debtors never presented them with a proposed financing that met the subordination conditions or with draft intercreditor or loan documents.  J. Kalikow Decl. ¶ 33.  The Debtors counter that the Lenders had no intention of actually subordinating their loan to a senior lender, despite subordination being a critical requirement for the Debtors in entering the Gamma 1 Financing.  One could easily see this subordination question as a contractual question about whether the Defendants breached the contract by failing to subordinate when the Debtors satisfied the conditions for subordination in the Gamma 1 contract.  But as the Debtors have raised their subordination arguments in their claim for breach of fiduciary duty, the Court will address these subordination issues here.

The Court concludes that several of the subordination conditions were never satisfied in the financing proposals that the Debtors received from Inbursa and Fortress, the two proposals that the Debtors allege that the Defendants improperly refused to permit.

a)  **Subordination to Mezzanine Position**

First and most importantly, the Inbursa and Fortress term sheets required the Lenders to become purely mezzanine lenders.  Specifically, the Inbursa and Fortress proposals did not allow the Lenders to retain a junior mortgage on the real property and Development Rights, instead permitting only subordination to a mezzanine debt position.  Kurland Decl. ¶¶ 20-21; DX-FI. This would obligate the Lenders to relinquish rather than subordinate their lien.  Kurland Decl. ¶ 21; J. Kalikow Decl. ¶ 34.

But this is inconsistent with the parties' written agreement.  The Lenders came into Gamma 1 lending on the real property as collateral.  They entered into a loan that stated they

42

would subordinate their lien if certain conditions were met.  But nothing in Section 4.16 on

subordination required the Lenders to release those liens and instead accept only recourse against

the mezzanine or parent entity.  The language of the Original Loan Agreement is instructive on

this question.  Specifically, Section 4.16 provides that after satisfying a number of specified

requirements that

> *then Lender agrees to execute a subordination agreement acceptable to Lender*
> *in its sole discretion, subordinating the Lien of the Loan Documents to the lien of*
> *such additional first mortgage financing.*

DX-P at 18 (emphasis added).  Thus, this language contemplates subordinating the Lenders' lien

to "additional . . . mortgage financing," which assumes that the Lenders' lien on the property

would stay in place.  Thus, nothing about the Original Loan Agreement required the Lenders to

accept a purely mezzanine position and completely relinquish their lien, rather than subordinate

their interest to a new lender.

Indeed, the evidence shows that the Debtors knew early on that the Lenders insisted on

maintaining a subordinated mortgage (rather than surrendering its mortgage and becoming solely

a mezzanine lender).  For example, J. Kalikow spoke with Mr. Beninati before Gamma 1

concerning the Lenders' insistence on maintaining a subordinated mortgage (rather than

surrendering its mortgage and becoming solely a mezzanine lender) to protect its position in the

event of a default or foreclosure, and Mr. Beninati stated in an email that he "now completely

understand[s] and support[s] the second vs. mezz. . . ."  DX-CD; J. Kalikow Decl. ¶¶ 15, 36 n.1;

11/7 Tr. 91:9-93:19.  Mr. Kurland confirmed that despite his advice to Mr. Beninati to negotiate

for conditions that would require the Lenders to take a mezzanine or preferred equity position at

the potential senior lender's discretion, Mr. Beninati instead agreed to the Gamma 1

subordination conditions, which allowed the Lenders to maintain a second mortgage position. Kurland Decl. ¶¶ 17, 24; DX-FQ.

### b) Fee Title to the 426 Property

But this is not the only problem with satisfying the subordination conditions in Section 4.16. The second problem is that the Debtors never closed on the acquisition of fee simple title to the 426 Property. Section 4.16(ii)(D) of the Original Loan Agreement specifically requires as a condition to subordination that "Borrower shall have closed on the acquisition of fee simple title to the Contract Property." DX-P at 18. The Contract Property is defined as "the parcel of real property known as 426 East 58th Street. . . ." DX-P at 1. It is undisputed that the Debtors never closed on the 426 Property. 11/1 Tr. 82:14-16. Thus, this requirement for subordination was not met.

The Debtors counter that they had an option to purchase this property during the relevant time period. Indeed, the Debtors entered into a purchase agreement with respect to the 426 Property (the "426 PSA"), which provided that the seller, *not the Debtors*, would have until May 1, 2015 to obtain surrender agreements from the property's three rent-regulated tenants. PX-42 at 2, § 2. If the seller obtained such surrender agreements by May 1, 2015, then the Debtors would purchase the property for $14,000,000. PX-42 at 2, § 2. If the seller was unable to obtain the surrender agreements by that date, the Debtors had the option to take title to the property for a reduced purchase price of $9,000,000. PX-42 at 2, § 2. The Debtors had this option until June 15, 2015. PX-42 at 2, § 2. The Debtors argue that because they had this option to acquire the 426 Property at any time after May 1, 2015, the acquisition of the property was not an impediment to subordination. But the fact remains that the 426 Property was never acquired by

the Debtors and therefore the condition to subordination requiring that the Debtors have closed on fee simple title to that property remained unmet.

The Debtors also seem to suggest that it was necessary to obtain the senior funding in order to close on the 426 Property. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 39 n.7 (implying that Inbursa proceeds would be used to close on the 426 Property). But this position is contrary to the language of the subordination conditions, which contemplates additional first mortgage financing "subject to *the prior satisfaction* of each of the following" conditions "as evidenced by a written acknowledgement of Lender as to the same. . . ." DX-P at 18 (emphasis added). Under the plain language of the Original Loan Agreement, therefore, the Lenders were not required to subordinate until fee simple title to the 426 Property was acquired. While no party at trial advocated for a slavish adherence to the sequence contemplated by Section 4.16, this language supports the validity of the Defendants' complaint that they were never formally presented with a deal by the Debtors that purported to meet all of the subordination conditions.

### c)  <u>Interest Rate</u>

There is a third problem on subordination: the proposed interest rates for the senior financings from Inbursa and Fortress, inclusive of fees and costs, were above those permitted by the subordination conditions. Section 4.16(ii)(I) provided that first mortgage financing would be permitted if "the interest rate on such additional first mortgage financing (inclusive of *all points and fees*) does not exceed the US 1 Month LIBOR rate plus 5.50%. . . ." DX-P at 18 (emphasis added).

Both the Inbursa and Fortress term sheets provided for interest rates above that threshold. Specifically, Keith Kurland of JLL, the Debtors' debt and equity advisor, testified that "[a]s

presented, the Fortress term sheet did not meet the Gamma I cost of capital condition.  The

Fortress's cost of capital (exclusive of fees and other charges) was Libor + 775, which was

higher than the maximum rate stipulated in Gamma I."  Kurland Decl. ¶ 22; DX-FI.

Additionally, Mr. Beninati testified, based on his review of contemporaneous evidence, that the

Inbursa loan did not satisfy the interest rate requirement.  11/1 Tr. 84:7-19.

        The Debtors' expert, Mr. Tenzer, seeks to avoid these contemporaneous conclusions by

now arguing that the total effective interest rate of the Inbursa proposal, including points and

fees, was LIBOR + 5.375 and therefore met the requirement in the subordination conditions.

11/3 Tr. 206:20-207:14.  But Mr. Tenzer reached this conclusion only by eliminating the exit fee

from his calculations, opining that it was more in the form of a prepayment penalty, and also by

annualizing the proposed origination fee over the two-year term of the loan.  11/3 Tr. 204:6-

207:17.  His conclusion is contrary to the plain language of the subordination condition, which

specifically provides that the interest rate is inclusive of *all* points and fees.  The Court finds that

his rational for excluding this fee from the interest rate unpersuasive.

        Moreover, the contemporaneous evidence suggests that in spring of 2015, the parties did

not believe the Inbursa interest rate satisfied the conditions for subordination.  An email from

Mr. Beninati to J. Kalikow on February 19, 2015 to discuss open items regarding the

subordination conditions, indicated in a passage relating to the interest rate requirement of

Section 4.16(ii)(I) that the Inbursa interest rate was "L plus 500, but all in cost is in the L plus

750 range."  DX-FE at 1, 3; 11/1 Tr. 84:7-19.

        **d)  Development Rights to Construct Building of 267,950 Square Feet**

        In addition to these three problems with subordination, there are some uncertainties as to

whether Plaintiffs could have satisfied other conditions of subordination.  One relates to a

subordination condition regarding the rent-stabilized and rent-controlled tenants in the 426

Property who never executed surrender agreements or vacated the premises.  The Defendants

argue that, as a result, the property could not be demolished and used as part of the assemblage to

reach the necessary 267,950 square feet.  11/7 Tr. at 35:11-25.  For this argument, the

Defendants rely on Section 4.16(ii)(G) of the subordination conditions, which requires that

> Borrower provide[] Lender with evidence that such additional first mortgage
> financing shall constitute all additional financing required by Borrower to close
> on unused floor area development rights such that Borrower may construct a
> building of at least 267,950 square feet on the Property in accordance with all
> Legal Requirements and, concurrently with the closing of such additional first
> mortgage financing, Borrower consummates closing on its acquisition of all
> Contract Air Rights. . . ."

DX-P at 18.  J. Kalikow credibly testified that this subordination condition was not met because

"[i]f the controlled and stabilized tenants are not under agreement to vacate you can't raze the

building with tenants in occupancy nor can you be assured that all the monies that have been

provided will enable you to finish that assemblage."  11/7 Tr. at 35:22-25.  He went on to note

that "[i]f they are not under contract at the time, you don't know that you can necessarily ever

get them under contract and, hence, be unable to build 267,950 feet, nor do you know what price

it would take to get them under contract."  11/7 Tr. 95:9-12.

The Debtors counter that the Defendants' position is contrary to the plain language of the

Original Loan Agreement.  The subordination conditions do not require that the tenants have

vacated the 426 Property, but rather simply *proof that the additional first mortgage financing*

will be all the financing required to close on unused floor area development rights to construct a

building of at least 267,950 square feet.  Pointing to a February 18, 2015 investor letter by the

Lenders to their investors, the Debtors argue that the evidence shows the Inbursa loan would

have provided sufficient funding to acquire all of the necessary Development Rights.  DX-HY at

1 (stating that $71,250,000 in additional financing, which includes closing costs, is needed to acquire a total of 267,950 square feet of Development Rights).  Moreover, as discussed above, the 426 PSA, of which Defendants were aware, required the seller of the 426 Property to obtain surrender agreements, not the Debtors.  PX-42.  Thus, with the Inbursa financing, Plaintiffs would have acquired all of the required Development Rights, and this subordination condition presented no impediment to subordination.

Considering both the Defendants' and the Debtors' arguments on this issue, the Court concludes that this subordination condition is a very close call.  Ultimately adopting a practical view of these subordination conditions and without the benefit of parol evidence to clarify this ambiguity, the Defendants appear to have the better of the argument.  Subsection (g) references unused floor area development rights of a certain amount necessary to construct a building of 267,950 square feet.  This language may reasonably be read to implicitly require that the building be free of tenants.  Buying the building with tenants still in residence would have technically satisfied subsection (d) of the subordination conditions.  But until those tenants vacated and the parties knew how much they would need to pay the tenants to vacate and were assured that the space could be used to build the Project, it would be impossible to satisfy subsection (g) as a practical matter.  *See, e.g.*, PX-83 at 5, 12.  Given the Court's prior conclusions about other subordination conditions, however, the Court's conclusion on this issue is not at all dispositive as to the subordination question and thus parol evidence is not necessary.

### e)  **Extra-Contractual Requirements**

Citing to an investor letter dated February 15, 2015, the Debtors argue that the Lenders intended to impose extra-contractual conditions to subordination that served to thwart the Debtors' third-party senior financing.  DX-HY.  Specifically, this investor letter lists three

conditions that are characterized as "Additional Terms Gamma will require but which are not specified in the Loan Agreement." DX-HY at 3. The conditions are that:

- Borrower pays down Gamma's principal balance to $55,000,000
- Gamma's loan will not mature concurrently or after any new indebtedness
- Gamma will retain a subordinated mortgage interest (i.e. won't only be mezz).

DX-HY at 3.

But even if the Defendants intended to impose extra-contractual conditions, this issue is irrelevant because the Debtors never had financing that would have satisfied all the subordination conditions in the Original Loan Agreement.

To the extent that the Court would even need to reach these additional conditions in assessing the Plaintiffs' lender liability claims, however, the Court has doubts that they would provide a basis for relief to the Plaintiffs given the broad discretion afforded to the Defendants in Section 4.16. While J. Kalikow accurately characterized some of the subordination conditions as "check-the-box" (i.e., objective), he properly labeled others as subjective, discretionary, and requiring negotiation with the Debtors and the new potential senior lender. 11/7 Tr. 95:13-97:12. In particular, subsections (a), (b), (c) of Section 4.16 in the Original Loan Agreement and the post-script (following subsection (j)) concerning the subordination agreement, all involve some level of subjectivity, discretion and negotiation. *Id.* Specifically, subsection (a) provided that any "additional first mortgage financing is pursuant to written loan documents that have been *reviewed and approved by Lender as to form and substance*. DX-P at 18 (emphasis added). Subsection (b) provided that "the provider of such additional first mortgage financing shall have entered into a *mutually acceptable intercreditor agreement* with Lender." DX-P at 18 (emphasis added). And subsection (c) provided that the "Borrower shall have executed and delivered such amendments to the Loan Documents *as Lender may reasonably request* in connection with such

49

additional first mortgage financing." DX-P at 18 (emphasis added). And, as noted above, the same paragraph stated that if the subordination conditions were satisfied, "then Lender agrees to execute a subordination agreement *acceptable to Lender in its sole discretion*, subordinating the Lien of the Loan Documents to the lien of such additional first mortgage financing." DX-P at 18 (emphasis added).

These subjective requirements granted tremendous discretion to the Lenders. Indeed, only one of these provisions even injects the concept of reasonableness into the Lenders' discretion. Of course, the Court does not have a sufficiently developed evidentiary record to know exactly how these additional conditions would have been applied and whether they would have turned out to be consistent or inconsistent with the terms of the written agreement. *Cf.* DX-HZ (investor letter where J. Kalikow noted that subordination conditions would be difficult to satisfy but Defendants would consider amending those conditions if it made good business sense for Defendants). But the broad discretion afforded to the Lenders in these subsections makes it far more difficult to argue that the conditions imposed by the Lenders had no basis. *See, e.g.,* J. Kalikow Decl. page 16 n.1 (explaining why Lenders believed that so-called additional conditions were consistent with the written agreement, even if not spelled out); *id.* ¶ 15 (noting that some of the subordination conditions would have been subject of an intercreditor agreement and would have been necessary to ensure that the Lenders remained sufficiently collateralized given the Debtors extremely small amount of equity and to avoid having the Lenders economically exposed by subordination).

### B)  <u>Position of Trust</u>

The Debtors assert that the Lenders held a position of trust with respect to the Debtors. In support of this position, the Debtors argue that the Sutton Principles and the Lenders were not

introduced as arms' length parties, but rather introduced by the Debtors' counsel as not only a

lender, but also as a potential mentor and business partner. The Debtors maintain that such a

relationship was fostered by the Lenders by providing advice regarding the Project's design and

future capitalization and the expression of an interest to join the venture as an equity partner.

The Debtors relatedly assert that any disclaimer in the Herrick conflicts waiver letter is

unenforceable as a matter of law.

In response to a question from the Court at closing argument about when the fiduciary

relationship came into existence here, the Debtors stated that a fiduciary relationship was

established at the very first meeting between the parties. This was obviously before either

Gamma 1 or Gamma 2. The Court finds that the Plaintiffs' position is wholly untenable and

unsupported by the record here. The record is devoid of anything at that first meeting that would

even remotely support this conclusion. Indeed, the Debtors' proposed findings of fact are

extremely thin as to this first meeting. *See* Plaintiffs' Proposed Findings at ¶ 10 (describing the

first meeting). The Plaintiffs appear to rely upon alleged statements from their attorney R.

Kalikow and not any statement from the Lenders' principles N.R. Kalikow and J. Kalikow.

Finally, the Plaintiffs do not provide details from this meeting that might establish the existence

of such a fiduciary relationship. *See* Beninati Decl. ¶ 33 (stating, without reference to time

period, that R. Kalikow "suggested that, by working with N.R. Kalikow as a lender and partner, I

would also be gaining his advice, mentorship and real estate expertise.").

### C) <u>Escrow</u>

The Debtors also argue that a fiduciary relationship existed between themselves and the

Defendants with respect to the reserve accounts created as part of the Gamma 2 Financing.

"New York case law recognizes a fiduciary duty where specific language in the contract

obligates a creditor to make payments out of an escrow account on behalf of the debtor." *Casey v. Citibank, N.A.*, 915 F. Supp. 2d 255, 265 (N.D.N.Y 2013) (citing *Davis v. Dime Sav. Bank*, 557 N.Y.S.2d 775, 776 (N.Y. App. Div. 3d Dep't 1990)).

The Defendants correctly observe, however, that the reserve accounts do not constitute an escrow. Under New York law, for an instrument to operate as an escrow agreement, there must be "'(a) an agreement as to the subject matter and delivery of the same; (b) a third-party depositary; (c) delivery of the subject matter to a third party conditioned upon the performance of some act or the happening of the event; and (d) relinquishment by the promisor.'" *Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *National Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn*, 634 N.Y.S.2d 609, 614 (Sup. Ct. New York Cty. 1994)). The Defendants note that they are not third parties to the transaction, and therefore the third element of the test is not met.

But even if reserve accounts were escrow accounts, the Defendants' duties would be defined by their contractual duties. "The scope of an Escrow Agent's fiduciary duty is defined by the scope of its contractual duty under the Escrow Agreement." *Qube Films Ltd v. Padell*, 2016 U.S. Dist. LEXIS 25328, at *11-12 (S.D.N.Y. Mar. 1, 2016) (citing *Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 729 (S.D.N.Y. 2014)); *see also Greenapple v. Capital One, N.A.*, 939 N.Y.S.2d 351, 353 (App. Div. 1st Dep't 2012) ("[A]n escrow agent has a duty not to deliver the monies in escrow except upon strict compliance with the conditions imposed by the controlling agreement."). When an escrow agent "act[s] in accordance with its obligations under the escrow agreement, it has not breached its fiduciary duty." *Ray Legal*, 37 F. Supp. 3d at 729. Furthermore, "[c]ourts have consistently rejected. . . . attempt[s] to impose a heightened obligation on all aspects of the debtor-creditor relationship simply because the mortgagee makes

52

payments from an escrow account on behalf of the mortgagor." *Dolan v. Select Portfolio Servicing*, 2016 WL 3512196, at *7 (E.D.N.Y. June 22, 2016). Thus, there is no basis for a fiduciary duty claim here that would be separate from a claim for breach of contract, which is the claim to which the Court now turns.

### 3.  BREACH OF CONTRACT (COUNTS 1, 2 AND 3)

To establish a cause of action for breach of contract, a party must prove "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted).

#### A)  Count 1

In Count 1 of the Complaint, the Debtors assert a breach of contract claim against the Lenders under the Gamma 1 Loan Documents, the Gamma 2 Loan Documents and the term sheet entered into by the parties with respect to the Gamma 1 Financing. It is unclear exactly what theories the Debtors now rely upon for Count 1, as many do not appear to have been focused on during trial or specifically addressed in the Debtors' pre- and post-trial briefing. For example, the Complaint alleges breaches of Gamma 1 (*see* Compl. ¶¶ 697, 699), but the Debtors acknowledged during closing arguments that none of their breach of contract theories were based on a breach of the Gamma 1 Financing documents. The Complaint also references the failure to fund the "Unfunded Commitment," which is defined in the Complaint as a $20 million dollar amount that was held in Sutton Owner DE's reserve account, but which the Lender allegedly wrongfully refused to distribute in accordance with the Gamma 2 Financing Documents. But

these theories were not focused upon at trial and are not addressed in the Debtors' post-trial briefing.

Leaving aside these seemingly abandoned theories—which in any event lack a sufficient basis for relief—the Court turns to the claims that were actually pursued at trial. First, the Debtors complain that the Lenders improperly interfered with the draw requisition process in Gamma 2. During trial, some of the Debtors' argument on the draw requisition process seemed to focus on the Lenders sending checks from reserve accounts directly to vendors. But the Debtors point to no contractual provisions in the Gamma 2 Financing documents that were violated by the Defendants' handling of the draw requests. Compl. ¶¶ 542, 543, 697. In any case, Section 4.03 of the Acquisition Cash Collateral Agreement specifically granted the Defendants the right to withdraw sums from the expense reserve for payment of project expenses it had approved. DX-BC at 7. Thus, it appears that the Defendants' delivery of checks to vendors was in accordance with the terms of the contract.

David Shapiro, a former employee of Bauhouse, testified that this conduct occurred just once and though he couldn't exactly recall, may have involved between five and fifteen checks. Shapiro Depo. Tr. 98:21-99:12. Mr. Shapiro, who was principally tasked with dealing with the issue, was not responsible for locating financing or selling the project and spent about two weeks dealing with the issue. Shapiro Depo. Tr. 112:12-114:3. The Debtors have not shown that this incident materially interfered with their efforts to obtain alternative financing or resulted in any other damage. Additionally, even if the Debtors were damaged by this one-time incident, the Acquisition Loan Agreement provided that the Debtors sole remedy against Lenders is commencing an action seeking injunctive relief or declaratory judgment and that the Lender would not be liable for any monetary damages. DX-AR at 34, § 8.11. Furthermore, the Debtors

54

waived any claims of special, exemplary, punitive or consequential damages pursuant to the terms of the Acquisition Loan Agreement.  DX-AR at 34 § 8.10.  The same is true for the Building Loan in Gamma 2.  DX-AS at 35.

Second, the Debtors argue that improper payments were made by the Lenders to their attorneys, Kramer Levin, from the reserve funds.  The Debtors note that the closing statement for the Gamma 2 Financing listed legal fees of $340,000 for Kramer Levin (DX-AN), but that during the course of the Gamma 2 loan term, the Lenders wired additional funds from the Plaintiffs' reserve accounts to Kramer Levin in payment of additional lender attorney fees. 11/7 Tr. 68:10-71:19.  The Debtors note that several of the invoices from Kramer Levin to the Lenders relating to these transfers were addressed to an entity named "Beta Capital, LLC" or "Betta Capital, LLC" and several of these related to a matter named "Oaktree" and that J. Kalikow testified that neither Beta Capital nor Oaktree had anything to do with the Gamma loans at issue in this case.  PX-130, 147-154; 11/7 Tr. 69:9-23.  But the Court credits the credible and rather straight forward explanation of J. Kalikow that these invoices were paid incorrectly and were corrected upon finding out that they had been incorrectly paid.  11/7 Tr. 69:1-2; 128:2-11.  Moreover, a refund was included in the Lenders' proof of claim for any monies that should not have been paid at all.  11/7 Tr. 128:12-23.  While the Debtors appear to suggest nefarious dealings with respect to these invoices, the Debtors have once again failed to show any harm or how it interfered with the Project.

### B)  Count 2

The Debtors assert a claim for breach of contract in Count 2, arguing that the Lenders should have released funds from the Contract Property Purchase Reserve under the Acquisition Loan Agreement and Acquisition Cash Collateral Agreement.  The Acquisition Loan Agreement

and Acquisition Cash Collateral Agreement established a reserve for the purchase of the real

property located at the 426 Property.  Beninati Decl. ¶ 134.  Section 4.02(a) of the Acquisition

Cash Collateral Agreement stated that "[t]he amounts on deposit in the Contract Property

Purchase Reserve shall be available, prior to the occurrence of an Event of Default and *from and*

*after satisfaction of all conditions to Pledgor's acquisition of fee title to the Contract Property*

*set forth in Section 4.28 of the Loan Agreement*. . . ."  DX-BC at 6 (emphasis added).  The

Contract Property was defined in the Acquisition Loan Agreement as the real property located at

426 East 58th Street.  DX-AR at 1.  Thus, the Acquisition Cash Collateral Agreement conditioned

release of funds from the Contract Property Purchase Reserve on the acquisition of fee title to the

426 Property and the satisfaction of conditions in Section 4.28 of the Acquisition Loan

Agreement.  Section 4.28 of the Acquisition Loan Agreement, in turn, stated that "Borrower

expressly agrees not to consummate a closing of fee title to the Contract Property until such time

as Borrower shall have delivered evidence acceptable to the Lender that the Contract Property

shall be conveyed to Borrower free of all tenants."  DX-AR at 22.  But this condition was not

met.  Negotiations to obtain a surrender agreement with one rent-controlled tenant of the

property were unsuccessful and the Debtors never acquired the 426 Property.  Beninati Decl. ¶

135; 11/1 Tr. 82:14-16, 123:21-23.

The Debtors appear to place the blame for failure to obtain the 426 Property on the

shoulders of the Lenders.  Specifically, the Debtors assert that the Sutton Principals were close to

reaching an agreement with this tenant, but that the tenant feared that she would never receive

her buyout if she agreed to vacate.  Beninati Decl. ¶ 135.  The Debtors argue the tenant's fears

were compounded by the Lenders' insistence that the funds be held in escrow by either Herrick

or Kramer, instead of by the tenant's attorney.  Beninati Decl. ¶ 135.  The Debtors point to an

August 27, 2015 email from Attorney Kalikow to Kramer Levin asking them to discuss this issue

with J. Kalikow and indicating that "[h]aving her lawyer hold the money i[n] escrow helps

assuage her paranoia, and gives her a degree of comfort. Changing this now will truly scare her,

and would not really benefit anyone." PX-45. The Debtors assert that the Lenders disregarded

these concerns. Beninati Decl. ¶ 135. But the evidence also suggests that the Lenders were not

simply acting arbitrarily but instead had concerns regarding the tenant's attorney holding the

escrow funds. These concerns appear to be reflected in the same email, in which Attorney

Kalikow tries to address them by stating that "I would also appreciate it if you would go on the

website of Dagostino Levine, [tenant's] attorneys. They are a legitimate law firm with serious

clients. I would ask that you discuss with Jon the fact that they are not going to violate the terms

of the escrow, especially not for one non-repeat client." PX-45. But the issue regarding the

tenant escrow does not change the fact that under the plain language of the contracts, the

condition was never satisfied, the property was never purchased and the Lenders were therefore

not obligated to release the reserve funds. Moreover, the Debtors do not point to anything in the

parties' written agreements that sets forth specific requirements for the mechanics of any escrow

established for a tenant.

The Debtors also appear to argue that the Lenders breached the Gamma 2 Financing

documents by failing to make timely payments from the Architecture and Engineering Reserve

to F+P and other professionals. 11/1 Tr. 209:15-22. The Debtors assert that as a result, F+P

would not continue working on the Project, including the redesign based on the cantilever plan

relating to the 426 Property. Beninati Decl. ¶ 145; 11/1 Tr. 209:15-22, 210:1-5. The Debtors

point to testimony by James Barnes, a partner at F+P, that sometime around August 2015, F+P

stopped working on the Project "[a]nd rather than us waste time spinning our wheels, we all put

our pens down for a period of time . . . ."  Barnes Depo. Tr. 56:5-57:13.  But Mr. Barnes also

testified that rather than F+P refusing to continue, they had been "put on hold by Joe" and there

were other issues in addition to the lack of payment contributing to this pause, including "a need

for Joe and his team to get things in order with regards to the site, the project."  Barnes Depo. Tr.

56:25-57:2, 57:6-8, 57:19-22.  They put their pens down until "the client said they were ready to

restart."  Barnes Depo. Tr. 57:10-13.  Though the evidence is unclear how much time was lost, it

appears that work resumed in November 2015.  Barnes Depo. Decl. 58:5-14.  Indeed, Mr. Barnes

testified that during this time, while F+P was not doing design work, they still participated in

weekly financing meetings regarding the Project.  Barnes Depo. Tr. 59:20-60:24.

Additionally, the Debtors are incorrect that the Defendants are entirely to blame for any

failure to pay F+P.  Rather, the evidence suggests that the Debtors asked for funds that didn't

exist in the applicable Architecture and Engineering Reserve.  The evidence suggests that the

Debtors did not request disbursement of funds from the Architecture and Engineering Reserve to

pay F+P until the third draw request on October 14, 2015.  DX-DS.  More specifically, the draw

requested an aggregate amount of $1.7 million for numerous architects and engineers, which

exceeded the $1.4 million in the Architecture and Engineering Reserve.  11/1 Tr. 135:3-136:7.

The evidence shows that the Defendants communicated with the Debtors regarding how to

allocate the reserve, given the excessive size of the draw request, and ultimately agreed to make

payments to the architects and engineers that exceeded the Architecture and Engineering Reserve

by $40,000—including a $700,000 payment to F+P.  11/1 Tr. 137:11-138:1; DX-DY; DX-DX.

On October 30, 2015, Defendants wired funds totaling $700,000 to F+P.  DX-DY.  Accordingly,

the Defendants did not cause F+P to stop working on the Project, but rather work stopped in

early 2016 due to multiple issues.  DX-HV.

The Debtors contend that the Lenders also breached the Acquisition Cash Collateral Agreement by failing to disburse funds from the Contract Property Purchase Reserve to purchase an easement over the 426 Property. But Section 4.02(a) of the Acquisition Cash Collateral Agreement stated that "[t]he amounts on deposit in the Contract Property Purchase Reserve shall be available . . . . to make payments on behalf of Borrower pursuant to the Contract Property PSA relating to the acquisition of *fee title* to the Contract Property. . . ." DX-BC at 6 (emphasis added). Thus, the plain language of the Acquisition Cash Collateral Agreement allowed for disbursement only to acquire fee title to the property, not to acquire an easement. And fee title was, in fact, never acquired.

The Debtors argue that the Acquisition Cash Collateral Agreement was somehow modified to allow the Contract Property Purchase Reserve to be used to purchase an easement over the 426 Property. The Debtors rely upon an alternative plan they developed to extend a 20-foot cantilever over the 426 Property. Beninati Decl. ¶ 136; 11/1 Tr. 205:3-14. The Debtors state that this plan would have cost approximately $1,000,000, saving approximately $14,000,000 in costs from purchasing the property and also had additional features that would enhance the value of the Project. Beninati Decl. ¶ 137; 11/1 Tr. 140:1-15, 207:13-208:3. The Debtors assert that on August 6, 2015, the Sutton Principals, Attorney Kalikow, J. Kalikow and N.R. Kalikow met at F+P's offices to discuss the Project and the cantilever plan was presented, including the design elements and reduced costs to the Project. Beninati Decl. ¶ 138; 11/1 Tr. 206:19-207:6, 207:10-208:3; 11/9 Tr. 79:18-23. The Debtors contend that no objections were made to the cantilever plan during the meeting, and everyone at the meeting believed that the plan was a good, economical idea. Beninati Decl. ¶¶ 140-142; 11/1 Tr. 209:1-14; 11/9 Tr. 80:8-17. But the Debtors complain that the Lenders subsequently refused to release any funds from

the reserve from the Acquisition Loan to close on the purchase of the easement or related costs consistent with the cantilever.  Beninati Decl. ¶ 144.

The Debtors rely on two investor letters in May 2015 from the Lenders to their investors to support the Debtors' argument that the Lenders' acquiesced to the cantilever plan.  PX-61 at 2 fn. 3; PX-62 at 1.  While these letters discuss the possibility of a cantilever alternative, nothing in them in any way reflects a commitment to the cantilever concept at this time or the modification of the loan documents to allow for an easement rather than the acquisition of fee title.  Moreover, the Debtors provide no evidence to suggest that the parties ever actually agreed to a modification of the contracts or what the purported terms of such a modification were.  J. Kalikow Decl. ¶¶ 88-89.  In fact, the Acquisition Cash Collateral Agreement and the Acquisition Loan Agreement expressly prohibit oral modification or oral waiver of terms and the Debtors have provided no evidence of any written, signed modification agreement or any written waiver.  DX-BC at 9; DX-AR at 21, 33.  The contract language therefore remained the same and the requirement to obtain fee title to the 426 Property was never met.  The Lenders therefore did not breach the contracts by refusing to release these funds.

### C)  Count 3

In Count 3, the Debtors assert a claim for breach of contract based on the argument that the Lenders should have released funds from the Demolition Reserve under the Building Loan Agreement and the Building Cash Collateral Agreement.  In fact, the release of Demolition Reserve funds was conditioned on the Debtors' obtaining all demolition permits.  Section 4.02(a)(i) of the Building Cash Collateral Agreement addresses disbursements from the Demolition Reserve.  DX-BD at 6.  This section states, in relevant part, that "[t]he amounts on deposit in the Demolition Reserve shall be available, prior to the occurrence of an Event of

Default and *from and after satisfaction of all conditions to disbursement set forth in Article 9 of the Loan Agreement*. . . ." DX-BD at 6 (emphasis added). Section 9.3(b)(i) of the Building Loan Agreement, in turn, states that "Lender's obligation to make the initial disbursement of the Demolition Reserve shall be conditioned upon, and no portion of the Demolition Reserve shall be disbursed until, the a satisfaction of the following conditions: (i) Copies of any and all authorizations required by any Governmental Authority for the Project or otherwise necessary to perform the work necessary to achieve Project Completion (including, without limitation, all Project Permits). . . ." DX-AS at 40. Project Permits was, in turn, defined to include "all demolition approvals and other permits. . . ." DX-AS at 6. Furthermore, Section 9.8(d) of the Building Loan Agreement provided that the Debtors "shall promptly undertake to obtain, and shall obtain within sixty (60) days from date hereof, all Project Permits not previously obtained." DX-AS at 44.

Though the Building Loan Agreement was dated as of June 19, 2015 (DX-AS), and the demolition process was begun before Gamma 2 (J. Kalikow Decl. ¶ 81), the Debtors did not obtain all the required demolition permits until December 3rd and 10th, 2015. DX-EB; J. Kalikow Decl. ¶ 83. Thus, the Debtors did not obtain all demolition permits within the 60 days contemplated by the agreement. Nonetheless, the Lenders subsequently paid the demolition expenses in the fourth draw on December 15, 2015, shortly after the permits were obtained. DX-EC; J. Kalikow Decl. ¶ 83.

The Debtors assert that in negotiating the permit language in the Building Loan Agreement, the Lenders failed in their advisory role under the June 2015 Option Agreement, where the Lenders agreed they would "cooperate with, and consult with, Beninati in his efforts to raise debt and equity for the Project, formulating a Project Budget and consulting on value

61

engineering, construction issues and design elements for the Project. . . ." DX-BA at 11, § 5(a).[8]
The Debtors note that while the Gamma 2 loan documents required the demolition permits to be
acquired within sixty days, J. Kalikow conceded that such permits could only been obtained in
ninety days, as a practical matter. 11/7 Tr. 63:17-64:2. The Debtors argue that by failing to
warn the Sutton Principals about the various costs and delays that can occur when trying to
obtain a demolition permit in New York City, the Lenders left the Plaintiffs in a position where
they could not access the demolition reserve funds.

But the Debtors' arguments don't hold up. As J. Kalikow noted, the language of the
Option Agreement stated the Lenders would "endeavor" to do so "upon the reasonable request"
of Mr. Beninati and the Lenders had in fact advised Mr. Beninati during Gamma 1 that the
demolition permit process took a long time. 11/7 Tr. 66:2-17; DX-BA at 11, § 5(a). Moreover,
the 60-day requirement must be understood in light of the testimony that the demolition process
had begun during Gamma 1 and thus was already underway at this time. More specifically, J.
Kalikow credibly testified that the acquisition of permits took 90 days *from start to finish* and
that it was not impossible to obtain the demolition permits in the time allotted under the Gamma
2 Financing documents because the demolition process had started under the Gamma 1
Financing; indeed, the Lenders had been told that the Debtors had applied for the permits during
Gamma 1 so they were in process. 11/7 Tr. 66:18-67:6, 68:2-3; 121:23-122:7. J. Kalikow's
testimony on this point was unrebutted.

---

[8]      The Debtors argue that the parties agreed in April 2015 that N.R. Kalikow would "be the leader of the
major construction decisions. . . ." PX-36. But as J. Kalikow testified, the language of that email exchange meant
that would be the case in the future after repayment, (11/7 Tr. 65:7-16), a conclusion buttressed by the same email.
*See* PX-36 ("Concept is that during term. . . gamma would only be lender and I would be owner. . . ."), *id.* ("The
proceeds of those new sources of money would be to retire the second Gamma loan, and build the project according
to an agreed upon general budget that we all approve. . . ."), *id.* ("Gamma would not be a partner until all of their
debt is amortized. . . .").

### 4. <u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (COUNT 5)</u>

The Debtors also argue that the Defendants breached an implied covenant of good faith

and fair dealing.  As with some of Plaintiffs' breach of contract claims, the Debtors have not

made clear the basis for this claim.  The Complaint itself references issues raised in Count 1 of

the Complaint, specifically that the Lenders failed to fund the Unfunded Commitment, interfered

with the draw requisition process, alleged defaults by the Debtors which had not occurred and

tortuously interfered with the Project.  But as noted above, many of these issues were not raised

in the Debtors' briefs nor focused upon at trial.  In any case, the Defendants argue that the breach

of implied covenant of good faith claims must be dismissed because they are based upon the

same facts as the breach of contract claims, making the good faith claims redundant.

It is true that "[t]here is an implied covenant of good faith and fair dealing in every

contract."  *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United

Techs. Corp.*, 610 F.3d 44, 54 (2d Cir. 2010).  But if allegations regarding the breach of this

implied covenant "do not go beyond the statement of a mere contract breach and, relying on the

same alleged acts, simply seek the same damages or other relief already claimed in a companion

contract cause of action, they may be disregarded as superfluous as no additional claim is

actually stated."  *United Techs. Corp.*, 620 F.3d at 54-55 (citing *Deer Park Enters., LLC v. Ail

Sys., Inc.*, 870 N.Y.S.2d 89, 90 (App. Div. 2d Dep't 2008) ("A cause of action to recover

damages for breach of the implied covenant of good faith and fair dealing cannot be maintained

where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of

the contract.")); *see also Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("New

York law . . . does not recognize a separate cause of action for breach of the implied covenant of

63

good faith and fair dealing when a breach of contract claim, based upon the same facts, is also

pled.  Therefore, when a complaint alleges both a breach of contract and a breach of the implied

covenant of good faith and fair dealing based on the same facts, the latter claim should be

dismissed as redundant.").

Moreover, "the covenant of good faith and fair dealing incorporates any promises which

a reasonable person in the position of the promisee would be justified in understanding were

included, [] it does not include any obligation that would be inconsistent with the express terms

of the contract."  *Ray Legal Consulting Grp. v. Dijoseph*, 37 F. Supp. 3d 704, 725 (S.D.N.Y.

2014).  Thus,  "[t]he covenant of good faith and fair dealing cannot be construed so broadly as to

effectively nullify other express terms of the contract, or to create independent contractual

rights."  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Xerox Corp.*, 807 N.Y.S.2d 344, 346

(App. Div. 1st Dep't 2006).  The Court has already rejected the Plaintiffs' claim that the Lenders

owed them a fiduciary duty—that conclusion is relevant to both that claim and this one that seeks

to impose obligations beyond the terms of the parties' written agreements.

The Debtors cite to two cases to support the proposition that a contract party can violate

the implied covenant of good faith and fair dealing even when technically in compliance with the

contract.  But the cases relied upon by the Debtors are inapposite because each involved an

active attempt to make an "end-run" around clear prohibitions in a contract.  *See LightSquared*

*LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 333 (Bankr.

S.D.N.Y. 2014) (concluding that "the conduct of Mr. Ergen and SPSO . . . was an end-run

around the Eligible Assignee provisions of the Credit Agreement that breached the implied

covenant of good faith and fair dealing arising under the Credit Agreement."); *Empresas*

*Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010) (labeling the maneuver "an end-run, if not a downright sham").

Furthermore, courts have also held that a party does not breach the covenant of good faith and fair dealing when, as is the case here, it was "acting in [its] own self-interest consistent with [its] rights under [the] contract. . . ." *Ray Legal*, 37 F. Supp. 3d at 726 (citing *DeBlasio v. Merrill Lynch & Co., Inc.*, 2009 U.S. Dist. LEXIS 64848, at *116 (S.D.N.Y. July 27, 2009) ("Defendants did not violate the implied covenant of good faith and fair dealing by acting in [their] own self-interest consistent with [their] rights under a contract.") (internal quotation marks omitted); *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 485 (S.D.N.Y. 2006) ("Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract. Indeed, courts have refused attempts to impose liability on a party that engaged in conduct permitted by a contract, even when such conduct is allegedly unreasonable.")).

## 5. EQUITABLE SUBORDINATION (COUNT 7)

The Debtors argue that the Defendants' claim should be equitably subordinated due to inequitable conduct. For purposes of equitable subordination, the Debtors claim that the Defendants should be considered insiders by virtue of their close relationship and control over Plaintiffs. As for the inequitable conduct, the Plaintiffs cite the Defendants' failure to pay creditors from the reserve accounts and Defendants' purported loan-to-own strategy.

Section 510(c) authorizes a bankruptcy court to, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . ." 11 U.S.C. § 510(c). The equitable subordination doctrine "empowers the

65

bankruptcy court to consider whether 'notwithstanding the apparent legal validity of a particular

claim, the conduct of the claimant in relation to other creditors is or was such that it would be

unjust or unfair to permit the claimant to share *pro rata* with the other claimants of equal

status.'" *Mishkin v. Siclari* (*In re Adler, Coleman Clearing Corp.*), 277 B.R. 520, 563 (Bankr.

S.D.N.Y. 2002) (quoting *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau

Assocs.*), 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994)).  The doctrine is considered an

"extraordinary remedy that is to be used sparingly." *In re Sabine Oil & Gas Corp.*, 547 B.R.

503, 564 (Bankr. S.D.N.Y. 2016) (quoting *Kalisch v. Maple Trade Fin. Co. (In re Kalisch)*, 413

B.R. 115, 133 (Bankr. S.D.N.Y. 2008)).  The party seeking equitable subordination bears the

burden of proof "because there is a presumption of the validity of the proof of claim." *In re

Kelton Motors, Inc.*, 121 B.R. 166, 190 (Bankr. D. Vt. 1990).

In determining whether to apply equitable subordination, bankruptcy courts have looked

to the test articulated in *Benjamin v. Diamond* (*In re Mobile Steel Corp.*), 563 F.2d 692 (5th Cir.

1977); *see, e.g., In re Aeropostale*, 555 B.R. 369 (Bankr. S.D.N.Y. 2016); *Official Comm. of

Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284

B.R. 355, 363 (Bankr. S.D.N.Y. 2002).  The three factors of the *Mobile Steel* test are: "(i) [t]he

claimant must have engaged in some type of inequitable conduct; (ii) [t]he misconduct must have

resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the

claimant; [and] (iii) [e]quitable subordination of the claim must not be inconsistent with the

provisions of the Bankruptcy Act." *Mobile Steel*, 563 F.2d at 699–700 (citations omitted).  In

thinking about these factors, the *Mobile Steel* court counsels that three principles be borne in

mind. *See id.* at 700.  First, "inequitable conduct directed against the bankrupt or its creditors

may be sufficient to warrant subordination of a claim irrespective of whether it was related to the

66

acquisition or assertion of that claim." *Id.* Second, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct." *Id.* at 701. Third, relating to the burden of proof, "an objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety." *Id.*

As to the first factor, inequitable conduct "is not limited to fraud, but includes even lawful conduct that shocks one's good conscience[.]" *In re Adler, Coleman Clearing Corp.*, 277 B.R. at 563 (citing *80 Nassau Assocs.*, 169 B.R. at 837). Such conduct includes "a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *80 Nassau Assocs.*, 169 B.R. at 837 (quoting *In re Tampa Chain Co.*, 53 B.R. 772, 779 (Bankr. S.D.N.Y. 1985)).

It is well-settled that the doctrine of equitable subordination applies to "general creditors" or "'non-insiders,' though the circumstances warranting equitable subordination of a non-insider's claim arise less frequently . . . ." *In re LightSquared*, 511 B.R. at 348; *Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp.* (*In re Lois/USA, Inc.*), 264 B.R. 69, 134-35 (Bankr. S.D.N.Y. 2001); *80 Nassau Assocs.*, 169 B.R. at 838. "Unless the non-insider has dominated or controlled the debtor to gain an unfair advantage, the type of inequitable conduct that justifies subordination of a non-insider's claim is 'breach of an existing, legally recognized duty arising under contract, tort or other area of law.'" *In re LightSquared*, 511 B.R. at 348 (quoting *80 Nassau Assocs.*, 169 B.R. at 840); *see In re Aeropostale, Inc.*, 555 B.R. 369, 398 (Bankr. S.D.N.Y. 2016). "In commercial cases, the proponent must demonstrate a

67

substantial breach of contract and advantage-taking by the creditor." *80 Nassau Assocs.*, 169

B.R. at 840.  Absent a contractual breach, "the proponent must demonstrate fraud,

misrepresentation, estoppel or similar conduct that justifies the intervention of equity." *Id.*; *see*

*also In re LightSquared*, 511 B.R. at 348; *In re Kalisch*, 413 B.R. at 133 ("In cases of non-insider

equitable subordination . . . the proponent of subordination has the burden of proving, among

other things, that the claimant engaged in egregious, improper or wrongful conduct that damages

creditors.").

As to the second factor, the claimant's conduct must cause injury "to the debtor or its

creditors, or result[] in an unfair advantage to the claimant." *In re LightSquared*, 511 B.R. at 349

(citing *Mobile Steel*, 563 F.2d at 700–01).  While this prong is stated in the disjunctive, some

courts have required that both injury *and* an unfair advantage to the claimant be shown. *See In*

*re LightSquared*, 511 B.R. at 347 n.152 (citing *Nisselson v. Softbank AM Corp.* (*In re MarketXT*

*Holdings Corp.*), 361 B.R. 369, 388 (Bankr. S.D.N.Y. 2007).  Equitable subordination is "a

remedial measure designed to offset harm" and "is not penal in nature." *In re LightSquared Inc.*,

511 B.R. at 349.  Thus, a claim should be subordinated "only to the extent necessary to offset the

harm which the bankruptcy and its creditors suffered on account of the inequitable conduct." *In*

*re Sunbeam Corp.*, 284 B.R. at 364.

As to the third and final prong of the *Mobile Steel* test, it requires that equitable

subordination of the claim be consistent with the Bankruptcy Code. *See Mobile Steel*, 563 F.2d

at 700.  This factor acknowledges that a bankruptcy court's equitable powers are "not boundless"

and cannot be used "to disregard unambiguous statutory language of the Bankruptcy Code." *In*

*re Enron*, 333 B.R. at 218–19.

As Courts differentiate between insiders and outsiders when analyzing whether conduct is inequitable, the Court will address the insider question here first. *See Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P.*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (noting that whether the creditor is an insider is the most important factor). Based on the entire evidentiary record and consistent with the Court's earlier findings, the Court first concludes that the Defendants are not insiders for purposes of equitable subordination. *In re A. Tarricone, Inc.*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002) (in determining non-statutory insider, courts look to the closeness of the relationship and whether the transactions were done at arms' length); *Broadstripe*, 444 B.R. at 80 (noting that courts have looked at various factors in determining insider status including "whether the creditor 1) attempted to influence decisions made by the debtor; 2) selected new management for the debtor; 3) had special access to debtor's premises and personal; 4) was the debtor's sole source of financial support; 5) generally acted as a joint venture or prospective partner with the debtor rather than an arm's length creditor; 6) control over the debtor's voting stock; 7) managerial control, including personnel decisions and decisions as to which creditors should be paid; 8) whether the relationship between the debtor and lender was the result of an arm's-length transaction."). Using the eight factors in *Broadstripe* as a guide, the Plaintiffs here have clearly failed to satisfy factors 2, 3, 5, 6, 7, and 8. As to factor 1, the Defendants did provide advice and comments to the Debtors—often at the Debtors' request—but that advice was sometimes not followed. As to factor 4, the Defendants were the only lender used by the Debtor but the record reflects that the Debtors actively searched for other financial backers and ultimately choose the Defendants financing as in their best interest. Considering these eight factors as well as all the other facts and circumstances set forth in the prior analysis, the Court finds that the Defendants were not insiders. *See Pan Am. Corp. v.*

*Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994) ("Courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and the term 'insider' must be flexibly applied on a case-by-case basis.") (cited in *Broadstripe*, 444 B.R. at 79 n.62); *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262-63 (Bankr. S.D.N.Y. 2002) (insider analysis is fact intensive one).

Evaluating the Defendants conduct as a non-insider, therefore, the Court concludes that the Plaintiffs have failed to establish inequitable conduct for purposes of equitable subordination. More specifically, the Court finds that Defendants did not breach the parties' written agreements, breach a fiduciary duty to the Debtors, or become enriched through unconscionable, unjust, unfair, close or double dealing or foul conduct. *See 80 Nassau Assocs.*, 169 B.R. at 837. And consistent with the Court's previous discussion of the reserve accounts, the Court does not find the Defendants' behavior as to those accounts is a basis for equitable subordination.

Last but not least, the Court also rejects the Plaintiffs' reliance on a purported loan-to-own strategy by the Defendants as a basis for equitable subordination. As a threshold matter, the Court finds the Plaintiffs' complaints now about the Lenders' involvement in the Project to be inconsistent with the Plaintiffs' clear desire and excitement at the time of the Project about having the Defendants involved, with the parties going so far as to memorialize the scope of Defendants' cooperation in the Option Agreement. In any event, the credible evidence is that the Lenders wished to be repaid—first and foremost. The Lenders did not take advantage of an opportunity to foreclose on Gamma 1, which largely eviscerates the Debtors' loan-to-own argument. J. Kalikow Decl. ¶¶ 50-51. The Defendants also have presented a number of credible explanations about why they would not take a loan-to-own path here, including the views of their anchor investor Mr. Nguyen. *See* Nguyen Decl. ¶¶ 6-9. Indeed, a loan-to-own strategy appears

to be inconsistent with the Defendants' usual approach.  Ezyenberg Decl.  ¶¶ 62-75; N.R.

Kalikow Decl. ¶ 8.

The Plaintiffs place too much reliance on the investor letters for their loan-to-own theory.

Taken as a whole, the investor letters show that the Lenders carefully tracked the project and

considered all their options as they went along.  And any lender must always contemplate the

possibility of foreclosing on their collateral if things do not go well—this is a day-to-day reality

of cases here in the Bankruptcy Court.  The Lenders here would have been particularly foolish

not to consider and plan for this possibility given that this financing involved risk much greater

than your average loan, as evidenced by the fact that traditional lenders were unwilling to fund

the Project.

## 6.  **FRAUDULENT CONVEYANCE (COUNT 24)**

The Debtors assert that (i) the December PNA, and (ii) the $713,333 transfer that the

Defendants caused to be paid from the Acquisition Loan to themselves for the benefit of the New

Mezz Loan, can both be avoided as constructively fraudulent conveyances pursuant to Section

548(a)(1)(B) of the Bankruptcy Code.

"Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer [by a debtor] made

within [two] year[s] of [the] debtor's petition date may be avoided if such transfer was made for

less than reasonably equivalent value and at the time of the transfer the debtor was insolvent, had

an unreasonably small capital or incurred or believed it would incur debts beyond its ability to

pay." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 398

(Bankr. S.D.N.Y. 2007).  The party seeking to avoid the transfer bears the burden to prove the

elements of constructive fraud by a preponderance of the evidence.  *Schneider v. Barnard*, 508

B.R. 533, 548 (E.D.N.Y. 2014). The Court concludes that the Plaintiffs have not satisfied their

burden of proof on this claim.

### A) <u>Insolvency</u>

Addressing the question of insolvency first, the Debtors assert that at the time of the

December PNA, they had no source of liquidity to fund their operations or from which to pay off

the Gamma 2 Financing and were therefore unable to pay their debts as the came due.

For purposes of constructive fraudulent conveyance, "insolvency is determined by the

'balance sheet test,' in other words whether the debtor's assets were exceeded by her liabilities at

the time of the transfer." *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006) (citing

11 U.S.C. § 101(32)(A)); *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 174

(Bankr. S.D.N.Y. 1998); *Durso Supermarkets v. D'Urso (In re Durso Supermarkets, Inc.)*, 193

B.R. 682, 701 (Bankr. S.D.N.Y. 1996)). "Generally, there must be some sort of financial data or

analysis provided so that the court can infer the company's liabilities exceeded its assets at the

time the transfers in question took place." *O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460

B.R. 379, 394 (Bankr. S.D.N.Y. 2011). "The calculation of insolvency is often technical and

will require expert testimony as to the value of the assets and the exposure on the liabilities.

Although accounting values are useful, they are not determinative, and although insolvency at a

later time may be indicative of insolvency at an earlier time, the facts and circumstances of the

case will determine whether the trier of fact will accept the inference." 5-548 Collier on

Bankruptcy P 548.05; *see also Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979)

("Insolvency is . . . a factual question. . . . [A] finding on the issue of insolvency often depends

upon the factual inferences and conclusions of expert witnesses. . . .").

The Court concludes that, as a factual matter, the Debtors have failed to satisfy the requirements of Section 548(a)(1)(B). The Debtors have not offered sufficient evidence to meet their burden of establishing insolvency, but instead have merely provided scattered and anecdotal information. For example, the Debtors argue that the Defendants were aware at the time of the transfer that other creditors were not being paid. As support, the Debtors cite to the delayed release of funds to F+P from the Architecture and Engineering Reserve. DX-DY. But in those circumstances, the Debtors requested funds that exceeded those held in the contractually delineated reserve. The funding of that reserve and the release of those funds were governed by the terms of the contract. The Debtors have not explained the contractual question of the amount in the Architecture and Engineering Reserve and how the release of any funds relates to any insolvency calculation or otherwise satisfies Section 548(a)(1)(B). Moreover, the Debtors say nothing about the value of the Project as compared to their obligations. For all these reasons, they have failed to meet their burden.

While the Debtors offered some testimony about the Debtors' books and records from Mr. DeLuise of Cohn Reznick, his testimony was insufficient to establish insolvency. *See Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (expert testimony utilized on the question of insolvency). He did not appear to offer an opinion on that issue and his analysis was far too superficial to meet the Plaintiffs' burden. Moreover, the Debtors' own allegations on valuation appear inconsistent with this cause of action. Their Complaint alleges valuations for the Project as of February 2016 in excess of the Defendants' claims. *See* Compl. at 2 ("The Project is valued at $181 mm 'as is,' $256 mm 'fully massed,' $277 mm with a completed foundation and over $1 billion 'as completed.'"). *See Lippe v. Bairnco Corp.*, 230 B.R. 906, 915 (S.D.N.Y. 1999) (dismissing fraudulent conveyance claim under New York state insolvency law for

73

insufficiency of pleading where complaint alleged in conclusory manner that debtor was
insolvent but the allegation was contradicted by more specific allegations in the complaint).
These valuations also negate a claim of unreasonably small capital because the Debtors could
have refinanced under such circumstances. *See, e.g.*, *Adelphia Recovery Tr. v. FPL Grp., Inc.
(In re Adelphia Communications Corp.)*, 2016 U.S. App. LEXIS 10790, at *5-6 (2d Cir. June 15,
2016) (ability to refinance is relevant to unreasonably small capital test under Pennsylvania
UFTA).

### B)  <u>Reasonably Equivalent Value</u>

While the fraudulent conveyance claim fails because the Debtors have not established
insolvency, the Plaintiffs also falter on the question of reasonably equivalent value. The Debtors
argue that the December PNA purported to grant the Defendants a release of certain claims that
the Plaintiffs held against the Defendants. The Debtors argue that in exchange for the releases,
the Defendants merely agreed to meet with the Debtors and at such meeting, despite the
December PNA, refused to negotiate with the Debtors. The Debtors therefore that they did not
receive reasonably equivalent value in exchange for the releases. As a matter of law, "[a] release
obtained for less than fair value can constitute a constructive fraudulent conveyance." *Nisselson
v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 399 (Bankr. S.D.N.Y.
2007); *see also Davis v. Eastman Kodak Co.*, 2007 U.S. Dist. LEXIS 23193, at *33 (W.D.N.Y.
Mar. 29, 2007) (a contract for the release of a claim is void unless it is supported by
consideration) (citing *Chaput v. Unisys Corp.*, 964 F.2d 1299, 1301 (2d Cir. 1992)).

But the Court disagrees with the Plaintiffs. The Debtors did receive fair consideration in
the form of the opportunity to engage in workout negotiations with the Defendants and avoid the
potential of an immediate default, acceleration and foreclosure. In return, the Debtors

surrendered the opportunity to pursue any claims that the Debtors might have had.  Indeed,

courts have concluded that such indirect benefits can constitute reasonably equivalent value.

*See, e.g.*, *Vargas Realty Enters. v. CFA W. 111 St., L.L.C. (In re Vargas Realty Enters.)*, 440

B.R. 224, 237 (S.D.N.Y. 2010) ("Appellants' execution of the Pre-Negotiation Agreement in

exchange for Appellee's agreement to engage in settlement negotiations served as valid

consideration."); *Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp. (In re Join-In Int'l

(U.S.A.) Ltd.)*, 56 B.R. 555, 560 (Bankr. S.D.N.Y. 1986) (in determining reasonably equivalent

value, "the court should not only consider the direct benefits conferred upon the debtor but the

indirect benefits as well").  Relatedly, the Defendants also correctly argue that the Debtors have

made no effort to value the benefits received by the Debtors or the consideration provided to the

Defendants under the December PNA.  *See, e.g.*, *Official Comm. of Unsecured Creditors

Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 353 (Bankr. S.D.N.Y.

2010) ("The Amended Complaint sets forth little more than a 'formulaic recitation of the

elements' of the section 548(a)(1)(B) claim. . . . In particular, there is a complete absence of facts

supporting the allegation that the Debtor received less than reasonably equivalent value in

exchange for the payments made to Defendants.  Given such absence, the Court concludes that

the Committee's section 548(a)(1)(B) constructive fraudulent transfer claim has failed to survive

the motions to dismiss.") (internal citations and quotations omitted).

      Plaintiffs' suggest that there was no consideration here because the Defendants were

already obligated at this time to assist the Plaintiffs under the Option Agreement.  This argument

fails because the parties to the Option Agreement and the December PNA are different.

Moreover, the two agreements do not cover the same things.  The Option Agreement obligates

Gamma Real Estate to "endeavor to cooperate with and consult with Beninati," concerning

certain specific matters: "efforts to raise debt and equity for the Project, formulating a Project Budget and consulting on value engineering, construction issues and design elements for the Project." DX-BA § 5(a). The scope of the discussions contemplated by the December PNA are far broader, including matters generally related to the Gamma 2 loans, the administration of the reserve accounts, and efforts to obtain fee title to the 426 Property. *See* DX-GA.

The Debtors also argue the sum of $713,333 that was made after closing on the Gamma 2 Financing on account of interest on the New Mezz Loan was a fraudulent conveyance. The Court initially notes that this argument is nowhere to be found in the Debtors' Complaint, which identifies the "Herrick Waiver Letter" as the only alleged fraudulent conveyance (and even that term is undefined in the Complaint). But the Herrick Waiver Letter is not addressed as a fraudulent transfer in either the Plaintiffs' Pretrial Brief or Proposed Findings of Fact. This highlights the Debtors' constantly evolving theories throughout this case and even during this trial, which frustrates the Court's ability to identify the matters truly in dispute in a far ranging litigation such as this. As to the $713,333, the Debtors rely on the Declaration of Kevin DeLuise, which states simply that "[i]t appears that Sutton Owner DE paid interest to the June Mezz Loan in the amount of $713,333. I am unable to determine whether this was a dividend, distribution or other payment to the Sutton Mezz Debtor." DeLuise Decl. ¶ 31. The Court finds this testimony to be inconclusive at best, and wholly unhelpful in meeting the Debtors burden to establish whether reasonably equivalent value was received with respect to these monies when the Court does not even know the nature of the alleged "transfer." To the extent that it is even proper for the Court to consider this argument about the $713,333, the Court finds it lacking.

## 7. **CRIMINAL USURY (COUNT 11)**

The Debtors assert that the Building Loan is criminally usurious under New York Penal Law. The Debtors assert that the principal amount of the Building Loan is $1,400,000. While the Building Loan Agreement has a stated interest rate of 6% per year, the Debtors cite to the "additional interest" in the amount of $280,000 due at maturity or upon prepayment. The Debtors divide the "additional interest" amount over the loan's seven-month term, to reach an effective annual interest rate on the Building Loan is 38%. Such a rate qualifies as criminally usurious under New York law as it is well in excess of the statutory maximum rate of 25%.

Section 190.40 of the New York Penal law states, in part, that:

A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

N.Y. Penal Law § 190.40. Thus, "criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance." *Hufnagel v. George*, 135 F. Supp. 2d 406, 407 (S.D.N.Y. 2001). The criminal usury statute is limited to loans that are under the amount of $2.5 million. *See* N.Y. Gen. Oblig. Law § 5-501(6)(b). "There is a strong presumption against a finding of usury, and . . . the defendant [must] establish usury by clear and convincing evidence." *Sabella v. Scantek Med., Inc.*, 2009 U.S. Dist. LEXIS 88170, at *45 (S.D.N.Y. Sept. 21, 2009) (quoting *Zhavoronkin v. Koutmine*, 860 N.Y.S.2d 561, 562 (App. Div. 2d Dep't 2008)).

The Defendants assert that the criminal usury statute does not apply to the loan in question because the Building Loan must be viewed as part of the Gamma 2 Financing which totaled $145.85 million and is therefore exempt from the criminal usury statute since it exceeded

77

the $2.5 million threshold.  The Debtors acknowledge that New York law allows for the

aggregation of loans for purposes of the criminal usury statute.  *See* Plaintiffs' Pre-Trial Brief at

36 ("Loans pursuant to 'a written agreement' can be aggregated for the purpose of New York's

exemption to the usury statute.").  Specifically, Section 5-501(6)(b) of New York General

Obligations Law provides that

> Loans or forbearances aggregating two million five hundred thousand dollars or
> more which are to be made or advanced to any one borrower in one or more
> installments pursuant to a written agreement by one or more lenders shall be
> deemed to be a single loan or forbearance for the total amount which the lender or
> lenders have agreed to advance or make pursuant to such agreement on the terms
> and conditions provided therein.

N.Y. Gen Oblig. Law § 5-501(6)(b).  But the Building Loan does not appear to meet the

admittedly less than clear language of the statute.  The Building Loan Agreement was a separate

contract from the Acquisition Loan Agreement and the Mezz Loan Agreement.  Case law in this

jurisdiction has interpreted the language "a written agreement" in Section 5-501(6)(b) to refer to

"one written agreement."  *Tripoint Glob. Equities, LLC v. Fasolino*, 2013 WL 5677126, at *5

(S.D.N.Y. Oct. 18, 2013) (finding a loan met the elements of Section 5-501(6)(b) because "two

loans, one from CIP and one from Grover, were extended to one borrower, Fasolino, in one

written agreement, i.e., the Loan Agreement.").  Additionally, the Building Loan seems to have

been treated as separate and distinct for the following reasons:

1. The Gamma 2 Financing consolidated all of the promissory notes executed
   by the fee owner into a single Amended, Restated and Consolidated
   Promissory Note, except for the Building Loan.

2. There were two separate Cash Collateral Agreements executed with respect
   to the Gamma 2 Financing. One agreement included an interest reserve for
   both the Acquisition Loan and the Mezz Loan. The second agreement
   provided for an interest reserve only for the Building Loan.

3. The parties agreed to a building loan agreement to prevent the filing of
   additional liens against the Property.

4.  The Building Loan was intended to fund separate and distinct items from the Acquisition Loan and the New Mezz Loan.

The Lenders did not argue in any of their briefing that the integrated transaction doctrine should apply here so as to consider all of the agreements under Gamma 2 as one transaction, although they did suggest as much when asked at closing. *See, e.g.*, *Pereira v. WWRD US, LLC*, 500 B.R. 371, 379-80 (Bankr. S.D.N.Y. 2013) (applying integrated transaction doctrine in context of fraudulent conveyance). In any event, as the issue is addressed in the language of Section 5-501(6)(b), it is not clear that there is room for the application of that doctrine since the New York State legislature has already spoken on the issue.

The Defendants next argue that they lack the requisite intent. Section 190.40 of the New York Penal Law states that someone is guilty of criminal usury when that person "knowingly charges" an interest rate in excess of 20%. N.Y. Penal Law § 190.40. The Defendants argue that Section 8.15 of the Building Loan Agreement negates the necessary intent, because it states that if the usury laws are ever deemed applicable to the loan, "then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt." Building Loan Agreement § 8.15 (emphasis added). The Defendants argue that this clause, known as a "usury savings clause" or a "usury avoidance clause" may be credited as a statement of intent.

One of the cases on which the Defendants rely for support is *Hillair Capital Investments v. Integrated Freight Corporation*, 963 F. Supp. 2d 336 (S.D.N.Y. 2013). But that case stated only that "[u]nder New York law, the 'usury avoidance clause' does not, by itself, save an agreement from a charge of usury, [though it] may be relevant to the issue of intent." *Id.* at 338-339 n.1. And other cases cast doubt on the Defendant's intent argument. Specifically, the intent element of the statute "does not require proof of specific intent; 'A loan is usurious if the

79

lender intends to take and receive a rate of interest in excess of that allowed by law even though

the lender has no specific intent to violate the usury laws.'"  *Sabella v. Scantek Med., Inc.*, 2009

U.S. Dist. LEXIS 88170, at \*46 (S.D.N.Y. Sept. 21, 2009); *see also Brodie v. Schmutz (In re*

*Venture Mortg. Fund, L.P.)*, 282 F.3d 185, 188 (2d Cir. 2002) ("[T]he application of New

York's usury statutes does not depend upon a finding of intent.  A loan is usurious if the lender

intends to take and receive a rate of interest in excess of that allowed by law even though the

lender has no specific intent to violate the usury laws."); *Hufnagel v. George*, 135 F. Supp. 2d

406, 407 (S.D.N.Y. 2001) ("The first element requires proof of the general intent to charge a

rate in excess of the legal rate rather than the specific intent to violate the usury statute. . . .

Accordingly, the borrower satisfied his prima facie burden of proving usury by showing that the

note given to the lender evidences a loan and reserves an illegal rate of interest. . ."). The level

of intent contemplated by the case law is satisfied here, particularly given the level of

sophistication of the Defendants.

The Defendants argue that even if the Building Loan is found to be usurious, the New

York criminal usury statute does not authorize the voiding of the loan.  This issue was first

addressed in dicta by the Second Circuit in *Brodie v. Schmutz (In re Venture Mortg. Fund,*

*L.P.)*, 282 F.3d 185 (2d Cir. 2002).  In *Venture Mortgage*, the Court of Appeals noted that the

only reference to the voiding of a usurious loan is contained in Section 5-511 of the New York

General Obligations Law, which operates to void loans that violate the *civil* usury statute.  *See*

*id*. at 189 (citing N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a).  But the

civil usury statute by its terms applies to loans of less than $250,000 and is therefore

inapplicable to this case.  *See id*.  Nothing contained in the *criminal* usury statute, N.Y. Penal

Law § 190.40, provides for voiding.  And as the Court of Appeals noted, it is unclear whether

the New York State Legislature intended for criminally usurious loans to be voided.  *See*

*Venture Mortg.*, 282 F.3d at 189.  The Court of Appeals observed that

> the larger the loan transaction, the less likely it is that the borrower needs or
> deserves financial protection; moreover, the greater the amount of forfeiture, the
> more unsettling it becomes to financial arrangements.  As the New York courts
> have recognized, the consequences to a lender of voiding a usurious loan
> transaction are harsh: the borrower is relieved of all further payment--not only
> interest but also outstanding principal, and any mortgages securing payment are
> cancelled. In effect, the borrower can simply keep the borrowed funds and walk
> away from the agreement. . . . Presumably for these reasons, no New York usury
> law prohibits, voids, or regulates transactions over $ 2.5 million, a financial plane
> above which all players apparently are deemed to be able to fend for themselves.

*Venture Mortg.*, 282 F.3d at 189 (internal citations and quotations omitted).  *Venture Mortgage*

suggested the alternative remedies of "a cancellation of the interest obligation but not the

obligation to pay principal, or . . . a revised obligation to pay a non-usurious rate. . . ."  *Id*. at 189

n.3.  More recent cases after *Venture Mortgage* have refused to void loans that violate the New

York criminal usury provision but instead contemplate using a non-usurious rate.  *See Prof.*

*Merch. Advance Capital, LLC v. C Care Servs., LLC*, 2015 U.S. Dist. LEXIS 92035, at *14 n.4

(S.D.N.Y. July 15, 2015) ("If the Court were to find that the Agreement contravened New

York's criminal usury law, the Court would nevertheless not void the Agreement *ab initio*, but

would rather revise the interest obligation to require a non-usurious rate.") (referencing *Venture*

*Mortgage*); *In re Merhi*, 518 B.R. 705, 719 (Bankr. E.D.N.Y. 2014) ("There is no private cause

of action for violations of [N.Y. Penal Law] § 190.40.") (referencing *Venture Mortgage*); *Koenig*

*v. Slazer Enters.*, 910 N.Y.S.2d 405, 405 (Sup. Ct. Rockland Cty. 2010) (while loans fit

definition of criminal usury, "there is nothing in the General Obligations Law or Penal Law that

requires that the Court deem these transactions void") (referencing *Venture Mortgage* and recent

state cases); *Funding Grp., Inc. v. Water Chef, Inc.*, 852 N.Y.S.2d 736, 743 (Sup. Ct. N.Y. Cty.

2008) ("There is no specific statutory authority for voiding a loan that violates the criminal usury

statute."). The Debtors cite to *Blue Wolf Capital Fund II v. Am. Stevedoring, Inc.*, 961 N.Y.S.2d 86 (App. Div. 1st Dep't 2013), to support their position that the Building Loan should be voided, but *Blue Wolf* does not address the issues raised in *Venture Mortgage*.

Following the reasoning of the Second Circuit in *Venture Mortgage* and subsequent decisions, this Court will not hold the Building Loan void *ab initio*. Instead, considering the sophistication of the parties here and all the facts and circumstances of this case, the Court finds the appropriate remedy is to revise the interest obligation on the Building Loan to an appropriate non-usurious rate.[9] *See, e.g.*, *Prof. Merch. Advance Capital*, 2015 U.S. Dist. LEXIS 92035, at *14 n.4 (citing *Carlone v. The Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312, 323 (S.D.N.Y. 2012)); *cf. Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).

## CONCLUSION

For the reasons stated above, the Court grants the Defendants judgment on all the remaining counts of the Complaint except Count 11, where the Court rules in favor of the Plaintiffs. Consistent with the Court's discussions with the parties at closing, the Court's ruling applies with equal force to the proof of claim filed by the Lenders and any potential objection to that claim. The Court has attempted to address the parties' arguments in the individual claims where the arguments were raised. But as there were thirteen counts to be considered and many, many more arguments raised—most of which relate to one another—the Court's conclusions on a specific argument for one obviously apply to all the other related counts. Moreover, the Court rejects as meritless any other arguments in favor of relief that have not been specifically

---

[9]    After the bench ruling on November 30, 2016, the Lenders agreed to waive their entitlement to interest on the Building Loan, thus resolving the issue of what would constitute an appropriate non-usurious interest rate.

addressed in this ruling.  With respect to Count 11, there is no need to determine an appropriate

remedy as the Lenders have agreed to waive their entitlement to interest on the Building Loan.

The Defendants are to settle an order on three days' notice.  The proposed order must be

submitted by filing a notice of the proposed order on the Case Management/Electronic Case

Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of

the notice and proposed order shall also be served upon counsel for the Plaintiffs.

Dated: New York, New York
       December 1, 2016

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE